IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| THE MAIDS INTERNATIONAL, LLC, | Civil Action No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| RAISING DREAMS GROUP LLC and DERK WALLACE, | |
| Defendants. | |

## INTRODUCTION

1.     Plaintiff The Maids International, LLC ("Plaintiff" or "TMI" or "Franchisor") is a national franchisor of The Maids® franchises, which offer a variety of household maintenance and cleaning services under the trademark The Maids®. Defendant Raising Dreams Group LLC ("Raising Dreams") is a former franchisee, subject to the terms and conditions of a Franchise Agreement pursuant to which it obtained the right and undertook the obligation to operate a The Maids® franchised business in Bexar County, Texas. Defendant Derk Wallace ("Wallace") is the owner and operator of Raising Dreams and the personal guarantor under the Franchise Agreement. The Franchise Agreement was terminated on August 15, 2025, for Defendants' abandonment of the franchised business, failure to submit gross revenue reports, and failure to pay royalties and other recurring fees and payments due to TMI under the Franchise Agreement. Defendants continue to utilize Plaintiff's trademarks, confidential system and proprietary information in the operation of a competitive business. Defendants have violated the in-term non-competition covenant and post-term non-competition covenant of the Franchise Agreement. In addition to the breach of contract, Defendants are committing intellectual property theft with the use of Plaintiff's trademarks, confidential system, and proprietary information. Defendants also owe Plaintiff at least $127,323.00, representing unpaid royalties and fees, as well as lost future royalties and fees.

As such, Plaintiff commences this action to protect its valuable intellectual property by seeking an injunction to enjoin Defendants from operating the competitive business and using Plaintiff's intellectual property in the operation of the competitive business, as well as to recover the outstanding amounts owed, damages and attorneys' fees.

## PARTIES

2.    Plaintiff, The Maids International, LLC ("Plaintiff" or "TMI" or "Franchisor"), is a Nebraska limited liability company with its principal place of business located at 9394 West Dodge Road, Suite 140, Omaha, Nebraska 68114.

3.    At all times referred to herein, TMI has engaged in business as the national franchisor of The Maids® franchises, which offer household maintenance, cleaning, and related services to customers under the federally registered trademark, The Maids®.

4.    Defendant, Raising Dreams Group LLC, is a Texas limited liability company with an address of 24514 Elise Falls San Antonio, Texas 78255.

5.    Defendant, Derk Wallace, is an individual, resident, and citizen of Texas with an address of 24514 Elise Falls San Antonio, Texas 78255.

6.    Raising Dreams Group LLC is owned and operated by Defendant Derk Wallace.

7.    Collectively, Raising Dreams Group LLC and Derk Wallace are hereinafter "Defendants."

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1338 in that Plaintiff's claims against Defendants are based upon trademark infringement, unfair competition, and dilution under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

2

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that Plaintiff is a Nebraska limited liability company with its principal place of business in Nebraska, Defendant Derk Wallace is a citizen of Texas, and Defendant Raising Dreams Group LLC is a Texas limited liability company with its principal place of business in Texas. Plaintiff's claims exceed $75,000, exclusive of interest and costs.

10. Venue for this action is predicated upon 28 U.S.C. §1391(b) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

**TMI'S INTELLECTUAL PROPERTY**

11. TMI is the owner and licensor of trademarks registered with the United States Patent and Trademark Office on the Principal Register as follows (the "Marks"):

| Mark | | Registration No. | Registration Date | Type of Mark |
|---|---|---|---|---|
| THE MAIDS | THE MAIDS | 2,247,181 Principal Register | 05/25/1999 | Service Mark |
| THE MAIDS and Star Design | The Maids | 4,197,823 Principal Register | 08/28/2012 | Service Mark |
| 22-STEP HEALTHY TOUCH | 22-Step Healthy Touch® Deep Cleaning System | 4,198,603 Principal Register | 08/28/2012 | Service Mark |
| REFERRED FOR A REASON | Referred for a reason.® | 3,993,901 Principal Register | 07/12/2011 | Service Mark |

12. TMI provides to franchisees a comprehensive business model that includes the TMI Marks, know-how relating to services and products, confidential information, training and assistance, advertising and marketing, sales techniques, brand standards and operations specifications, promotional and training programs, and coaching materials (the "System").

13. TMI owns the rights to the Marks and System.

14. TMI and franchisees are licensed to use the Marks and System to operate a franchised business pursuant to the terms and conditions of the TMI franchise agreement entered into by each franchisee.

15.     TMI exhausts great efforts to protect the Marks and System, which is disclosed to TMI franchisees in confidence.

## THE FRANCHISE AGREEMENT

16.     In exchange for franchisees' payment to TMI of an initial franchise fee and continuing fees throughout the term of the Franchise Agreement and franchisees' compliance with the terms and conditions of the franchise agreement, TMI licenses individuals and entities the right to own and operate The Maids® franchised businesses that offer a variety of household maintenance and cleaning services under the trademark The Maids®.

17.     Raising Dreams entered into a Franchise Agreement with TMI on July 24, 2020, pursuant to which Raising Dreams obtained the right and undertook the obligation to operate a The Maids® franchised business in or around Bexar County, Texas, as further described in Exhibit A thereto (the "Franchised Business"), for an initial term of ten (10) years (the "Franchise Agreement"). A true and correct copy of the Franchise Agreement is attached as **Exhibit A**.

18.     As a condition to entering into the Franchise Agreement, Wallace entered into a Personal Guaranty Agreement binding him, as an individual, to all terms, conditions, and obligations of Raising Dreams under the Franchise Agreement (the "Personal Guaranty"). *See id.* at 47-48.

19.     Pursuant to Section 4.2 of the Franchise Agreement, Defendants acknowledged the Marks were licensed to Defendants for the Franchised Business. *See* Exhibit A at § 4.2. Defendants acknowledged that their "right to use the Marks and the System applies only to the Franchised Business within the Designated Market Area and such rights will exist only so long as the Franchisee fully performs and complies with all of the conditions, terms and covenants of [the Franchise] Agreement." *See id.* Defendants acknowledged and agreed that they had the "right to

4

use the Marks and the System only in the manner prescribed, directed and approved by TMI in writing." *See id.*

20.     Pursuant to Section 8 of the Franchise Agreement, Defendants acknowledged that the proprietary information and other confidential data and information (including but not limited to the contents of the confidential standard operation manuals) have been provided or revealed to Raising Dreams, as a franchisee, and Wallace, as the owner and operator of Raising Dreams and as the personal guarantor, exclusively for use in connection with the Franchised Businesses (the "Trade Secrets"). *See* Exhibit A at § 8. Defendants acknowledged the Trade Secrets were revealed in confidence under the Franchise Agreement and agreed to keep and respect the confidences so reposed, both during the term and after the term. *See id.*

## NON-COMPETITION COVENANTS

21.     Pursuant to Section 19.2 of the Franchise Agreement, Defendants agreed to abide by and comply with in-term non-competition covenants. The relevant part the covenant reads as follows:

> TMI has advised the Franchisee that this provision is a material provision of this Agreement, and that TMI will not sell a The Maids® franchise to any person or entity that does or intends to own, operate or be involved in a business that competes directly or indirectly with a The Maids® Business. Consequently, the Franchisee, the holders of all Ownership Interests in the Franchisee and the Personal Guarantors will not, during the term of this Agreement, on their own account or as an employee, agent, consultant, partner, officer, director, member or shareholder of any other person, firm, entity, partnership or corporation, own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in, or assist any person or entity engaged in any business that is in any way competitive with (including, but not limited to, over the Internet) or similar to The Maids® Business, except with the prior written consent of TMI. For purposes of this Article 19 and the other Articles of this Agreement, any business that is involved or engaged in any fashion in the home services, cleaning or maintenance of the interior or exterior of any residential or commercial structure or facility is competitive to a The Maids® Business.

*See* Exhibit A at § 19.2.

22.    Pursuant to Section 19.3 of the Franchise Agreement, Defendants agreed to abide by and comply with post-term non-competition and non-solicitation covenants. The relevant parts of the covenants read as follows:

> The Franchisee, the holders of all Ownership Interests in the Franchisee and the Personal Guarantors will not, for a period of 18 months after the termination or expiration of this Agreement, on their own account or as an employee, agent, consultant, partner, officer, director, member or shareholder of any other person, firm, entity, partnership or corporation, without first obtaining the prior written consent of TMI,

> (A) own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in any or other related business that is in any way competitive with (including, but not limited to, over the Internet) or similar to The Maids® Business or a facet thereof, which is located (i) within the Designated Market Area, (ii) within the territories of any other The Maids® Businesses operated by TMI or any of its franchisees, (iii) within any development area granted to any other person or entity by TMI pursuant to a development agreement, sub-franchise agreement or other agreement, (iv) within 20 miles of any of the areas described in (i), (ii) or (iii) above, or (v) over the Internet; or

> (B) divert or attempt to divert any existing or potential business or customers of TMI or any The Maids® Franchisee; or

> (C) solicit or perform maintenance or cleaning services for any customer for whom or which such services was performed by the Franchisee under The Maids® service marks, trademarks and System during the term of this Agreement.

*See* Exhibit A at § 19.3.

## DEFENDANTS' OPERATION OF THE COMPETITIVE BUSINESS AND USE OF TMI'S TRADEMARKS AND SYSTEM IN THE COMPETITIVE BUSINESS

23.    During the term of the Franchise Agreement, Defendants serviced clients of the Franchised Business and collected gross revenues for residential cleaning and maintenance services but failed to submit to Franchisor gross revenue reports associated with such clients and services.

24.    During the term of the Franchise Agreement, Defendants consistently failed to pay when due Continuing License Fees, Advertising Fund Fees, and Technology Innovation Fund Fees

6

owed to TMI under the Franchise Agreement.

25.     Defendants' failure to submit gross revenue reports as required under the Franchise Agreement limited Franchisor's rights to collect Continuing License Fees, Advertising Fund Fees, and Technology Innovation Fund Fees that are based on certain percentages of the Franchised Business's gross revenues.

26.     Therefore, during the term of the Franchise Agreement, Defendants used and leveraged TMI's System and Marks, including the goodwill associated therewith, to earn gross revenues without paying the royalties and other recurring fees and payments due to TMI under the Franchise Agreement.

27.     Defendants failed to comply with the contractual obligations and in-term non-competition covenants set forth in the Franchise Agreement.  *See* Exhibit A at § 19.2.

28.     Defendants notified TMI on August 14, 2025, that they had ceased operation of the Franchised Business (the "Notification of Closure"). A true and correct copy of the Notification of Closure is attached as **Exhibit B**.

29.     Defendants ceased operation and abandoned the Franchised Business before the expiration of the initial term, in violation of the Franchise Agreement.

30.     TMI issued the Defendants a Notice of Termination of Franchise Agreement on August 15, 2025 (the "Notice of Termination"), for Defendants unauthorized abandonment and closure of the Franchised Business, failure to submit gross revenue reports, and failure to pay to TMI royalties and other recurring fees and payments. The Notice of Termination terminated Defendants' rights under the Franchise Agreement, directed Defendants to pay all amounts owed to TMI within five (5) days, and set forth Defendants' post-term obligations pursuant to the

Franchise Agreement, including the non-competition and non-solicitation covenants. A true and correct copy of the Notice of Termination is attached as **Exhibit C**.

31.    Following the termination of the Franchise Agreement, and despite Defendants' clear post-term non-competition and non-solicitation obligations, Defendants continue to use TMI's confidential System and proprietary information to service clients and perform cleaning and maintenance services in the Franchised Business' prior territory and under The Maids® Marks.

32.    Defendants continue to direct and/or permit its employees and personnel to wear uniforms displaying The Maids® Marks and to use branded items in the performance of cleaning and maintenance services.

33.    Defendants failed to comply with the contractual obligations and post-term non-competition covenants set forth in the Franchise Agreement.  *See* Exhibit A at § 19.3.

34.    Defendants' operation of the competitive residential cleaning and maintenance business during the term of the Franchise Agreement and following termination of the Franchise Agreement is hereinafter referred to as the "Competitive Business."

35.    As outlined in the Notice of Termination, at the time of termination, Defendants owed TMI at least $3,600.00 in unpaid Continuing License Fees, Advertising Fund Fees, and Technology Innovation Fund Fees. *See* Exhibit C.

36.    At the time of termination, Defendants owed TMI $93,300.00 in lost future Continuing License Fees, $27,043.00 in lost future Advertising Fund Fees, and $3,380.00 in lost future Technology Innovation Fund Fees, for a total of $123,723.00 in lost future fees that would have been due to TMI had Defendants not abandoned and closed the Franchised Business before the expiration of the 10-year term in order to continue operating the Competitive Business without having to pay continuing fees to TMI.

37.     Defendants failed to pay all amounts owed to TMI within five (5) days of the Notice of Termination. Therefore, Defendants owe TMI at least $127,323.00.

## COUNT I
## TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

38.     Plaintiff TMI incorporates by reference the facts set forth in paragraphs 1 through 37 above as though set forth at length herein.

39.     Defendants have utilized and benefited from the Marks in operation of the Competitive Business without authorization from TMI.

40.     Defendants willfully intended to trade on TMI's reputation and cause dilution of the Marks.

41.     Defendants have committed trademark infringement pursuant to the Lanham Act, 15 U.S.C. §1051, *et seq*.  Defendants' usage of the Marks constitutes a false designation of origin and is likely to cause confusion, mistake or deception as to it being affiliated, connected or associated with TMI in violation of 15 U.S.C. §1125(a).  Defendants' conduct is also a violation of the common law of unfair competition and is an unfair trade practice under common law.

42.     Defendants' continued operation of the Competitive Business as set forth above has caused and will cause TMI irreparable injury in that customers are being deceived by Defendants as a result of their continued use of TMI's System and Marks; TMI will have difficulty franchising Defendants' trading areas, which includes the area TMI exclusively granted to Defendant Raising Dreams; business will be diverted from TMI's Marks; TMI's Marks will be diluted and taken from TMI's control; and TMI will lose profits and revenues which, because of Defendants' conduct, cannot be readily calculated.

43.     TMI has no adequate remedy at law because TMI cannot be adequately compensated for the deprivation and dilution of the consumer recognition and goodwill built up

under the Marks as a result of Defendants' conduct.

44.     TMI's immediate and irreparable harm will continue unless Defendants are enjoined from continuing to use of the Marks.

WHEREFORE, Plaintiff The Maids International, LLC demands judgment in its favor and against Defendant Raising Dreams Group LLC and Derk Wallace as follows:

      a.  A preliminary and permanent injunction enjoining Defendants and their agents, employees and any person acting in concert with them from utilizing the System and any trade secrets of Plaintiff TMI.

      b.  An accounting of and judgement for the profits to which Plaintiff TMI may be entitled as a result of Defendants' misappropriation.

      c.  Treble damages pursuant to 15 U.S.C. § 1117;

      d.  Punitive damages;

      e.  Attorneys' fees and costs of this action pursuant to Sections 6.10, 16.8, and 24.1 of the Franchise Agreement; and

      f.  Such further relief as this Court deems just and proper.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS

45.     Plaintiff TMI incorporates by reference the facts set forth in paragraphs 1 through 37 above as though set forth at length herein.

46.     Defendants made use of TMI's Marks and System through their operation of the Competitive Business and the offering of residential cleaning and maintenance services in the territory of the former Franchised Business.

47.     It is because of TMI's resources spent in educating Defendants in the TMI System that Defendants have the trade knowledge to continue operating the Competitive Business.

48. Defendants knowingly used and may continue to use TMI's System and Marks for economic benefit as they have operated and continue to operate the Competitive Business.

49. TMI is injured by Defendants' action by way of dilution of the Marks and Defendants' continued use of TMI's System.

WHEREFORE, Plaintiff The Maids International, LLC demands judgment in its favor and against Defendant Raising Dreams Group LLC and Derk Wallace as follows:

    a. A preliminary and permanent injunction enjoining Defendants and their agents, employees and any person acting in concert with them from utilizing the System and any trade secrets of Plaintiff TMI in any manner whatsoever;

    b. An accounting of and judgment for the profits to which Plaintiff TMI may be entitled as a result of Defendants' misappropriation;

    c. Punitive damages;

    d. Attorneys' fees and costs of this action pursuant to Sections 6.10, 16.8, and 24.1 of the Franchise Agreement; and

    e. Such further relief as this Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT – OPERATION OF COMPETITIVE BUSINESS AND VIOLATION OF THE IN-TERM NONCOMPETE COVENANT

50. Plaintiff TMI incorporates by reference the facts set forth in paragraphs 1 through 37 above as though set forth at length herein.

51. During the term of the Franchise Agreement, Defendants were required to comply with the in-term non-compete obligations set forth in Section 19.2 of the Franchise Agreement.

52. Defendants failed to comply with their in-term obligations by operating the Competitive Business and performing residential cleaning and maintenance services without

remitting to TMI the Continuing License Fees, Advertising Fund Fees, and Technology Innovation Fund Fees due under the Franchise Agreement.

53.    The acts, practices, and conduct of Defendants in operating the Competitive Business constitute a misuse of the Marks, confidential System and proprietary information.

54.    TMI has been harmed by Defendants' operation of the Competitive Business because the Competitive Business benefits from the use of TMI's Marks and System without Defendants paying the royalty and other recurring fees and payments due to TMI.

WHEREFORE, Plaintiff The Maids International, LLC demands judgment in its favor and against Defendant Raising Dreams Group LLC and Derk Wallace as follows:

a.    A preliminary and permanent injunction enjoining Defendants and their agents, employees and any person acting in concert with them from utilizing the Marks, the System and any trade secrets of Plaintiff TMI in any manner whatsoever;

b.    Attorneys' fees and costs of this action pursuant to Sections 6.10, 16.8, and 24.1 of the Franchise Agreement; and

c.    Such further relief as this Court deems just and proper.

## COUNT IV
## OPERATION OF COMPETITIVE BUSINESS AND VIOLATION OF THE POST-TERM NON-COMPETE COVENANT

55.    Plaintiff TMI incorporates by reference the facts set forth in paragraphs 1 through 37 above as though set forth at length herein.

56.    Defendant Raising Dreams is a former franchisee, subject to the non-compete provision set forth in Section 19.3 of the Franchise Agreement.

57.     Defendants are engaged in the business of operating a Competitive Business within the same territory that Defendants operated the Franchised Business and performing the same service offerings.

58.     The acts, practices, and conduct of Defendants in operating the Competitive Business constitutes a misuse of TMI's Marks, confidential System, and proprietary information.

59.     TMI has been and will continue to be irreparably harmed by Defendants' operation of the Competitive Business.

60.     Despite TMI's demand to comply with the non-compete, Defendants continue to operate the Competitive Business.

WHEREFORE, Plaintiff The Maids International, LLC demands judgment in its favor and against Defendant Raising Dreams Group LLC and Derk Wallace as follows:

a.   A preliminary and permanent injunction enjoining Defendants and their agents, employees and any person acting in concert with them from utilizing the Marks, the System and any trade secrets of Plaintiff TMI in any manner whatsoever;

b.   Attorneys' fees and costs of this action pursuant to Sections 6.10, 16.8, and 24.1 of the Franchise Agreement; and

c.   Such further relief as this Court deems just and proper.

### COUNT V
### BREACH OF CONTRACT –
### COVENANT OF GOOD FAITH AND FAIR DEALING

61.     Plaintiff TMI incorporates by reference the facts set forth in paragraphs 1 through 37 above as though set forth at length herein.

62.     Plaintiff TMI and Defendant Raising Dreams were parties to the Franchise Agreement.

63.     The Franchise Agreement was supported by adequate consideration, is legally binding, and represents TMI and Defendants' mutual assent.

64.     TMI performed its obligations as Franchisor under the Franchise Agreement.

65.     Defendants' operation of the Competitive Business diverted business from the Franchised Business and interfered with TMI's ability to collect royalty and other recurring fees and payments that are calculated based on a percentage of the gross revenues derived by the Franchised Business pursuant to the Franchise Agreement.

66.     Defendants profited from the operation of the Competitive Business, as they were able to collect gross revenues from the same service offerings of the Franchised Business but without remitting to TMI the royalty and other recurring fees and payments that are calculated based on a percentage of gross revenues derived by the Franchised Business pursuant to the Franchise Agreement.

67.     TMI has been and will continue to be irreparably harmed by the Defendants' operation of the Competitive Business.

WHEREFORE, Plaintiff The Maids International, LLC demands judgment in its favor and against Defendant Raising Dreams Group LLC and Derk Wallace as follows:

     a.  A preliminary and permanent injunction enjoining Defendants and their agents, employees and any person acting in concert with them from utilizing the Marks, the System and any trade secrets of Plaintiff TMI in any manner whatsoever;

     b.  Attorneys' fees and costs of this action pursuant to Sections 6.10, 16.8, and 24.1 of the Franchise Agreement; and

     c.  Such further relief as this Court deems just and proper.

## COUNT VI
## UNJUST ENRICHMENT

68.    Plaintiff TMI incorporates by reference the facts set forth in paragraphs 1 through 37 above as though set forth at length herein.

69.    Defendants are engaged in the business of operating a Competitive Business within the same territory that Defendants operated the Franchised Business and performing the same service offerings.

70.    In Defendants' operation of the Competitive Business, they continue to use TMI's Marks, confidential System, and proprietary information.

71.    Defendants' operation of the Competitive Business diverted, and continues to divert, business from the Franchised Business and interfered, and continues to interfere, with TMI's ability to collect royalty and other recurring fees and payments that are calculated based on a percentage of the gross revenues derived by the Franchised Business pursuant to the Franchise Agreement.

72.    Defendants profited from the operation of the Competitive Business, as they were able to collect gross revenues from the same service offerings of the Franchised Business but without remitting to TMI the royalty and other recurring fees and payments that are calculated based on a percentage of the gross revenues derived by the Franchised Business pursuant to the Franchise Agreement

73.    TMI has been and will continue to be irreparably harmed by the Defendants' operation of the Competitive Business.

WHEREFORE, Plaintiff The Maids International, LLC demands judgment in its favor and against Defendant Raising Dreams Group LLC and Derk Wallace as follows:

a. A preliminary and permanent injunction enjoining Defendants and their agents, employees and any person acting in concert with them from utilizing the Marks, the System and any trade secrets of Plaintiff TMI in any manner whatsoever;

b. An accounting of and judgement for the profits to which TMI may be entitled as a result of Defendants' operation of the Competitive Business;

c. Disgorgement of Defendants' profits that resulted from and continue to result from Defendants' operation of the Competitive Business;

d. Punitive damages;

e. Attorneys' fees and costs of this action pursuant to Sections 6.10, 16.8, and 24.1 of the Franchise Agreement; and

f. Such further relief as this Court deems just and proper.

Dated September 24, 2025.

THE MAIDS INTERNATIONAL, LLC, Plaintiff,

By:    */s/ Ryan M. Kunhart*
Ryan M. Kunhart, #24692
Dvorak Law Group, LLC
9500 W. Dodge Rd., Ste. 100
Omaha, NE  68114
402-934-4770
402-933-9630 (facsimile)
rkunhart@ddlawgroup.com

and

JoyAnn Kenny
(*pro hac vice to be filed*)
Fisher Zucker LLC
21 South 21st Street
Philadelphia, PA  19103
215-825-3100
215-825-3101 (facsimile)
jkenny@fisherzucker.com

Attorneys for Plaintiff.

16

DocuSign Envelope ID: C4D89F01-5A1A-4258-9A66-D0EC009105BF



**EXHIBIT**

**A**

## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (this "Agreement") is made and entered into to be effective as of this 24th _____ day of _____, 20__20__ by and between The Maids International, LLC, a Nebraska limited liability company ("TMI") and <u>Raising Dreams Group, LLC, a Texas limited liability company</u> ("Franchisee");

## R E C I T A L S:

WHEREAS, TMI has expended considerable time, effort, skill and financial resources in developing a business concept for operating businesses of a distinctive character and quality offering household maintenance and cleaning under the name "The Maids®" (the "System") and has publicized the name The Maids® to the public and other businesses as an organization of businesses operating under the System;

WHEREAS, TMI represents that it has the right and the authority to license the use of the name The Maids®, Mr. Clean® and certain other trademarks, trade names, service marks, slogans, logos and commercial symbols (the "Marks") for use in connection with the businesses operated in conformity with the System to selected persons, businesses or entities who will comply with TMI's uniformity requirements and quality standards;

WHEREAS, The Franchisee desires to operate a business using the name The Maids® and the other Marks (a "The Maids® Business") within the Designated Market Area set forth in Exhibit "A" in conformity with the System and TMI's uniformity requirements and quality standards as established and promulgated from time to time by TMI;

WHEREAS, The Franchisee has had a full and adequate opportunity to read and review this Agreement and to be thoroughly advised of the terms and conditions of this Agreement by an attorney or other personal advisor, and has had sufficient time to evaluate and investigate the System, the financial requirements and the economic and business risks associated with the System;

WHEREAS, TMI is willing to provide the Franchisee with marketing, advertising, operational and other business information and "know-how" regarding the operation of a The Maids® Business that has been developed by TMI over time and at a significant cost and investment to TMI;

WHEREAS, The Franchisee acknowledges that it would take substantial capital and human resources to develop a business similar to the Franchised The Maids® Business and as a result, desires to acquire from TMI the right to use the Marks and the System and to operate a The Maids® Business subject to and under the terms and conditions set forth in this Agreement; and

WHEREAS, The Franchisee acknowledges that TMI would not grant the Franchise to the Franchisee or provide the Franchisee with any business information or operational know-how about the Franchised Business and the System unless the Franchisee agreed to comply in all respects with the terms and conditions of this Agreement and to pay the Initial Franchise Fee, the Software Licensing Fee, the Continuing License Fees, all as defined below and the other fees and payments specified in this Agreement and any other agreements executed in connection with this Agreement.

1

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth in this Agreement and for other good and valuable consideration, the parties hereby contract as follows:

**ARTICLE 1**
**GRANT OF FRANCHISE**

1.1     **GRANT.**  TMI grants to the Franchisee, subject to the terms and conditions of this Agreement, the personal right and license to:

(A)     establish and operate one The Maids® Business ( the "Franchised Business") within the specific geographic area described on Exhibit A to this Agreement that has been authorized by TMI (the "Designated Market Area");

(B)     use the Marks under the terms and conditions of this Agreement to identify and promote the Franchised Business and the goods and services offered hereunder; and

(C)     use TMI's proprietary business methods, know-how, standards and requirements for the System as set forth periodically in TMI's Manuals, online media, video and audio tapes, compact discs, other manuals, training programs, The Maids® internet site or other communications to the Franchisee.

1.2     **PROTECTED AREA.**  So long as this Agreement is in full force and effect and Franchisee is not in default under any of the terms hereof, TMI will not operate, or grant to any other The Maids® franchisee the right to operate, a The Maids® Business within the Designated Market Area without the prior consent of the Franchisee.  TMI will have the absolute and unconditional right to grant other franchisees the right to use the name "The Maids®," the other Marks and the System outside of the boundaries of the Designated Market Area.  During the term of this Agreement and thereafter, TMI has the right to directly or indirectly sell any proprietary products that have been or may be developed by TMI to other persons, businesses or entities that are not The Maids® franchises through other methods of distribution (including, without limitation, the Internet) anywhere in the world, including the Designated Market Area.  TMI reserves all rights not specifically granted to Franchisee.

1.3     **TMI'S RIGHT TO ENTER PROTECTED AREA.**  Notwithstanding the provisions of Article 1.2 above, TMI may operate, or grant others the right to operate, a The Maids® Business within the Designated Market Area without the Franchisee's written permission, if:

(A)     the Franchisee fails to cure a breach of this Agreement after TMI gives the Franchisee written notice of the breach in accordance with Article 16 of this Agreement; or

(B)     TMI terminates this Agreement in accordance with Article 16 of this Agreement.

1.4     **DESIGNATED MARKET AREA/MULTIPLE FRANCHISE TERRITORIES.**
The Franchisee's Designated Market Area will be made up of one or more Franchise Territories.  A Franchise Territory consists of approximately 10,000 Potential Customers that meet TMI's then current demographic standards ("Potential Customers").  Each Franchise Territory is defined by population, relative affluence, geography of the area, and other demographic data including age, location and incomes of $75,000, $100,000, $150,000, and above.  The Designated Market described on Exhibit "A" of this Agreement consists of SIX Franchise Territories.



## ARTICLE 2
## ACCEPTANCE BY FRANCHISEE

**2.1** <u>ACCEPTANCE.</u>  Franchisee accepts this Agreement and the license granted herein, and undertakes the obligation to operate the Franchised Business in accordance with the System within the Designated Market Area using the Marks in strict compliance with the terms and conditions of this Agreement for the entire term of this Agreement.  The rights and privileges granted to the Franchisee by TMI under this Agreement are applicable only in the Designated Market Area, are personal in nature, and may not be used elsewhere or at any other location or within any other Designated Market Area within the United States or any other country by the Franchisee without the prior written permission of TMI. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, IF THE FRANCHISEE PERFORMS SERVICES, SELLS PRODUCTS OR OTHERWISE CONDUCTS BUSINESS OF THE TYPE COVERED BY THIS AGREEMENT INSIDE THE DESIGNATED MARKET AREA OF ANOTHER THE MAIDS FRANCHISEE, THEN THE FRANCHISEE WILL BE IN MATERIAL BREACH OF THIS AGREEMENT AND TMI WILL HAVE THE RIGHT TO TERMINATE THIS AGREEMENT IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF ARTICLE 16 BELOW; IN ADDITION, WITH RESPECT TO THE GROSS REVENUES RECEIVED FOR SUCH BUSINESS CONDUCTED INSIDE OF THE DESIGNATED MARKET AREA, THE FRANCHISEE WILL ALSO OWE COMPENSATION (UP TO 100% OF GROSS REVENUES EARNED) TO THE FRANCHISEE WHOSE DESIGNATED MARKET AREA WAS INFRINGED UPON. THE DEMAND FOR AND THE COLLECTION AND ACCEPTANCE OF THE RESTITUTION COMPENSATION UNDER THIS ARTICLE 2.1 WITH RESPECT TO BUSINESS CONDUCTED BY THE FRANCHISEE INSIDE OTHER FRANCHISEE'S DESIGNATED MARKET AREA SHALL NOT, UNDER ANY CIRCUMSTANCES, BE A WAIVER BY TMI OF THE FRANCHISEE'S OBLIGATION TO CONDUCT ITS BUSINESS ONLY WITHIN THE FRANCHISEE'S DESIGNATED MARKET AREA OR A WAIVER BY TMI OF ANY BREACH OF SUCH OBLIGATION.  FRANCHISEE MAY NEVER SOLICIT OR SERVE CUSTOMERS IN ANY OTHER FRANCHISEE'S DESIGNATED MARKET AREA.

**2.2** <u>PERSONAL LICENSE.</u>  Franchisee will not have the right to franchise, sub-franchise, license or sublicense its rights under this Agreement.  Franchisee will not have the right to assign or transfer this Agreement or its rights under this Agreement, except as specifically provided in this Agreement.

## ARTICLE 3
## TERM OF AGREEMENT; FRANCHISEE'S RIGHT OF RENEWAL

**3.1** <u>TERM</u>.  The term of this Agreement will be for 10 years, and will commence on the date set forth on Page l of this Agreement.  This Agreement will not be enforceable until it has been signed by both the Franchisee and TMI, and until the signed Agreement has been delivered to the Franchisee.

**3.2** <u>CONDITIONS TO RENEWAL.</u>  At the end of the term of this Agreement, the Franchisee will have a right of first refusal to reacquire the Franchise for the Designated Market Area, if Franchisee has agreed to and has complied in all respects with the following conditions:

  (A)  The Franchisee has given TMI written notice of its intent to reacquire the Franchise for the Designated Market Area at least 360 days, but no more than 540 days prior to the end of the term of this Agreement;

(B)     The Franchisee has complied with all of the terms and conditions of this Agreement and has complied with TMI's operating and quality standards and procedures;

(C)     All monetary obligations owed by the Franchisee to TMI have been remitted or satisfied prior to the end of the term of this Agreement and have been timely met throughout the term of this Agreement;

(D)     The Franchisee agrees to execute and comply with the then-current standard The Maids® franchise agreement then being offered to new franchisees by TMI, subject further to the provisions of Article 3.3 of this Agreement, and executes such agreement at least 180 days prior to the expiration of this Agreement;

(E)     The Franchisee pays to TMI, simultaneously with the execution and delivery of the then-current standard The Maids® franchise agreement, a renewal fee in an amount equal to 10% of the then-current Initial Territory Fee;

(F)     At the time of the exercise of such right of first refusal and prior to the end of the term of this Agreement, the Franchisee has not received three or more notices of default from TMI during any 12 month period during the term of this Agreement; and

(G)     The Franchisee or the Franchisee's Manager agrees to complete and does successfully complete to TMI's reasonable satisfaction, prior to commencement of the renewal term, any retraining program TMI may prescribe, attendance at such retraining program to be at the sole expense of the Franchisee including, but not limited to, all expenses of transportation and lodging.

**3.3     TERMS OF RENEWAL.**  The Franchisee will have a right of first refusal to reacquire the Franchise for the Designated Market Area under the same terms and conditions then being offered to other franchisees by TMI under TMI's then-current standard The Maids® franchise agreement.  The Franchisee will, however, be required to remit the Continuing License Fees and all other fees at the rates specified in the then-current standard The Maids® franchise agreement, and to remit any additional fees not specified or provided in this Agreement but which are required to be remitted to TMI or others by the terms of the then-current standard The Maids® franchise agreement.  TMI will not offer to sell the Franchise for the Designated Market Area at the end of the term of this Agreement to any other person or entity on more favorable terms or conditions than those being offered to the Franchisee.  The Franchisee acknowledges that the terms, conditions, capital requirements, equipment costs and economics of subsequent The Maids® franchise agreements and the then-current standard The Maids® franchise agreement of TMI may, at that time, vary in substance and form from the terms, conditions and economics of this Agreement.

**3.4     EXTENSION OF TERM.**  If Franchisee does not renew pursuant to the terms of this Article 3 at the expiration of the term and continues to accept the benefits of this Agreement after the expiration of the term, then at TMI's option, this Agreement may be treated as: (i) expired as of the date of the expiration with Franchisee then operating the Franchised Business without a license to do so in violation of TMI's rights; or (ii) continued on a month-to-month basis until TMI provides Franchisee with notice of TMI's intent to terminate the month-to-month term.  In the latter case, all of Franchisee's obligations shall remain in full force and effect as if this Agreement had not expired, and all obligations and restrictions imposed upon Franchisee upon the expiration of this Agreement shall be deemed to take effect upon the termination of the month-to-month term.

# ARTICLE 4
## LICENSING OF MARKS AND
## SYSTEM TO FRANCHISEE

**4.1     TMI'S RIGHT TO LICENSE MARKS.**  TMI warrants that it has the right to grant the Franchisee and, except as provided herein, to license the Marks and the System to the Franchisee. Any and all improvements made by the Franchisee relating to the Marks or the System will be the sole and absolute property of TMI who will have the exclusive right to register and protect all such improvements in its name in accordance with applicable law.  The Franchisee's right to use and identify with the Marks and the System will exist concurrently with the term of this Agreement and such use by the Franchisee will inure exclusively to the benefit of TMI.

**4.2     CONDITIONS TO LICENSE OF MARKS.**  TMI hereby grants to the Franchisee the nonexclusive personal right to use the Marks and the System in accordance with the provisions of this Agreement.  The Franchisee's nonexclusive personal right to use the name "The Maids®" as the name of the Franchised Business and its right to use the Marks and the System applies only to the Franchised Business within the Designated Market Area and such rights will exist only so long as the Franchisee fully performs and complies with all of the conditions, terms and covenants of this Agreement.  The Franchisee will not have or acquire any rights in any of the Marks or the System other than the right of use as provided herein.  The Franchisee will have the right to use the Marks and the System only in the manner prescribed, directed and approved by TMI in writing.  If, in the judgment of TMI, the acts of the Franchisee infringe upon or demean the goodwill, uniformity, quality or business standing associated with the Marks or the System, then the Franchisee will, upon written notice from TMI, immediately modify its use of the Marks or the System in the manner prescribed by TMI in writing.  Any and all goodwill associated with the Marks and the System will inure exclusively to TMI's benefit and upon the expiration or termination of this Agreement, no monetary amount will be assigned as attributable to any goodwill associated with the Franchisee's use of the Marks and the System.  The Franchisee will at no time take any action whatsoever to contest the validity or the ownership of TMI's Marks and System and the goodwill associated therewith.

**4.3     INTERNET AND WEBSITE USAGE.**  Franchisee may market, advertise and promote its Franchised Business using social and professional networking sites, on-line listings, and on-line advertisements to promote the Franchisee's Franchised Business, only with TMI's prior written approval and in accordance with TMI's current social media and/or internet-related policies (if any). However, TMI reserves the right to create, operate, maintain, modify, or discontinue the use of websites, social and professional networking sites, on-line listings and on-line advertisements that utilize the Marks.  Franchisee will not, without TMI's prior written approval:  (1) link or frame TMI's website; (2) create or register any internet domain name with any connection with Franchisee's Franchised Business; or (3) use any e-mail address which TMI has not authorized for use in operating the Franchised Business.  Franchisee will not register, as internet domain names, any of the Marks now or hereafter owned by TMI or any abbreviation, acronym or variation of the Marks, or any other name that could be deemed confusingly similar.

**4.4     ADVERSE CLAIMS TO MARKS.**  If there are any claims by any third party that its rights to any or all of the Marks are superior to those of TMI and if TMI's attorneys are of the opinion that such claim by a third party is legally meritorious, or if there is an adjudication by a court of competent jurisdiction that any party's rights to the Marks are superior to those of TMI, then upon written notice from TMI, the Franchisee will, at its sole expense, immediately adopt and use the changes and amendments to the Marks that are specified by TMI in writing.  In that event, the Franchisee will

5

immediately cease using the Marks specified by TMI, and will, as soon as reasonably possible, commence using the new trademarks, trade names, service marks, logos, designs and commercial symbols designated by TMI in writing in connection with all advertising, marketing and promotion of the Franchised Business. The Franchisee will not make any changes or amendments whatsoever to the Marks or the System unless specified or approved in advance by TMI in writing.

       **4.5**       **DEFENSE OR ENFORCEMENT OF RIGHTS TO MARKS OR SYSTEM.** The Franchisee will have no right to and will not defend or enforce any rights associated with the Marks or the System in any court or other proceedings for or against imitation, infringement, prior use or for any other claim or allegation. The Franchisee will give TMI prompt and immediate written notice of any and all claims or complaints made against or associated with the Marks and the System and will, without compensation for its time and at its expense, cooperate in all respects with TMI in any lawsuits or other proceedings involving the Marks and the System. TMI will have the sole and absolute right to determine whether it will commence any action or defend any litigation involving the Marks and/or the System, and the cost and expense of all litigation incurred by TMI, including attorneys' fees, specifically relating to the Marks or the System will be paid by TMI.

       **4.6**       **TENDER OF DEFENSE.** If the Franchisee is named as a defendant or party in any action involving the Marks or the System and if the Franchisee is named as a defendant or party solely because the plaintiff or claimant is alleging that the Franchisee does not have the right to use the Marks or the System licensed by TMI to the Franchisee within the Designated Market Area pursuant to this Agreement, then the Franchisee shall tender the defense of the action to TMI and TMI will, at its expense, defend the Franchisee in the action providing that the Franchisee has tendered the action to TMI within ten days after receiving service of the summons and complaint involving the action. TMI will indemnify and hold the Franchisee harmless from any damages assessed against the Franchisee in any actions resulting solely from the Franchisee's use of the Marks and the System within the Designated Market Area if the Franchisee has tendered the defense of the action to TMI.

       **4.7**       **FRANCHISEE'S RIGHT TO PARTICIPATE IN LITIGATION.** The Franchisee may, at its expense, retain an attorney to represent it individually in all litigation and court proceedings involving the Marks or the System, and may do so with respect to matters involving only the Franchisee (i.e. not involving TMI or its interests); however, TMI and its attorneys will control and conduct all litigation involving the Marks or the System. Except as provided for herein, TMI will have no liability to the Franchisee for any costs that the Franchisee may incur in any litigation involving the Marks or the System, and the Franchisee will pay for all costs, including attorneys' fees, that it may incur in any litigation or proceeding arising as a result of matters referred to under this Article 4, unless it tenders the defense to TMI in a timely manner as provided for herein.

       **4.8**       **MR. CLEAN MARK**. As of the date of this Agreement, the Marks include (among others) the "Mr. Clean®" trademark. TMI has the right to use, and license its franchisees to use, the Mr. Clean® trademark pursuant to a license agreement with The Proctor and Gamble Company ("P&G"). The Franchisee must feature the Mr. Clean® trademark prominently in conjunction with the The Maids® trademark and other Marks in the operation of the Franchisee's Franchised Business. The Franchisee must abide by P&G's and TMI's brand standards and obligations related to the use of the Mr. Clean® trademark, as described in the Manuals. If the agreement between TMI and P&G terminates, the Franchisee acknowledges that it must, at the Franchisee's expense, cease using the Mr. Clean® trademark in the operation of its Franchised Business upon written notice from TMI or P&G.

**ARTICLE 5**
**INITIAL FRANCHISE FEE; APPROVAL OF FRANCHISEE;**
**SMART START PACKAGE**



     **5.1**     **INITIAL FRANCHISE FEE.**  The "Initial Franchise Fee" of <u>$74,895.05</u> is due and payable on the date this Agreement is executed by the Franchisee.  The Initial Franchise Fee is composed of two components:

          1.     an Initial License Fee of $12,500; and

          2.     an Initial Territory Fee in an amount equal to $0.95 for each Potential Customer in Franchisee's Designated Market Area.

If additional Franchise Territories are purchased the Franchisee will not be required to pay the Initial License Fee if it has already been paid. However, the Franchisee will be required to remit an Initial Territory Fee of $0.95 per Potential Customer in any additional Franchised Territories purchased.  In order to purchase additional Franchise Territories, the Franchisee must not be in breach or default of any agreement with TMI and Franchisee must meet TMI's then-current criteria for expansion.  Any additional Franchise Territories to be purchased are subject to the final approval of TMI in its sole and absolute discretion.

     **5.2**     **USE OF INITIAL FRANCHISE FEE.**  The Initial Franchise Fee payable by the Franchisee is payment, in part, to TMI for the costs incurred by TMI to operate its business, including costs for general sales and administrative expenses, sales commissions, market research, travel, long distance telephone calls, training, marketing and promotion, legal and accounting fees, compliance with federal and state franchising and other laws, and the initial services rendered by TMI to the Franchisee as set forth in this Agreement.  The Initial Franchise Fee is fully earned upon execution of this Agreement and is nonrefundable, except as set forth in Article 5.4 below.

     **5.3**     **TMI'S UNILATERAL RIGHT TO REJECT FRANCHISEE.**  TMI will have the absolute right to reject or disapprove the Franchisee and to cancel this Agreement at any time within 180 days after the date of this Agreement if TMI, in its sole discretion, determines that:

          (A)     any required or other financial, personal or other information provided by the Franchisee to TMI is materially false, misleading, incomplete or inaccurate; or

          (B)     the Franchisee or the Franchisee's Manager is not qualified or competent to properly manage or operate the Franchised Business because such person has failed to successfully complete TMI's training program, or because the Franchisee or the Franchisee's Manager is deemed by TMI to be incapable of successfully completing TMI's training program.

For purposes of this Agreement, "Manager" means that individual, designated by the Franchisee, who will be responsible on a full-time basis for the overall management of the Franchised Business, including responsibility for operations and sales.

     **5.4**     **REFUND OF INITIAL FRANCHISE FEE**.  If TMI cancels this Agreement pursuant to Article 5.3, then the Initial Franchise Fee paid by the Franchisee pursuant to Article 5.1 will be refundable to the Franchisee after TMI deducts all of its reasonable administrative and out-of-pocket expenses incurred as a result of TMI's relationship with Franchisee, including, but not limited to, training costs, salespersons' commissions, brokers' fees, attorneys' fees, audit fees, and travel expenses. TMI will notify the Franchisee in writing if the Franchisee is disapproved by TMI pursuant to Article 5.3, and TMI will provide the Franchisee with a written accounting of the administrative and out-of-pocket expenses that were incurred by TMI and deducted from the Initial Franchise Fee paid by the Franchisee.



     **5.5**     <u>**SMART START PACKAGE FEE**</u>.  The Franchisee will pay $<u>0.00</u> for the initial equipment supply package (the "SMART Start" package). This fee is due and payable on the date this Agreement is executed by the Franchisee.

     (A)     <u>**SMART Start Package.**</u>  TMI will provide the Franchisee with a list of the SMART Start package.

     (B)     <u>**Refund of SMART Start Package.**</u>  This payment is fully earned upon execution of this Agreement and tender of such SMART Start package to the Franchisee and is nonrefundable, unless TMI rejects the Franchisee pursuant to Article 5.3 above.  If the Franchisee is rejected pursuant to Article 5.3 above, then such payment shall be refunded to the Franchisee after TMI receives, freight prepaid, the returned SMART Start package and deducts the costs of any items not returned to TMI in a new and saleable condition, the determination of such condition to be in the sole and exclusive discretion of TMI.

     (C)     <u>**One-Time Fee.**</u>  Notwithstanding anything to the contrary in this Article 5.5, the Franchisee will not be obligated to purchase the SMART Start package referenced in this Article 5.5 if the Franchisee purchases additional territory after signing this Agreement and has previously purchased a SMART Start package; provided that the Franchisee must pay any applicable per user or per office fees.

## ARTICLE 6
## CONTINUING LICENSE FEES

     **6.1**     <u>**CONTINUING LICENSE FEES**</u>.  In addition to the Initial Franchise Fee payable by the Franchisee, the Franchisee will, for the entire term of this Agreement, remit to TMI weekly fees equal to a percentage of the Franchisee's total combined weekly Gross Revenues which are received, billed or generated by, as a result of, in connection with or from the Franchised Business operated pursuant to this Agreement and any business that is involved or engaged in any fashion in the home services, cleaning or maintenance of interior or exterior of any residential or commercial structure or facility owned or controlled by, or under common control with, the Franchisee (the "Continuing License Fee"); provided, however, Franchisees who are currently operating a commercial cleaning business when they execute this Agreement are not required to pay a Continuing License Fee on income derived from their existing business and customer base.  Any Franchisee not required to remit the continuing franchise fee on income derived from its current commercial customer base, shall provide a list of its current customers upon execution of this Agreement.  The Continuing License Fees remitted by the Franchisee to TMI will not be refundable to the Franchisee under any circumstances.  So long as the Franchisee has not failed to cure a default under any agreement with TMI after receiving written notice of such default, the percentage of weekly Gross Revenues is determined pursuant to the following chart:

| <u>Weekly Gross Revenues</u> | <u>Continuing License Fee Percentage</u> |
|---|---|
| $0   -   6,730 | 6.9% |
| $6,731 -   13,460 | 6.5% |
| $13,461 -   28,840 | 6.0% |
| $28,841 -   48,070 | 5.5% |
| $48,071 -   76,920 | 5.0% |
| $76,921 - 134,615 | 4.5% |
| $134,616 -  above | 3.9% |

8

- The Continuing License Fee percentage is based on the lowest rate for one week of Gross Revenues.

- Notwithstanding anything to contrary in this Article 6.1, if Franchisee fails to cure a default under this or any other agreement with TMI within 30 days of receiving written notice of such default, then Franchisee's Continuing License Fee percentage will be 6.9% of Gross Revenues until such time as the default is cured.

- Notwithstanding anything to the contrary in this Article 6.1 or Article 6.4 and provided that Franchisee is in full compliance with the terms of all of it's The Maids® franchise agreements, TMI will allow Franchisee to remit Continuing License Fees and Advertising Fees at the lowest rate in any of its existing The Maids® franchise agreements until that agreement expires. For example, if Franchisee signed a The Maids® franchise agreement in year one and expanded in year two, Franchisee would be allowed to remit Continuing License Fees and Advertising Fees at the rate in its first The Maids® franchise agreement for the area Franchisee expanded into year two until the first The Maids® franchise agreement expires. After the first The Maids® franchise agreement expires, Franchisee would remit Continuing License Fees and Advertising Fees in accordance with the second The Maids® franchise agreement. Franchisee may not apply the lowest Continuing License Fee or Advertising Fee rate to any The Maids® franchise agreement that Franchisee entered into as a result of an acquisition of an existing The Maids® Businesses after December 31, 2012. In that situation, Franchisee must pay TMI the Continuing License Fee and Advertising Fee stated in that The Maids® franchise agreement.

- If Franchisee is in full compliance with the terms of all of it's The Maids® franchise agreements and Franchisee owns multiple The Maids® Businesses, Franchisee may combine weekly Gross Revenues to reach the lowest possible Continuing License Fee percentage provided that Franchisee submit weekly Gross Revenues reports for all The Maids® Businesses on the same day in the format TMI requires. Notwithstanding the foregoing, Franchisee may not use any Gross Revenues from a The Maids® Business that Franchisee acquired as a result of any acquisition of an existing The Maids® Business after December 31, 2012 for the purposes of combining weekly Gross Revenues to reach the lowest possible Continuing License Fee percentage. Gross Revenue received in connection with any The Maids® Business that Franchisee acquired as a result of an acquisition of an existing The Maids® Business may not be combined with the Gross Revenue of any other The Maids® Business.

- Example: If Franchisee's Gross Revenues during week 1 are $7,000, Franchisee will pay 6.5% of $7,000 as the weekly Continuing License Fee for week 1. If Franchisee's weekly Gross Revenues are $14,000 in week 2, Franchisee will pay 6.0% of $14,000 as the Continuing License Fee for week 2. If in week 3, Franchisee had weekly Gross Revenues of $15,000 in its first The Maids® Business, and Franchisee expanded into a new territory and opened a second The Maids® Business that had Gross Revenues of $15,000 in the same week, Franchisee would pay 5.5% of the combined Gross Revenues of $30,000 as the Continuing License Fee for that week. If in week 4, Franchisee had weekly Gross Revenues of $30,000 in its first and second The Maids® Business, and Franchisee purchases an existing The Maids® Business that had Gross Revenues of $15,000 in the same week, Franchisee would pay 5.5% of the combined Gross Revenues of $30,000 and 6.5% of $15,000 as the Continuing License Fee for that week.

**6.2     MINIMUM CONTINUING LICENSE FEES.** During the term of this Agreement, the Franchisee agrees to remit to TMI the minimum weekly Continuing License Fees set forth in the chart below for each of Franchisee's The Maids® franchise agreements. The Franchisee's failure to remit to

DocuSign Envelope ID: C4D58F01-5A1A-4258-9A66-D0EC009105BF

TMI the minimum weekly Continuing License Fees set forth below will be a material breach of this Agreement:

| Period from Date of This Agreement | Minimum Weekly Continuing License Fees Per Agreement |
|---|---|
| Months 1 - 12 | No minimum |
| Months 13 - 24 | $90 |
| Months 25 - 48 | $150 |
| Months 49 - thereafter | $220 |

**6.3**    **WEEKLY ADVERTISING FEE**.  The Franchisee will, for the entire term of this Agreement, remit to TMI weekly Advertising Fees equal to 2% of the Franchisee's weekly Gross Revenues which are received, billed or generated by, as a result of, in connection with or from the Franchised Business operated pursuant to this Agreement and any other cleaning and/or maintenance business owned or controlled by, or under common control with, the Franchisee (the "Advertising Fee"). The Franchisor will rebate to the Franchisee on a quarterly basis, or in any other frequency as the Franchisor may determine in its discretion, the Advertising Fees that the Franchisee pays to the Franchisor until the first time that Franchisee generates $6,000 or more in weekly Gross Revenues. Franchisee acknowledges and agrees that commencing as of the first instance in which Franchisee's weekly Gross Revenue is equal to $6,000 or more, Franchisee shall not be entitled to a rebate of the Advertising Fees regardless of any level of weekly Gross Revenues that Franchisee may subsequently generate. The weekly Advertising Fees paid by the Franchisee to TMI will be deposited in The Maids® National Advertising Fund and will not be refundable to the Franchisee under any circumstances.

**6.4**    **RIGHT TO INCREASE ADVERTISING FEES**.  TMI reserves the right to increase the amount of the weekly Advertising Fee.  TMI agrees to review any such increase with The Maids® Advisory Council.  Any increase in the weekly Advertising Fees will not take effect until the Franchisee has been given at least 90 days prior written notice of the increase.  Any increase will not be more than ½ of 1% in any two-year period.

**6.5**    **WEEKLY TECHNOLOGY FEE.**  The Franchisee will, for the entire term of this Agreement, remit to TMI weekly Technology Fees from .25% to 1% of the Franchisee's weekly Gross Revenues which are received, billed, or generated by, as a result of, in connection with or from the Franchised Business operated pursuant to this Agreement and any other cleaning and/or maintenance business owned or controlled by, or under common control with, the Franchise (the "Technology Fee"). The Franchisor will rebate to the Franchisee on a quarterly basis, or in any other frequency as the Franchisor may determine in its discretion, the Technology Fees that the Franchisee pays to the Franchisor until the first time that Franchisee generates $6,000 or more in weekly Gross Revenues. Franchisee acknowledges and agrees that commencing as of the first instance in which Franchisee's weekly Gross Revenue is equal to $6,000 or more, Franchisee shall not be entitled to a rebate of the Technology Fees regardless of any level of weekly Gross Revenues that Franchisee may subsequently generate. The weekly Technology Fees paid by the Franchisee to TMI will be deposited in The Maids® National Technology Fund and will not be refundable to the Franchisee under any circumstances.

**6.6**    **RIGHT TO INCREASE TECHNOLOGY FEES.**  TMI reserves the right to increase the amount of the weekly Technology Fee.  Any increase in the weekly Technology Fee will not take effect until the Franchisee has been given at least 90 days prior written notice of the increase.  Any increase will not exceed the maximum 1% of the Franchisee's weekly Gross Revenues.  The Technology Fee will be capped annually at $15,000 per franchisee per year.

6.7 **GROSS REVENUES.** "Gross Revenues" will mean the total dollar income resulting from all sales made to customers or clients of the Franchised Business, and of any other cleaning, maintenance or service businesses of the Franchisee or any entity owned or controlled by or under common control with the Franchisee, for all products and services including, without limitation, cleaning and/or maintenance of any structure's interior, exterior or contents, whether made for cash, credit or barter. "Gross Revenues" will not include any sales, use or gross receipts tax imposed by any taxing authority directly upon sales, if: (a) the amount of the tax is added to the selling price and is expressly charged to the customer; (b) a specific record is made at the time of each sale of the amount of such tax; and (c) the amount of such tax is paid to the appropriate taxing authority.

6.8 **FRANCHISEE'S OBLIGATION TO PAY.** The weekly Continuing License Fees, weekly Advertising Fees, and weekly Technology Fees payable to TMI under this Article 6 will be calculated and paid to TMI by the Franchisee on a weekly basis during the entire term of this Agreement, and the Franchisee's failure to pay the Continuing License Fees, weekly Advertising Fees, and/or weekly Technology Fees to TMI will be a material breach of this Agreement. The Franchisee's obligation to pay TMI the Continuing License Fees, Advertising Fees, and Technology Fees pursuant to the terms of this Agreement will be absolute and unconditional, and will remain in full force and effect until the term of this Agreement has expired or is terminated pursuant to its terms. The Franchisee will not have the "right of offset" and, as a consequence, the Franchisee will timely pay all Continuing License Fees, Advertising Fees, and Technology Fees due to TMI under this Agreement regardless of any claims or allegations the Franchisee may allege against TMI.

6.9 **DATE AND TERMS OF PAYMENT.** All Continuing License Fees, weekly Advertising Fees, and weekly Technology Fees will be calculated and paid weekly and are due and payable and must be received by TMI by no later than Wednesday following the end of each weekly period. For purposes of this Agreement, a "week" is 7 consecutive days beginning on Monday and ending on Sunday. The Franchisee will pay the Continuing License Fees, Advertising Fees and Weekly Technology Fees to TMI by pre-authorized electronic bank transfer from the Franchisee's account to the account of TMI or as otherwise directed by TMI. If the Franchisee's report of Gross Revenues is not received by TMI no later than Wednesday of each week, TMI will estimate and collect by pre-authorized electronic bank transfer based upon the most recent available data. Any Continuing License Fees, Advertising Fees and Weekly Technology Fees not received by TMI no later than Wednesday of each week for the preceding week will be past due. The Franchisee's report of Gross Revenues required under Article 13 of this Agreement will be submitted to TMI no later than Wednesday of each week for the preceding week.

6.10 **LATE PAYMENT.** Any amounts that are not paid to TMI when due shall bear interest from the date due until paid of the lesser of 18% per annum or the maximum legal rate of interest allowed by the state in which the Franchised Business is located. The Franchisee shall remit to TMI for any and all costs incurred by TMI in the collection of any unpaid amount from Franchisee including, but not limited to, attorneys' fees, costs and other expenses incurred in collecting amounts owed by the Franchisee.

## ARTICLE 7
## ADVERTISING

7.1 **APPROVAL OF ADVERTISING.** The Franchisee will use its best efforts to advertise and promote the Franchised Business. With the exception of the advertising materials provided to the Franchisee by TMI, all concepts, materials or media proposed by the Franchisee for any advertising, promotion, marketing or public relations program or campaign must have the prior written approval of TMI. The Franchisee will not permit any third party to advertise its business, services or products through the Franchised Business without obtaining the prior written approval of TMI.

    **7.2**    **LOCAL ADVERTISING.**  In addition to the Weekly Advertising Fees, the Franchisee agrees to invest $3,750 a month for approved advertising and promotion for the first twelve months of this Agreement. The Franchisee's failure to invest the required monthly minimum for local advertising will be a material breach of this Agreement.  On or before the 20th day of each month, the Franchisee will furnish to TMI, in the form prescribed by TMI, an accurate accounting of the Franchisee's monthly expenditures during the preceding month for approved advertising and promotion in the Designated Market Area.  If the Franchisee has failed to invest such required annual minimum for approved advertising and promotion in any year, then, in addition to any other remedies available to TMI under this Agreement, TMI may require the Franchisee to deposit with TMI the difference between the required minimum and what was actually spent for approved advertising and promotion.  TMI will use such amount in the Franchisee's Designated Market Area for advertising or promotion that TMI deems, in its sole discretion, to be in the best interests of the Franchised Business.

    **7.3**    **USE OF ADVERTISING FUNDS.**  Payments to The Maids® National Advertising Fund by the Franchisee and any other The Maids® franchises will be used by TMI to purchase and pay for research and development, production materials, ad slicks, brochures, services provided by advertising agencies, market research, customer retention, incentive programs, radio and television commercials, internet and other advertising, promotions, marketing, public relations, telemarketing, communication and education, and for any other purpose deemed beneficial by TMI to the general recognition and public awareness of the Marks and the Business System, and any administrative costs and expenses related to the foregoing.  Funds in The Maids® National Advertising Fund will be used to pay for all long distance telephone charges, office rental, furniture, fixtures and equipment, leasehold improvements, personnel, salaries, travel costs, office supplies, collection costs (including without limitation attorneys' fees) incurred in attempting to collect past-due weekly Advertising Fees from franchisees and all other administrative costs associated with and incurred in connection with The Maids® National Advertising Fund.  The Maids® National Advertising Fund will be administered and controlled exclusively by TMI.  TMI will have the absolute and unilateral right to determine when, how and where any funds in The Maids® National Advertising Fund will be spent.  TMI will have the right to retain and pay agency fees to an advertising agency which is owned by, or is an affiliate of, TMI or any of its principals.  TMI will have no fiduciary duty to the Franchisee with respect to collection or expenditure of the weekly Advertising Fees, and any advertising fund will not be a trust or escrow account.  Any The Maids® Businesses operated by TMI will be required to contribute to The Maids® National Advertising Fund in the same manner as franchisees.

    **7.4**    **RIGHT TO BORROW FUNDS**.  If The Maids® National Advertising Fund does not contain sufficient funds to make the expenditures determined by TMI, in its sole discretion, to be necessary or advisable, then TMI will have the right, but not the obligation, to loan funds to The Maids® National Advertising Fund in an amount sufficient to cover such expenditures, and the loan (plus interest as provided herein) will be repaid from future payments to The Maids® National Advertising Fund paid by all The Maids® Businesses pursuant to their The Maids® franchise agreements with TMI.  TMI will have the right and option to either use its own funds, or borrow the necessary funds in the name of The Maids® National Advertising Fund or from one or more financial institutions.  The unpaid balance of any loan made by TMI to The Maids® National Advertising Fund will accrue and pay interest at either: (a) a rate equal to the rate of interest established by First National Bank of Omaha as its "reference rate" at the time of the loan, if TMI utilized its own funds for the loan; or (b) the rate equal to the rate of interest charged to TMI by the financial institution for the amount of the loan, if TMI borrowed the funds for the loan from a financial institution.

    **7.5**    **ACKNOWLEDGMENTS REGARDING NATIONAL ADVERTISING FUND.**
The Franchisee acknowledges and agrees that The Maids® National Advertising Fund is intended to maximize general recognition of the Marks and patronage of all of The Maids® Businesses, including, without limitation, the Franchised Business.  The Franchisee further acknowledges and agrees that: (a)

TMI has no obligation to ensure that the expenditures by The Maids® National Advertising Fund in or affecting any territory or area will be proportionate to contributions by The Maids® Franchisees operating in that territory or area; (b) Franchisee, and other The Maids® Franchisees, may not benefit directly from or in proportion to its/their contributions to The Maids® National Advertising Fund or from the development of advertising and marketing materials and placement of advertisements by The Maids® National Advertising Fund; (c) TMI is not required to invest any amount on advertising in the Designated Market Area; (d) TMI uses the funds in The Maids® National Advertising Fund to develop advertising materials which are made available to the Franchisee; and (e) Franchisee will, in all events, be liable for the costs of personalization, printing and shipping of advertising materials.

### ARTICLE 8
### CONFIDENTIAL STANDARD OPERATION MANUALS, CUSTOMER LISTS
### AND OTHER INFORMATION

**8.1     CONFIDENTIALITY OF MANUALS.**  The Franchisee will at all times during the term of this Agreement and thereafter treat the confidential standard operation manuals, compact discs, e-learning courseware, audio and videotapes, podcast and other media including web-based internet media, and all supplemental bulletins and notices from TMI, all of which are deemed a part of the operations manuals (collectively referred to as the "Manuals"), any other materials created for or approved for use in the operation of the Franchised Business, and the information contained therein as secret and confidential, and the Franchisee will use all reasonable means to keep such information secret and confidential. Neither the Franchisee nor any employees of the Franchisee will: (A) make any copy, duplication, record or reproduction of the Manuals, or any portion thereof, available to any unauthorized person; or (B) use the Manuals or any information contained therein in connection with the operation of any other business or for any purpose other than in conjunction with the operation of the Franchised Business. The Franchisee shall provide prompt notice to TMI of any lost or stolen confidential data and notice to TMI if the Franchisee or employee has breached this Article 8.1.  The Franchisee's failure to timely provide notice of breach of confidentially shall be a material breach.

**8.2     USE OF AND REVISIONS TO THE  MANUALS.**  TMI will provide on loan to the Franchisee the Manual.  The Manuals and all supplements, changes and modifications to the Manuals will remain the sole and exclusive property of TMI.  The Manual will contain mandatory and suggested specifications, standards and operating procedures exist to protect TMI's  interest in the System and the Marks and to create a uniform customer experience, and not for the purpose of establishing any control or duty to take control over those matters that are reserved to the Franchisee.  TMI may from time to time revise the Manuals and the Franchisee expressly agrees to operate its Franchised Business in accordance with all such mandatory revisions.  The Franchisee will at all times use only current and up-to-date Manuals and in the event of a dispute regarding the Manuals, the terms of the master copy of the Manuals maintained by TMI in its offices or on its intranet will be controlling .  The Franchisee will promptly return to TMI any versions of the Manuals and Supplements that have been revised by TMI.

**8.3     CONFIDENTIALITY OF OTHER INFORMATION.**  TMI will be disclosing and providing to the Franchisee certain confidential and proprietary information concerning the System and the procedures, operations and data used in connection with the System.  The Franchisee will not, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any person or entity any such confidential and proprietary information, knowledge or know-how concerning the methods of operation of The Maids® Business which may be communicated to the Franchisee, or of which the Franchisee may be apprised by virtue of this Agreement.  The Franchisee will divulge such confidential and proprietary information only to its employees who must have access to it in order to operate the Franchised Business.  Any and all information, knowledge and know-how including, without limitation, drawings, client lists, materials, brochures, marketing materials, equipment, technology,

13

methods, procedures, specifications, techniques, teaching methods, software programs, systems and other data which TMI copyrights or designates as confidential or proprietary will be deemed confidential and proprietary for the purposes of this Agreement ("Confidential Information"). Neither the Franchisee nor any employees of the Franchisee will make any copy, duplication, record or reproduction or any of the Confidential Information available to any unauthorized person. Any client lists developed by either TMI or the Franchisee and any information designated as Confidential Information by TMI will be and remain the sole and exclusive property of TMI.

8.4    **CUSTOMER LISTS.** The Franchisee acknowledges and agrees that TMI owns any and all customer lists that the Franchisee may develop during the normal course of operating the Franchised Business. The Franchisee agrees to provide to TMI upon its request, an electronic copy, or in a form TMI approves, a complete list of current and former customers, including their name, telephone number, complete mailing address, frequency of service, last date serviced, and price of service and other information concerning such customers as TMI requests. The Franchise agrees to allow TMI to access the Franchisee's customer list through the Internet. The Franchisee agrees not to use any customer list for any purpose other than in the normal operation of the Franchised Business without TMI's approval. The Franchisee agrees to log all consumer inquiries and resulting sales and customer information into TMI's designated software.

8.5    **CONFIDENTIALITY AGREEMENTS.** All of the Franchisee's Managers and employees shall sign agreements in a form satisfactory to TMI agreeing to maintain the confidentiality, during the course of their employment and thereafter, of all information copyrighted or designated by TMI as confidential and proprietary. Copies of all confidentiality agreements executed by the Franchisee's Managers and employees will be promptly submitted to TMI.

8.6    **REMEDIES.** The Franchisee acknowledges that the provisions of this Article 8 are reasonable and necessary for the protection of TMI and TMI's franchisees. If the Franchisee violates any of the provisions contained in this Article 8, then TMI will have the right to:

(A)    terminate this Agreement as provided for in Article 16 below;

(B)    seek injunctive relief from a court of competent jurisdiction;

(C)    commence an action or lawsuit against the Franchisee for damages; and

(D)    enforce all other remedies or take such other actions against the Franchisee that are available to TMI under this Agreement, common law, in equity and any federal or state laws.

**ARTICLE 9**
**TRAINING PROGRAM**

9.1    **SMART START SET-UP.** Upon execution of this Agreement, TMI will provide a pre-opening program ("SMART Start Set-Up") for the Franchisee by telephone to familiarize and acquaint the Franchisee with the System and the operation of a The Maids® Business. The SMART Start Set-Up will follow a project-plan format and will include instruction on basic business procedures, training of employees, insurance, autos, basic accounting, basic computer operations and setup, selling and marketing techniques, office selection and setup and other business and marketing topics selected by TMI. Several of the SMART Start Set-Up topics are provided via web-based e-learning lessons and online certification and are required pre-requisites to SMART Start Training described below. The Franchisee is required to successfully complete the SMART Start Set-Up prior to attending SMART Start

Training, as defined below, and prior to commencing the business operations of the Franchisee's Business. The SMART Start Set-Up will be scheduled by TMI in its sole discretion. In the event TMI determines that the Franchisee has failed to successfully complete TMI's SMART Start Set-Up within 180 days of the date of this Agreement, then TMI will have the right to reject the Franchisee pursuant to Article 5.3 above. There is no charge for the SMART Start Set-Up.

      **9.2**    **SMART START TRAINING**. After completing the SMART Start Set-Up, TMI will provide live hands-on training in Omaha, Nebraska, or at such other location as may be designated by TMI, for the Franchisee. The purpose of this training is to familiarize and train new business owners and managers in the methods of operating a The Maids® Business. The SMART Start Training program, which will be scheduled by TMI in its sole discretion, may be up to six days. There is no charge for attendance at the SMART Start Training program for the Franchisee and the first two persons selected for SMART Start Training by the Franchisee. TMI reserves the right to charge a fee for attendance at the SMART Start Training program for each additional person sent to SMART Start Training by the Franchisee. Prior to commencing business operations the Franchisee must successfully complete SMART Start Training. We recommend the Franchisee employ, at all times, at least two persons who have successfully completed TMI's SMART Start Training program.

      **9.3**    **POWER TRAINING**. In addition to the SMART Start Set-Up and the SMART Start Training program, TMI will provide the Franchisee with a training program referred to as the Power Training and described in this Article 9.3. Within 90 days of the opening of the Franchised Business, TMI will provide a training program for the Franchisee and its managers which will facilitate understanding of the System and its operation. TMI's technical trainer will review subjects such as quality, safety, inventory control and adherence to system procedures. A TMI qualified trainer or performance consultant will provide one to four days of on-site training for the franchise owner.

      **9.4**    **ADDITIONAL TRAINING**. TMI may, from time to time, in its sole discretion, make available to the Franchisee additional required and optional training as live or online programs and reserves the right to establish charges payable by the Franchisee applicable to such additional training courses or programs.

      **9.5**    **PAYMENT OF WAGES AND EXPENSES; RELEASE OF CLAIMS.** During the SMART Start Set-Up program, SMART Start Training program, Power Training program and any other training provided by TMI, the Franchisee will pay all the wages, fringe benefits, payroll taxes, unemployment compensation, workers' compensation insurance, lodging, food, automobile rental, travel costs and other expenses for the Franchisee and all other persons who attend any such training on behalf of the Franchisee. The Franchisee, for itself and all persons who attend any such training on behalf of the Franchisee, hereby releases and agrees to hold harmless TMI, and its officers and directors, from and against any and all claims, liability, damages, or causes of action of any nature arising from the participation and attendance by the Franchisee or any such person in TMI's training programs.

      **9.6**    **ATTENDANCE AT NATIONAL CONVENTION**. The Franchisee is required to attend each of The Maids® National Convention which TMI holds periodically and pay TMI the applicable fee; provided, however, that TMI shall not hold a National Convention more frequently than annually.

## ARTICLE 10
## TMI'S OBLIGATIONS

      **10.1**    **SYSTEM.** Consistent with TMI's uniformity requirements and quality standards, TMI or its authorized representative will:

(A)     provide the Franchisee with a list of approved suppliers and sources for the goods and services necessary and required for the Franchised Business;

(B)     provide recommendations to the Franchisee regarding basic accounting and business practices for use by the Franchisee in its Franchised Business;

(C)     make advertising and marketing recommendations;

(D)     review the Franchisee's Franchised Business as often as TMI deems necessary and render written reports to the Franchisee as deemed appropriate by TMI;

(E)     protect legally and enforce the Marks and the System for the benefit of all The Maids® franchisees in the manner deemed appropriate by TMI;

(F)     provide the Franchisee with access to the Manuals and any supplements and modifications to the Manuals that may be published by TMI from time to time;

(G)     provide the training set forth in Article 9 above;

(H)     assist the Franchisee in obtaining the insurance required under this Agreement through TMI's sponsored insurance program;

(I)     periodically, but no more frequently than annually, conduct a National Convention for all Franchisees which may include training seminars;

(J)     publish and distribute a newsletter to Franchisees at times, frequencies and in a format to be determined by TMI in its discretion; and

(K)     upon the reasonable written request of the Franchisee, render reasonable advisory services by telephone or in writing pertaining to use of the System and the operation of the Franchised Business as deemed appropriate, reasonable and necessary by TMI.

**10.2     CONSULTING SERVICES.**  During the term of this Agreement, TMI will, upon the reasonable written request of the Franchisee, provide on-site consulting services to the Franchisee in the Designated Market Area regarding marketing, advertising and promotional issues, operational issues, accounting matters, personnel issues, and other business matters or special projects relating to The Maids® Business.  The Franchisee will pay TMI the then current charge imposed by TMI for such consulting services, and will pay for the travel and lodging expenses incurred by the individual or individuals employed or retained by TMI who provide such consulting services to the Franchisee.

## ARTICLE 11
## FRANCHISEE'S OBLIGATIONS

**11.1     QUALITY AND SERVICE STANDARDS.**  TMI will promulgate, from time to time, uniform standards of quality and service regarding the business operations of the Franchised Business so as to protect and maintain (for the benefit of all The Maids® franchisees and TMI) the distinction, valuable goodwill and uniformity represented and symbolized by the Marks and the System. Accordingly, to insure that all The Maids® franchisees will maintain and adhere to the uniformity requirements and quality standards for the products and services associated with the Marks and the System, the Franchisee agrees to maintain the uniformity and quality standards required by TMI for all

products and services associated with the Marks and the System and agrees to the following terms and conditions to assure that all The Maids® Businesses will be uniform in nature and will sell and dispense quality products and services to the public.

**11.2    IDENTIFICATION OF BUSINESS.**  The Franchisee will operate the Franchised Business so that it is clearly identified and advertised as a The Maids® Business.  The style and form of the words "The Maids®" and the Marks used in any advertising, marketing, public relations, telemarketing or promotional program or campaign must have the prior written approval of TMI.  The Franchisee will use the name "The Maids®", the approved logo and all graphics commonly associated with the System and the Marks which now or hereafter may form a part of TMI's System, on all vehicles, equipment, uniforms, advertising, public relations and promotional materials, signs, video tapes, stationery, paper supplies, business cards and other materials in the identical combination and manner prescribed by TMI in writing.  The Franchisee will place www.maids.com on all printed materials, advertising materials and automobiles.  The Franchisee will, at its expense, comply with all legal notices of registration required by TMI or its attorneys and will, at its expense, comply with all trademarks, trade names, service marks, copyrights, patents and other notice markings that are required by TMI or by applicable law.

**11.3    COMPLIANCE WITH STANDARDS.**  The Franchisee will operate its Franchised Business and use the Marks and the System in strict compliance with the highest business and ethical practices and standards and the quality standards, operating procedures, policies, specifications, requirements and instructions required by TMI, which may be amended and supplemented by TMI from time to time.

**11.4    FRANCHISEE'S NAME.**  The Franchisee will not use the words "The Maids®" in its corporate, partnership or sole proprietorship name.  The Franchisee will hold itself out to the public as an independent contractor operating its The Maids® Business pursuant to a Franchise from TMI.  Whenever practical, the Franchisee will clearly indicate on its business checks, stationery, business cards, invoices, receipts, video tapes, advertising, public relations and promotional materials, website, and other written materials that the Franchisee is a franchisee of TMI. The Franchisee will display signs on the Franchisee's vehicles which are clearly visible to the general public indicating that the Franchised Business is independently operated as a franchise. The Franchisee will file for a certificate of assumed name in the manner required by applicable state law so as to notify the public that the Franchisee is operating its Franchised Business as an independent business pursuant to this Agreement.  Prior to adoption of an assumed name, the Franchise shall submit such name to, and obtain the written approval of such name by TMI.

**11.5    VEHICLES, SUPPLIES AND EQUIPMENT USED BY FRANCHISEE.**  The Franchisee will obtain and pay for the vehicles, supplies and equipment (including computer equipment and software) required by TMI and used by the Franchisee for the operation of the Franchised Business.  The vehicles, supplies and equipment used in the Franchised Business shall comply with then-current prescribed color schemes, display the Marks as designated by TMI, and conform to the quality standards and uniformity requirements established by TMI from time to time.  As of the date of this Agreement, the Franchisee is required to use in operating its Franchised Business vehicles with the yellow body color prescribed by TMI that display The Maids® logo.  All replacement vehicles, supplies, equipment and other items used in the Franchised Business by the Franchisee shall comply with TMI's then-current standards and specifications.

**11.6    APPROVED ADVERTISING AND PROMOTION.**  The Franchisee will not conduct any media advertising, promotion, marketing, public relations or telemarketing programs or campaigns for its Franchised Business unless or until TMI has given the Franchisee prior written approval for all

DocuSign Envelope ID: C4D59E01-5A1A-4258-9A66-D0EC009105BF

concepts, materials or media proposed for any media advertising, promotion, marketing, public relations or telemarketing program or campaign. The Franchisee will not permit any third party to advertise its business, services or products through the Franchised Business without obtaining the prior written approval of TMI.

**11.7    SIGNS.** The Franchisee will only display signs that have been approved by TMI in writing, and the Franchisee will not use or display any other signs of any kind or nature on the Franchisee's vehicles without obtaining the prior written approval of TMI prior to their installation or use.

**11.8    MAINTENANCE OF VEHICLES AND EQUIPMENT.** The Franchisee will, at its expense, repair and keep in good working order at all times all vehicles and equipment used in the Franchised Business in accordance with TMI's quality standards. The Franchisee will replace all equipment, supplies and vehicles as such items become worn-out or in disrepair. All replacement equipment, supplies, vehicles and other items used in the Franchised Business shall comply with TMI's then-current standards and specifications. Recognizing that the System's image is of the utmost importance, the Franchisee agrees to keep all automobiles, inside and out, clean at all times.

**11.9    LIMITATIONS ON PRODUCTS AND SERVICES.** The Franchisee will promote and sell only those products and services approved by TMI in writing and will offer for sale all products and services prescribed by TMI. The Franchisee will conform to all customer service standards and policies prescribed by TMI in writing. The Franchisee will have the absolute right to sell all products and services to its customers and clients at whatever prices and on whatever terms it deems appropriate.

**11.10    MODIFICATION OF SYSTEM.** The Franchisee acknowledges that the System must continue to evolve in order to reflect changing market conditions and to meet new and changing customer demands. Therefore, variations and additions to the System may be required from time to time to preserve and enhance the public image of the System and to improve the continuing operating efficiency of all Franchisees. Accordingly, Franchisee agrees that TMI may from time to time, upon written notice, add to, subtract from or otherwise change the System, including, without limitation, adopting new or modified trademarks, products, services, equipment (including computer equipment and software) and new techniques and methods relating to the sale, operation, promotion and marketing of services. The Franchisee agrees to promptly accept, implement, use and display in the operation of the Franchised Business all such additions, modifications and changes at its sole cost and expense.

**11.11    COMPLIANCE WITH MANUALS.** The Franchisee will conform to the common image and identity created by the products and services associated with The Maids® Business which are portrayed and described by the Manuals and the Franchisee will conform to all changes and modifications to the Manuals made by TMI and provided to the Franchisee that are required and deemed necessary by TMI to: (A) improve the standards of service or the products offered for sale under the System; (B) protect the goodwill associated with the Marks; or (C) improve the operation or efficiency of the Franchised Business. TMI reserves the right to revise the Manuals at any time during the term of this Agreement.

**11.12    APPROVED SUPPLIERS.** The Franchisee agrees that it will purchase only those products, goods, machinery, signs, vehicles, supplies, equipment and services (sometimes referred to in this Agreement as "goods and services") which are to be used or sold by the Franchisee that are approved in writing by TMI and which TMI determines must meet the standards of quality and uniformity required to protect the valuable goodwill and uniformity symbolized by and associated with the Marks and the System. These goods and services may only be purchased from suppliers, approved in writing by TMI. TMI periodically may modify the lists of approved goods, services and suppliers, and the Franchisee will comply with such modified lists of approved goods, services and suppliers. If the Franchisee proposes to

use or sell any goods and services which TMI has not approved, or purchase any goods or services from suppliers that TMI has not approved, the Franchisee must first notify TMI in writing and provide sufficient information, specifications and samples concerning the goods or service and/or supplier to permit TMI to determine whether the goods or service complies with TMI's specifications and standards and/or the supplier meets TMI's approved supplier criteria. TMI may develop procedures for the submission of requests for approved goods or service, or suppliers and obligations that approved suppliers must assume (which may be incorporated in a written agreement to be signed by approved suppliers). TMI will have the right to charge the Franchisee or each proposed supplier a reasonable fee in reviewing a proposed good or service or supplier. TMI may impose limits on the number of suppliers and/or brands for goods or service to be used in the Franchised Business. The Franchisee agrees that certain products, materials, and other items and supplies may only be available from one source, and TMI or its affiliates may be that source.

**11.13** **SALES TO OTHERS.** The Franchisee hereby acknowledges and agrees that TMI has the right to directly or indirectly sell any proprietary or other products or merchandise under the name "The Maids®," or any other name that has been or may be developed by TMI, to other persons, businesses or entities, including without limitation those that are not The Maids® franchisees, through any method of distribution anywhere in the world, including in the Franchisee's Designated Market Area.

**11.14** **COMPLIANCE WITH APPLICABLE LAWS.** The Franchisee will, at its sole expense, comply with all applicable federal, state, city, local and municipal laws, ordinances, rules and regulations pertaining to the operation of the Franchised Business, including, but not limited to, health and safety regulations, all environmental laws, all laws relating to labor and employment, all discrimination laws, all sexual harassment laws and all laws relating to the disabled. The Franchisee will, at its sole expense, consult an attorney to obtain advice with regard to the Franchisee's compliance with all federal and state environmental laws, OSHA laws, licensing laws and all other laws relating to the application, storage and disposal of products used by the Franchised Business. The Franchisee will, at its sole expense, be absolutely and exclusively responsible for determining the licenses and permits required by law for the Franchised Business, for filing, obtaining and qualifying for all such licenses and permits, and for complying with all applicable laws. The Franchisee must comply with all laws and regulations relating to privacy and data protection, and must comply with any privacy policies or data protection and breach response policies TMI may periodically establish. In addition, the Franchisee must comply with all applicable data security standards set by the payment card industry. The Franchisee must notify TMI immediately of any suspected data breach at or in connection with the Franchised Business.

**11.15** **PAYMENT OF OBLIGATIONS.** The Franchisee will timely pay all of its uncontested and liquidated obligations and liabilities due and payable to TMI, and to the suppliers, lessors and creditors of the Franchisee.

**11.16** **PAYMENT OF TAXES.** The Franchisee will be absolutely and exclusively responsible and liable for the prompt filing and payment of all federal, state, city and local taxes including, but not limited to, individual and corporate income taxes, sales and use taxes, franchise taxes, gross receipts taxes, employee withholding taxes, F.I.C.A. taxes, unemployment taxes, inventory taxes, personal property taxes, real estate taxes and other taxes payable in connection with the Franchised Business (hereinafter referred to as "Taxes"). TMI will have no liability for the Taxes which arise or result from the Franchised Business and the Franchisee will indemnify TMI for any such Taxes that may be assessed or levied against TMI which arise or result from the Franchised Business. It is expressly understood and agreed by the Personal Guarantors, as defined in Article 19.1 to this Agreement that their personal guaranty applies to the prompt filing and payment of all Taxes which arise or result from the Franchised Business.

**11.17    REIMBURSEMENT TO TMI FOR TAXES.**  In the event any "franchise" or other tax which is based upon the Gross Revenues, receipts, sales, business activities or operation of the Franchised Business is imposed upon TMI by any taxing authority, then the Franchisee will reimburse TMI in an amount equal to the amount of such taxes and related costs imposed upon and paid by TMI. The Franchisee will be notified in writing if TMI is entitled to reimbursement for the payment of such taxes and, in that event, the Franchisee will pay TMI the amount specified in the written notice within ten days of the date of the written notice.

**11.18    STANDARD ATTIRE.**  The Franchisee will require its employees to wear only the standard attire or uniforms which have been established and approved by TMI. All employees of the Franchisee will wear clean and neat attire and will practice good personal hygiene. Management and employees will wear the safety or protective clothing or equipment designated by TMI and any appropriate regulatory agencies.

**11.19    PERSONNEL.**  The Franchisee will at all times have at least one Manager on duty that is responsible for supervising the employees and the business operations and for the sales and promotion of the Franchised Business.  The Franchisee will also employ at least one team leader per team and will have a sufficient number of adequately trained and competent other personnel on duty to guarantee efficient service to the Franchisee's customers and clients. The Franchisee will use its best efforts to assure that the Franchisee employees conduct themselves during business hours in a manner which is consistent with The Maids®  professional image.

**11.20    TMI'S INSPECTION RIGHTS.**  TMI reserves the right to interview the Franchisee's employees, to take photographs and videotapes of the Franchisee's vehicles and of the work being performed by the Franchisee's employees on the Franchisee's customers' premises during normal business hours, and to evaluate the quality of the services provided by the Franchisee to its customers. TMI will have the right to use all interviews, photographs and videotapes of the Franchised Business for such purposes as TMI deems appropriate including, but not limited to, use in training, advertising, marketing and promotional materials, and as evidence in any court or other proceeding.  The Franchisee will not be entitled to, and hereby expressly waives, any right that it may have to be compensated by TMI, its advertising agencies, or other The Maids® franchisees for the use of such interviews, photographs or videotapes for training, advertising, marketing, promotional and/or litigation purposes.

**11.21    NO SECURITY INTEREST.**  This Agreement and the Franchise granted to the Franchisee hereunder may not be the subject of a security interest, lien, levy, attachment or execution by the Franchisee's creditors or any financial institution, except with the prior written approval of TMI.

**11.22    NOTICES OF DEFAULT, LAWSUITS OR OTHER CLAIMS.**  The Franchisee will immediately deliver to TMI a copy of any notice of default received from any mortgagee, trustee under any deed of trust, contract for deed holder, lessor or any other party with respect to the Franchised Business and copies of all written notifications of any lawsuits, consumer claims, employee claims, federal or state administrative or agency proceedings or investigations or other claims, actions or proceedings relating to the Franchised Business.  Upon request from TMI, the Franchisee will provide such additional information as may be required by TMI regarding the alleged default, lawsuit, claim, action, investigation or proceeding, and any subsequent action or proceeding in connection with the alleged default, lawsuit, claim, action, investigation or proceeding.

**11.23    TELEPHONE EQUIPMENT AND NUMBER.**  In addition to standard telephone equipment at the office for the Franchised Business, the Franchisee will, at its sole expense, obtain and maintain at all times during the term of this Agreement either a telephone answering machine, voice mail system or mobile cellular telephone equipment as may be required for the Franchised Business.  The

Franchisee's telephone answering machine, voice mail system or mobile cellular telephone equipment must meet the then-current standards and specifications established by TMI. The Franchisee agrees to answer the Franchised Business's telephone live during normal business hours. The Franchisee acknowledges that TMI may require it to obtain and maintain a phone line for sales and advertising and a separate telephone line for operations. The Franchisee agrees to obtain new telephone numbers for the conduct of the Franchised Business and shall assign, in writing, on instruments approved in advance by TMI, all rights to each of such numbers to TMI, such assignment to be effective upon termination of this Agreement. Assignment of such phone numbers will occur when representatives of the Franchisee attend TMI's SMART Start Training program. The Franchisee shall, at all times during the term of this Agreement, subscribe to an internet service provider and an electronic mail service provider and install and maintain a high speed internet connection for such service.

      **11.24**   **EQUIPMENT; ACCESS TO INFORMATION.**  The Franchisee will, at its sole expense, obtain and maintain at all times during the term of this Agreement, such computer equipment, electronic telephone facsimile, internet access via the fastest high speed service provider reasonably available (excluding dial-up), and other equipment as may from time to time be required by TMI for use in operating the Franchised Business, including without limitation for use with the required software. The Franchisee agrees to use, at all times during the term of this Agreement, the latest version of the required software in the Franchised Business. TMI shall have no obligation to update, upgrade, or otherwise modify any software utilized in The Maids® System, including but not limited to, any software provided by TMI. All such equipment must meet the then-current standards and specifications established by TMI. The Franchisee acknowledges and agrees that TMI has the right to access, both electronically and through hard copy of printed data, all data and other information, including customer lists, maintained by the Franchisee on such computer equipment for purposes of monitoring compliance by the Franchisee with its obligations under this Agreement and for any other purpose deemed beneficial by TMI to The Maids® System and all The Maids® franchisees. The failure of the Franchisee to provide or allow such access to the data and other information maintained on the Franchisee's computer equipment will be a material breach of this Agreement and will give TMI the right to immediately terminate all computer support provided by TMI and to immediately terminate the Franchisee's rights to use the required software. In addition, the Franchisee is solely responsible for protecting itself from disruptions, Internet access failures, Internet content failures, and attacks by hackers and other unauthorized intruders, and the Franchisee waives any and all claims the Franchisee may have against TMI as the direct or indirect result of such disruptions, failures or attacks.

      **11.25**   **OPERATION OF THE MAIDS® BUSINESS.**  The Franchisee will be totally and solely responsible for operating its Franchised Business, and will control, supervise and manage all the employees, agents and independent contractors who work for or with the Franchisee. The Franchisee will be responsible for the acts of its employees, agents and independent contractors, and will take all reasonable business actions necessary to ensure that its employees, agents and independent contractors comply with all federal, state and local laws, rules and regulations including, but not limited to, all employment laws, discrimination laws, sexual harassment laws and laws relating to the disabled. TMI will not have any right, obligation or responsibility to control, supervise or manage the Franchisee's employees, agents or independent contractors, and Franchisee will be solely responsible for the terms and conditions of employment of Franchisee's personnel, including the soliciting, hiring, firing, disciplining, paying, scheduling, and managing of Franchisee's employees.

      **11.26**   **USE OF INTERNET.**  The Franchisee's conduct on the Internet or any existing or future forms of electronic or digital communications, including without limitation, its use of the Marks on the Internet and in domain names for the Internet, is subject to the provisions of this Agreement. TMI reserves the right to establish and modify, from time to time, rules which will govern the Franchisee's conduct and use of the Internet or any existing or future forms of electronic or digital communications, in

connection with the Franchised Business, and the Franchisee agrees to abide by such rules. The Franchisee's right to use the Marks and the System on the Internet will terminate when this Agreement terminates or expires.

**11.27    USE OF TECHNOLOGY FUND.**  Payments to The Maids® National Technology Fund by the Franchisee and any other The Maids® franchises will be used by TMI to purchase and pay for the research, development and utilization of technologies, in order to give The Maids® franchises a competitive advantage in operational efficiency; information management; any and all other technology TMI deems beneficial for the System; and any administrative costs and expenses related to the foregoing. Funds in The Maids® National Technology Fund will be used to pay for all long distance telephone charges, office rental, furniture, fixtures and equipment, leasehold improvements, personnel, salaries, travel costs, office supplies, collection costs (including without limitation attorneys' fees) incurred in attempting to collect past-due weekly Technology Fees from franchisees, and all other administrative costs associated with an incurred in connection with The Maids® National Technology Fund. The Maids® National Technology Fund will be administered and controlled exclusively by TMI. TMI will have the absolute and unilateral right to determine when, how, and where any Funds in The Maids® National Technology Fund will be spent. TMI will have no fiduciary duty to the Franchisee with respect to collection or expenditure of the weekly Technology Fees, and any technology fund will not be a trust or escrow account. Any The Maids® Businesses operated by TMI will be required to contribute to The Maids® National Technology Fund in the same manner as franchisees.

**11.28    ACKNOWLEDGMENTS REGARDING NATIONAL TECHNOLOGY FUND.**  The Franchisee acknowledges and agrees that The Maids® National Technology Fund is intended to maximize technology advancement and any competitive advantages of all The Maids® Business, including, without limitation, the Franchised Business. The Franchisee further acknowledges and agrees that: (a) TMI has no obligation to ensure that the expenditures by The Maids® National Technology Fund in or affecting any The Maids® Business will be proportionate to contributions by The Maids® Franchisees; and (b) Franchisee, and other The Maids® Franchisees, may not benefit directly from or in proportion to its/their contributions to The Maids® National Technology Fund or from the research, development and implementation of new technologies by The Maids® National Technology Fund.

## ARTICLE 12
## INSURANCE

**12.1    GENERAL LIABILITY INSURANCE.**  The Franchisee will procure and maintain in full force and effect, at its sole cost and expense, general liability insurance with coverage of at least $1,000,000 per occurrence and $2,000,000 aggregate (with a deductible no greater than $100,000) insuring the Franchisee, TMI, P&G, and their respective officers, directors, agents and employees from and against any and all loss, liability, claim or expense of any kind whatsoever, including losses connected with Franchisee's professional work, bodily injury, personal injury, death, property damage, products liability and all other occurrences resulting from the condition, operation, use, business or occupancy of The Maids® Business and the Franchisee's office.

**12.2    VEHICLE INSURANCE.**  The Franchisee will procure and maintain in full force and effect, at its sole cost and expense, automobile liability insurance with coverage of at least $1,000,000 insuring the Franchisee, TMI and their respective officers, directors, agents and employees from any and all loss, liability, claim or expense of any kind whatsoever resulting from the use, operation or maintenance of all automobiles, trailers or vehicles owned by the Franchisee or used by the Franchisee or any of the Franchisee's employees (including vehicles or trailers owned or leased by any employee of the Franchisee) in connection with the Franchised Business.

**12.3    PROPERTY INSURANCE; FIRE AND EXTENDED COVERAGE.**  The Franchisee will procure and maintain in full force and effect, at its sole cost and expense, "all risks" property insurance coverage, which must include fire and extended coverage, for the inventory, machinery, equipment and fixtures and furnishings owned or leased by the Franchisee and used by the Franchised Business.  The Franchisee's property insurance policy (including fire and extended coverage) must have coverage limits of at least "replacement" cost.

**12.4    THIRD-PARTY FIDELITY INSURANCE.**  The Franchisee will procure and maintain in full force and effect, at its sole cost and expense, a third-party fidelity bond or similar insurance with coverage of at least $25,000 insuring the Franchisee, TMI and their respective officers, directors, agents and employees from and against any and all loss, liability, claim or expense of any kind whatsoever relating to any theft from customers.

**12.5    INSURANCE REQUIRED BY LAW.**  The Franchisee will, at its sole cost and expense, procure and maintain all other insurance required by state or federal law, including workers' compensation insurance for its employees.

**12.6    OTHER INSURANCE.**  The Franchisee will, at its sole cost and expense, also procure and maintain all insurance required under any lease, mortgage, deed of trust, contract for deed or any other legal contract in connection with the Franchised Business.  The insurance policies described above are minimum requirements, and the Franchisee may purchase and maintain additional insurance policies or insurance policies with greater coverage limits.

**12.7    INSURANCE COMPANIES; EVIDENCE OF COVERAGE.**  All insurance companies providing coverage to the Franchisee and the Franchised Business must be acceptable to and approved by TMI, and must be licensed in the state where coverage is provided.  The Franchisee will provide TMI with certificates of insurance, insurance policy endorsements, or other information TMI requires evidencing the insurance coverage required of the Franchisee pursuant to this Article 12 prior to the date the Franchisee's representatives attend TMI's SMART Start Training program, and the Franchisee will immediately provide, upon expiration, change or cancellation, a new certificate of insurance to TMI.

**12.8    DEFENSE OF CLAIMS.**  All liability insurance policies procured and maintained by the Franchisee will require the insurance company to provide and pay for attorneys to defend any legal actions, lawsuits or claims brought against the Franchisee, TMI, and their respective officers, directors, employees and agents.

**12.9    TMI'S RIGHTS.**  All insurance policies procured and maintained by the Franchisee pursuant to this Article 12 will name TMI as an additional insured on all policies except workers compensation, will contain endorsements by the insurance companies waiving all rights of subrogation against TMI, and will stipulate that TMI will receive copies of all notices of cancellation, nonrenewal, or coverage reduction or elimination at least 30 days prior to the effective date of such cancellation, nonrenewal or coverage change.

**12.10    MATERIAL BREACH.**  The Franchisee's failure to comply with the provisions of this Article 12 will be a material breach of this Agreement and TMI will have the right, but not the obligation, to procure on behalf of the Franchisee and the Franchised Business, any and all insurance required under this Agreement with the agent and insurance company of TMI's choice.  TMI will invoice the Franchisee for all costs and expenses incurred by TMI to procure the required insurance coverage on behalf of the Franchisee and the Franchised Business.  Within ten days of receipt of an invoice from TMI, the

Franchisee agrees to pay all amounts owed to TMI for costs and expenses to procure insurance coverage on behalf of the Franchisee and the Franchised Business.

## ARTICLE 13
## FINANCIAL STATEMENTS, REPORTS OF GROSS REVENUES;
## FORMS AND ACCOUNTING

**13.1     MONTHLY, YEAR-TO-DATE AND ANNUAL FINANCIAL STATEMENTS.** The Franchisee will, at its expense, provide TMI with a monthly profit and loss statement and an annual profit and loss statement. All financial statements provided to TMI for the Franchised Business will be presented in the exact form and format prescribed by TMI in writing, and will be categorized according to the standard chart of accounts developed and approved by TMI. The Franchisee's financial statements will be prepared in accordance with generally accepted accounting principles applied on a consistent basis.

**13.2     VERIFICATION OF FINANCIAL STATEMENTS.** If the Franchisee's annual financial statements are not audited by an independent certified public accountant, then, if the Franchisee is a corporation, the Franchisee's annual financial statements must be certified in writing as accurate by the Franchisee's President and Chief Financial Officer, or if the Franchisee is a partnership, then by the Franchisee's Partners, or if the Franchisee is an individual, then by the Franchisee.

**13.3     DUE DATE.** The Franchisee's monthly and year-to-date financial statements will be delivered to TMI by the 20th day of each month for the preceding month, and the Franchisee's annual financial statements will be delivered to TMI within 60 days after the Franchisee's fiscal year end.

**13.4     TAX RETURNS.** Within ten days after the Franchisee files any such return with the applicable governmental agencies, the Franchisee will provide TMI with a signed copy of each of the Franchisee's annual federal and state income tax returns, sales tax returns, and a copy of any other federal, state and local tax returns filed by the Franchisee including, but not limited to, any amended tax return filed by the Franchisee for a preceding year or other period, together with written proof that the Franchisee has paid all taxes due. TMI will not disclose any such tax returns to persons not employed by TMI except as may be reasonably necessary in the conduct of TMI's business.

**13.5     WEEKLY REPORTS OF GROSS REVENUES AND CUSTOMERS.** The Franchisee will maintain an accurate record of the daily Gross Revenues of the Franchised Business and will remit a report of the Gross Revenues generated by, at, as a result of, or from the Franchised Business using such formats as TMI may from time to time prescribe in writing. In addition, the Franchisee will maintain an accurate record of a complete list of current and former customers, including their name, telephone number, complete mailing address, frequency of service, last date serviced, and price of service, budgeted minutes and other information concerning such customers as TMI may request, of the Franchised Business and will remit a report of such customer information using such formats as TMI may from time to time prescribe in writing. The reports of Gross Revenues and customer information as provided above, must be signed and certified as accurate by the Franchisee and will be delivered to TMI on or before Monday of each week for the preceding week.

**13.6     AUDIT OR REVIEW RIGHTS.** TMI or its authorized agent shall have the right to audit or review the Franchisee's books and records. The Franchisee and the Franchisee's accountants will make all of their records, ledgers, work papers, books, accounts and financial information available to TMI or its authorized agent during regular business hours and at all other reasonable times for review and audit by TMI or its designee. The Franchisee must, upon TMI's written request, make photocopies of all records TMI requests and forward them to TMI or its authorized representative. To the extent the

24

Franchisee's financial records are computerized, TMI will have the absolute right to access the Franchisee's computer and software programs containing the financial records and to copy, or have the Franchisee copy, the financial records to a computer disk or to any portable or other computer owned or controlled by TMI. The Franchisee's financial records for each fiscal year will be kept in a secure place by the Franchisee and will be available for audit by TMI for at least five years. If such an audit or review reveals that the Franchisee's Gross Revenues were understated by more than 2%, or that the Franchisee has underpaid the monthly Continuing License Fees by more than $500 during any 12 month period, then the Franchisee will remit to TMI all costs and expenses (including salaries of TMI's employees, travel costs, room and board, audit fees, attorneys' fees, and professional fees) that TMI incurred as a result of the audit or review of the Franchisee's financial records, but no less than $5,000. If the Franchisee has related businesses, TMI reserves the right to obtain information to confirm the accuracy of Continuing License Fees submissions. If the Franchisee has underpaid TMI, then the Franchisee will, within ten days of receipt of an invoice from TMI indicating the amounts owed, remit to TMI any deficiency in Continuing License Fees or other amounts owed to TMI, together with interest as provided for herein. Such understatement of earnings shall be a material breach of this Agreement as set forth in Article 16.1. The Franchisee's failure or refusal to produce the books and financial records for audit or review by TMI or its authorized agent in accordance with this Article 13.6 will constitute a material breach of this Agreement and will be grounds for the immediate termination of this Agreement by TMI.

      **13.7**    **PRE-AUTHORIZED BANK TRANSFERS.** The Franchisee will, from time to time during the term of this Agreement, execute such documents as TMI may request to provide the Franchisee's unconditional and irrevocable authority and direction to its bank or financial institution authorizing and directing the Franchisee's bank or financial institution to allow transfer directly to the bank account of TMI, and to charge to the account of the Franchisee the amount of Continuing License Fees, including but not limited to Continuing License Fees and Weekly Advertising Fees, and other sums due and payable by the Franchisee to TMI pursuant to this Agreement, the Software License Agreement or any other agreement between TMI and the Franchisee, including but not limited to any promissory note executed by Franchisee in favor of TMI. The transfer authorizations will be in the form prescribed by TMI's bank. The Franchisee's authorizations will permit TMI to designate the amount to be transferred from the Franchisee's account, and to adjust such amount from time to time, for the Continuing License Fees and other sums then payable to TMI from the Franchisee. If the Franchisee fails at any time to provide the weekly reports of Gross Revenues required under this Article 13, then TMI will have the right, in its sole discretion, to estimate the amount of Continuing License Fees and other sums due and payable to TMI, and to transfer such estimated amount from the Franchisee's bank account to TMI's bank account. The Franchisee will at all times maintain a balance in its account at its bank or financial institution sufficient to allow the appropriate amount to be transferred from the Franchisee's account for payment of the Continuing License Fees and other sums payable by the Franchisee directly to TMI's bank account. The Franchisee shall pay all charges imposed by its financial institution for the establishment and implementation of the pre-authorized electronic bank transfers referenced above. Failure to do so shall be a material breach of this Agreement.

      **13.8**    **ELECTRONIC REPORTING REQUIRED**. The Franchisee acknowledges and agrees that all financial statements, returns, reports and other information required to be provided to TMI by the Franchisee pursuant to this Article 13 or otherwise pursuant to this Agreement shall be provided to TMI electronically through an electronic mail service provider as directed by TMI. The failure of the Franchisee to report electronically will be a material breach of this Agreement.

**ARTICLE 14**
**TMI'S RIGHT OF FIRST REFUSAL TO PURCHASE**

14.1    **RESTRICTIONS.** The Franchisee will not sell, assign, trade, transfer, lease, sublease, or otherwise dispose of any interest in or any part of the Franchised Business or the Business Assets, as defined in this provision, to a third party without first offering the same to TMI in writing, at the same price and on the same terms as the Franchisee proposes to accept from such third party. For purposes of this Agreement, "Business Assets" shall mean (a) the Franchisee's Business; (b) the lease for the Franchisee's office (if applicable); (c) the land and building for the Franchisee's office (if applicable); (d) this Agreement; and (e) the vehicles, supplies and equipment used in the Business, except for transactions involving the sale of the items listed in this Article 14.1 to the extent such sales occur in the normal course of business. The Franchisee's written offer to TMI must contain all material terms and conditions of the proposed sale or transfer, including but not limited to the name, address, business experience and financial condition of the proposed third party transferee. Upon receipt by TMI of written notice specifying such material terms and conditions of the proposed sale or transfer, TMI will have the right (but not the obligation), exercisable by written notice to the Franchisee within 15 business days thereafter, to (1) accept such offer, (2) waive its right of first refusal to purchase, or (3) state an interest in negotiating to purchase the Business Assets. If TMI elects to commence negotiations to purchase the Franchisee's Business Assets as set forth herein, the Franchisee may not sell the Business Assets to such third party for at least 30 days or until TMI and the Franchisee agree in writing that the negotiations have terminated, whichever comes first. If TMI waives its right to purchase, the Franchisee shall have the right to complete the sale or transfer of the Business Assets according to the terms set forth in the written notice to TMI; however, any such sale, transfer or assignment to such third party is expressly subject to the terms and conditions set forth in Article 15 below and any material variation in the terms of the sale from those set forth in the original notice to TMI, including but not limited to a change to the identity of such third party, shall constitute a new offer to purchase that shall be submitted to TMI in the manner provided above. If TMI elects to accept the offer from the Franchisee, the sale shall be consummated in accordance with the terms and conditions of the offer. The Franchisee's obligations under this Agreement including, but not limited to, its obligations to pay the Continuing License Fees and to operate the Business Assets as a The Maids® Business shall not be affected or changed because of TMI's non-acceptance of the Franchisee's written offer.

14.2    **SALE OF OWNERSHIP INTEREST IN FRANCHISEE.** If the Franchisee is a corporation, limited liability company, partnership or other entity, then the capital shares, membership interests, partnership interests or other ownership interests in the Franchisee ("Ownership Interests"), may not be sold, pledged, assigned, traded, transferred or otherwise disposed of by the holders thereof until the Ownership Interests have been first offered to TMI in writing under the same terms and conditions as if Business Assets were proposed to be sold under Article 14.1 above. Notwithstanding the terms of this Article 14, a holder of the Ownership Interests may bequeath, sell, assign, trade or transfer Ownership Interests, without first offering them to TMI, (a) to the other holders of the Ownership Interests because of death or permanent disability or (b) to a spouse or child of the holder; provided, however, the Franchisee must provide TMI with written notice of all such transactions, the Franchisee and the transferee must comply with the provisions of Articles 15.4(B) through 15.4(E) and Articles 15.4(G) thorough 15.4(H) below, the transferee signs a personal guarantee, and the transfer will not be valid or effective until TMI has received the properly executed legal documents which its attorneys deem necessary to properly and legally document the transfer, assignment or bequest. All certificates representing Ownership Interests issued by the Franchisee to its owners must bear the following legend:

> The ownership interests represented by this certificate are subject to a
> written Franchise Agreement which grants THE MAIDS
> INTERNATIONAL, LLC the right of first refusal to purchase these
> interests from the holder. Any person acquiring the ownership interests
> represented by this certificate will be subject to the terms and conditions
> of the Franchise Agreement between the company named on this

certificate and The Maids International, LLC, which includes provisions containing covenants not to compete, that apply to all holders of ownership interests in the company.

**14.3    ACKNOWLEDGMENT OF RESTRICTIONS.**  The Franchisee acknowledges and agrees that the restrictions imposed by TMI on the transfer of the Business Assets and the Ownership Interests are reasonable and necessary to protect the goodwill associated with the System and the Marks, as well as TMI's reputation and image, and are for the protection of TMI, the Franchisee and all other franchisees that operate The Maids® Businesses.  Any assignment or transfer of the Business Assets or the Ownership Interests permitted by this Article 14 will not be effective until TMI receives fully executed copies of all documents relating to the assignment or transfer, and TMI has consented in writing to the assignment or transfer.

**14.4    SELLING HOLDERS SUBJECT TO COVENANT NOT TO COMPETE.**  Any holder of Ownership Interests in the Franchisee that sells, assigns, trades, bequeaths, transfers or disposes of any Ownership Interests in the Franchisee will be subject to the provisions of Article 19.3 of this Agreement after the sale or assignment.

**14.5    TMI'S RIGHT TO PURCHASE FRANCHISEE'S ASSETS.**  If this Agreement expires or is terminated by either TMI or the Franchisee for any reason whatsoever, if the Franchisee wrongfully terminates this Agreement by failing to comply with Article 17 or otherwise, or if the Franchisee at any time ceases to do business within the Designated Market Area as a The Maids® franchisee, then TMI will have the right, but not the obligation, to purchase the Franchised Business, including the then-usable vehicles, supplies, inventory and equipment, and all other assets that are required by TMI for a standard The Maids® Business and owned by the Franchisee in its Business and to acquire any lease or other contract rights of the Franchisee (hereinafter referred to in this provision as the "Franchise Assets").  TMI will not purchase any assets from the Franchisee that are not part of the standard The Maids® Business.  Within two business days after this Agreement expires or is terminated by either party, wrongfully terminated by the Franchisee or the Franchisee ceases to do business as a The Maids® Business, the Franchisee agrees to give TMI written notice of the Franchisee's asking price for the Franchise Assets.  If the Franchisee fails to give TMI this notice and/or if TMI and the Franchisee cannot agree on the price of the Franchise Assets, then, without considering any value for goodwill associated with the name "The Maids®", the Assets will be valued at book value (cost less depreciation). TMI will have the right, but not the obligation, to purchase any or all of the Franchise Assets from the Franchisee for cash within 20 days after the fair market value of the Franchise Assets has been established and delivered to the parties in writing.  Nothing in this provision may be construed to prohibit TMI from enforcing the terms and conditions of this Agreement, including the covenants not to compete contained in Article 19.

**ARTICLE 15**
**ASSIGNMENT**

**15.1    ASSIGNMENT BY TMI.**  TMI may assign its interest in this Agreement, directly or indirectly, by merger, assignment, pledge or other means, without the approval or consent of the Franchisee.  TMI will give the Franchisee written notice of any such assignment or transfer, and the assignee will be required to fully perform TMI's obligations under this Agreement.

**15.2    ASSIGNMENT BY FRANCHISEE TO CONTROLLED ENTITY.**  In the event the Franchisee is an individual or partnership, this Agreement may be transferred or assigned by the Franchisee, without first offering it to TMI pursuant to Article 14, to a corporation, limited liability company, partnership or other entity which is owned or controlled by the Franchisee without paying any

27

transfer fee, provided that: (A) the Franchisee and the holders who own a majority (51% or greater) of the voting ownership interests of the assignee entity sign or have signed a personal guaranty in the form contained in this Agreement; (B) the Franchisee furnishes prior written proof to TMI substantiating that the assignee entity will be financially able to perform all of the terms and conditions of this Agreement; and (C) none of the holders of ownership interests in the entity owns, operates, franchises, develops, manages or controls any business that is in any way competitive with or similar to a The Maids® Business. The Franchisee will give TMI 30 days written notice prior to the proposed date of assignment or transfer of this Agreement to an entity owned or controlled by the Franchisee; however, the transfer or assignment of this Agreement will not be valid or effective until TMI has received the documents its attorneys deem reasonably necessary to properly and legally document the transfer or assignment of this Agreement to the entity as provided for herein.

     **15.3    ASSIGNMENT BY INDIVIDUAL FRANCHISEE IN EVENT OF DEATH OR PERMANENT DISABILITY.** If the Franchisee is an individual, then in the event of the death or permanent disability of the Franchisee, this Agreement may be assigned, transferred or bequeathed by the Franchisee to any designated individual or beneficiary without first offering TMI the right to acquire this Agreement pursuant to Article 14 of this Agreement and without the payment of any transfer fee. However, the assignment of this Agreement to the transferee, assignee or beneficiary of the Franchisee will be subject to the provisions of Articles 15.4(A) through (E) and 15.4(G) and (H), and will not be valid or effective until TMI has received the properly executed legal documents which its attorneys deem necessary to properly and legally document the transfer, assignment or bequest of this Agreement. The transferee will assume the existing Franchise Agreement(s) from the Franchisee for the remaining term(s) of the Franchise Agreement(s). Furthermore, the transferee, assignee or beneficiary must agree to be unconditionally bound by the terms and conditions of this Agreement and to personally guarantee the performance of the Franchisee's obligations under this Agreement.

     **15.4    APPROVAL OF TRANSFER.** Subject to the provisions of Article 15.2 and 15.3, this Agreement, the Business Assets (as defined in Article 14.1), or the Ownership Interest (as defined in Article 14.2) may be sold, assigned or transferred by the Franchisee only with the prior written approval of TMI. TMI will not unreasonably withhold its consent to any sale, assignment or transfer under this Agreement, provided the Franchisee and the transferee comply with the following conditions:

        (A)    The Franchisee has complied in all respects with the applicable provisions of Article 14 of this Agreement;

        (B)    All of the Franchisee's monetary obligations due to TMI have been paid in full, and the Franchisee is not otherwise in default under this Agreement or any other agreement with TMI;

        (C)    The Franchisee or transferor has executed a written agreement, in a form satisfactory to TMI, in which the Franchisee or transferor agrees to observe all applicable provisions of this Agreement, including the provisions with obligations and covenants that continue beyond the expiration or termination of this Agreement which includes the covenants not to compete contained in Article 19 of this Agreement;

        (D)    The transferee is not and does not intend to own, operate or be involved in a business that competes directly or indirectly with a The Maids® Business;

        (E)    The transferee has demonstrated to TMI's satisfaction that he, she or it meets TMI's standards for new franchisees, including managerial, financial and

business standards, possessing a good business reputation and credit rating, possessing the aptitude and ability to operate The Maids® Business in an economic and businesslike manner (as may be evidenced by prior related business experience or otherwise), possessing the required financial wherewithal, and meeting any other conditions TMI may reasonably apply in evaluating the transferee;

(F)    The transferee and all parties having a legal or beneficial interest in the transferee, including, if applicable, the holders of all Ownership Interests in the transferee and the transferee's personal guarantors as required by TMI, execute TMI's then-current standard The Maids® franchise agreement, including a personal guarantee, to be effective for the then-current full standard term, and such other ancillary agreements as TMI may require for the transfer of the Franchised Business; provided that the transferee will not be required to pay any Initial Franchise Fee;

(G)    Before the transferee takes over the Franchisee's operations, (i) the transferee and the transferee's Manager must successfully complete the SMART Start Training program prescribed by TMI, (ii) the transferee must provide evidence satisfactory to TMI that at least two employees of the transferee have successfully completed the TMI SMART Start Training program and that one of whom has completed the program within the five-year period immediately preceding the transfer, and (iii) the transferee must pay the wages, fringe benefits, payroll taxes, unemployment compensation, workers' compensation insurance, travel costs, lodging, food, automobile rental, and all other expenses for the transferee and all other persons sent to TMI's SMART Start Training program; and

(H)    The Franchisee or transferor, or the Franchisee's or transferor's personal representative if the Franchisee or transferor is deceased, and the holders of the Ownership Interests, as defined in Article 14.2 above, in the Franchisee have executed a general release, in a form prescribed by TMI, of any and all claims, known and unknown, against TMI and its shareholders, officers, directors, agents, attorneys, accountants, employees, affiliates, successors and assigns, excepting only (if required by applicable law) those claims solely related to the offer and sale of the new Franchise.

TMI may expand upon, and provide details related to, the conditions for transfer and TMI's consent as described in this Section 15.4, and may do so in the Manual or otherwise in writing.

**15.5**    __TRANSFER TO COMPETITOR PROHIBITED.__  The Franchisee will not sell, assign or transfer this Agreement to any person, partnership, corporation or entity that owns, operates, franchises, develops, consults with, manages, is involved in, or controls any business that is involved or engaged in any fashion in the home services, cleaning or maintenance of the interior or exterior of any residential or commercial structure or facility that is in any way competitive with a The Maids® Business either in the United States or in another country.  If TMI refuses to permit a transfer of this Agreement under this Article 15.5, the Franchisee's only remedy will be to have a court of competent jurisdiction determine whether the proposed transferee is a competitor of TMI.

**15.6**    __ACKNOWLEDGMENT OF RESTRICTIONS.__  The Franchisee acknowledges and agrees that the restrictions imposed by TMI pursuant to this Article 15 are reasonable and necessary to protect the goodwill associated with the System and the Marks, as well as TMI's reputation and image,

and are for the protection of TMI, the Franchisee and all other franchisees that operate The Maids® Businesses.  Any assignment or transfer permitted by this Article 15 will not be effective until TMI receives fully executed copies of all documents relating to the assignment or transfer, and TMI has consented in writing to the assignment or transfer.

**15.7** **TRANSFER FEE.**  If, pursuant to the terms of this Article 15, this Agreement or the Business Assets are assigned, transferred or sold to another person or entity, or if the holders of Ownership Interests in the Franchisee representing more than 10% of the voting power in the Franchisee transfer their interests in the Franchisee to a third party (other than as permitted under Articles 15.2 and 15.3 above), then the Franchisee will pay TMI a transfer fee of the lesser of $15,000 or 10% of the purchase price of the Business Assets, which will help defray the costs incurred by TMI for training, attorneys' fees, accountants' fees, out-of-pocket expenses, long distance telephone calls, administrative costs and the time of its employees and officers.  If, however, the Franchisee assigns, transfers, or sells its interest to an existing The Maids® franchisee pursuant to this Article 15, then the Franchise will remit to TMI a transfer fee of $5,000.  The transfer fee must be paid by the Franchisee to TMI prior to the date of transfer.

## ARTICLE 16
## TMI'S TERMINATION RIGHTS; DAMAGES

**16.1** **CONDITIONS OF BREACH.**  In addition to its other rights of termination contained in this Agreement, TMI will have the right to terminate this Agreement if:

(A)     the Franchisee fails to open and commence operations of its Business within 30 days from the date the Franchisee successfully completes the SMART Start raining program or the Franchisee does not successfully complete the SMART Start Training program within 180 days from the date of this Agreement;

(B)     the Franchisee violates any material provision, term or condition of this Agreement or any other agreement between the Franchisee and TMI or an affiliate of TMI, including, but not limited to, failure to timely pay any Continuing License Fees or any other monetary obligations or fees due to TMI or its affiliates;

(C)     the Franchisee or any of its Managers, partners, directors, officers or majority stockholders are convicted of, or plead guilty to or no contest to, a charge of violating any law relating to the Franchised Business, or any felony;

(D)     the Franchisee fails to conform to the System or the standards of uniformity and quality for the products and services promulgated by TMI in connection with the System;

(E)     the Franchisee fails to timely pay any of its uncontested obligations or liabilities due and owing to its employees, suppliers, banks, purveyors and other creditors, or TMI;

(F)     the Franchisee or its Personal Guarantors are determined to be insolvent within the meaning of any state or federal law, any involuntary petition for bankruptcy is filed against the Franchisee or its Personal Guarantors (and is not dismissed by the court within 60 days of the filing), or the Franchisee or its Personal Guarantors file for bankruptcy under any state or federal law;

(G)     the Franchisee makes an assignment for the benefit of creditors or enters into any similar arrangement for the disposition of its assets for the benefit of creditors;

(H)     any check issued by the Franchisee is dishonored because of insufficient funds (except where the check is dishonored because of an error in bookkeeping or accounting) or closed accounts;

(I)     the Franchisee fails to pay for the vehicles, supplies and equipment required for its Franchised Business prior to commencing business;

(J)     the Franchisee voluntarily or otherwise "abandons" the Franchised Business.  For purposes of this Agreement "abandon" means the conduct of the Franchisee, including acts of omission as well as commission, indicating the willingness, desire or intent of the Franchisee to discontinue operating the Franchised Business in accordance with the quality standards, uniformity requirements and the System as set forth in this Agreement and the Manuals;

(K)     the Franchisee is involved in any act or conduct which materially impairs the goodwill associated with the name "The Maids®", any other Marks or the System;

(L)     the Franchisee fails to file any required federal, state or other income or sales tax return or fails to timely pay any federal, state or other income or sales taxes when due;

(M)     the Franchisee commits three violations of the material provisions, terms or conditions of this Agreement within any 24 month period during its term, regardless of whether such violations have been cured.

**16.2     NOTICE OF BREACH.**  Except as set forth in Articles 16.5 and 16.6 below, TMI will not have the right to terminate this Agreement unless and until:

(A)     written notice setting forth the alleged breach in detail has been given to the Franchisee by TMI; and

(B)     the Franchisee fails to correct the alleged breach within the period of time specified by applicable law.

If applicable law does not specify a time period to correct an alleged breach, then the Franchisee will have 30 days after the date of the written notice to correct the alleged breach, except where the written notice states that the Franchisee is delinquent in the payment of any fees or other payments payable to TMI pursuant to this Agreement, in which case the Franchisee will have 15 days after the date of the written notice to correct the breach by making full payment (including interest as provided herein) to TMI.  If the Franchisee fails to correct the alleged breach set forth in the written notice within the applicable period of time, then this Agreement may be terminated by TMI as provided in this Agreement.  For the purposes of this Agreement, an alleged breach of this Agreement by the Franchisee will be "corrected" if both TMI and the Franchisee agree in writing that the alleged breach has been corrected.

**16.3     LITIGATION.**  If the Franchisee files a lawsuit within the time period established in Article 16.2 for correcting the alleged breach, then TMI will not have the right to terminate this Agreement until the facts of the alleged breach have been submitted to a court of competent jurisdiction

and the court determines that the Franchisee has breached this Agreement and the Franchisee fails to correct the breach within the applicable time period.  If the court determines that the Franchisee has violated or breached this Agreement as alleged by TMI in the written notice given to the Franchisee, then, unless applicable law specifies otherwise, the Franchisee will have 30 days from the date the court issues a written determination on the matter to correct the specified breach or violation of this Agreement, except where the Franchisee's breach is for failure to pay any fees or other payments to TMI, in which case the Franchisee will have 15 days to make full payment (including interest) to TMI.  If the Franchisee timely corrects the specified breach or violation of this Agreement, then this Agreement will remain in full force and effect.  The time limitations set forth in this Article 16.3 within which the Franchisee may commence litigation of a dispute or controversy relating to the right of TMI to terminate this Agreement for an alleged breach will be mandatory.  If the Franchisee fails to comply with the time limitations set forth in this Article 16.3, then TMI may terminate this Agreement as provided for herein.

**16.4**    **NOTICE OF TERMINATION.**  If TMI has complied with the provisions of this Article 16 and if the Franchisee has not corrected the alleged breach set forth in the written notice within the time period specified in this Agreement, then TMI will have the absolute right to terminate this Agreement by giving the Franchisee written notice that this Agreement is terminated and in that event, the effective date of termination of this Agreement will be the day the written notice of termination is given, as specified in Article 26.

**16.5**    **TMI'S IMMEDIATE TERMINATION RIGHTS.**  TMI will have the absolute right and privilege, unless precluded by applicable law, to immediately terminate this Agreement if:

(A)    the Franchisee or any of its Managers, partners, directors, officers or majority shareholders are convicted of, or plead guilty to or no contest to a charge of violating any law relating to the Franchised Business, or any felony;

(B)    the Franchisee or its Personal Guarantors are determined to be insolvent within the meaning of any state or federal law, any involuntary petition for bankruptcy is filed against the Franchisee or its Personal Guarantors (and is not dismissed by the court within 60 days of the filing), or the Franchisee or its Personal Guarantors file for bankruptcy under any state or federal law;

(C)    the Franchisee makes an assignment for the benefit of creditors or enters into any similar arrangement for the disposition of its assets for the benefit of creditors;

(D)    the Franchisee voluntarily or otherwise abandons the Franchised Business;

(E)    the Franchisee fails or refuses to permit TMI or its authorized agent to audit or review  the Franchisee's financial records or fails or refuses to produce its financial records for audit or review in accordance with Article 13.6;

(F)    the Franchisee fails to allow or provide to TMI electronic access to the Franchisee's data or information as required under Article 11.24 above; or

(G)    the Franchisee is involved in any act or conduct which materially impairs the goodwill associated with TMI's Marks or the System and the Franchisee fails to correct the breach within 24 hours of written notice from TMI of the breach.  For the purposes of this Agreement, an alleged breach of this Agreement by the Franchisee will be "corrected" if both TMI and the Franchisee agree in writing that the alleged breach has been corrected.

**16.6**    **NOTICE OF IMMEDIATE TERMINATION.**  If this Agreement is terminated by TMI pursuant to Article 16.5 above, then TMI will give the Franchisee written notice that this Agreement is terminated and in that event, the effective date of termination of this Agreement will be the day the written notice of termination is given, as specified in Article 26.

**16.7**    **DAMAGES.**  In the event this Agreement is terminated by TMI pursuant to this Article 16, or if the Franchisee breaches this Agreement by a wrongful termination or a termination that is not in accordance with the terms and conditions of Article 17 of this Agreement, then TMI will be entitled to seek recovery from the Franchisee for all damages that TMI has sustained and will sustain in the future as a result of the Franchisee's breach of this Agreement, taking into consideration the Continuing License Fees that would have been payable by the Franchisee for the remaining term of this Agreement.

**16.8**    **OTHER REMEDIES.**  Nothing in this Article 16 will preclude TMI from seeking other remedies or damages under state or federal laws, common law, or under this Agreement against the Franchisee including, but not limited to, attorneys' fees, punitive damages and injunctive relief.

**16.9**    **APPLICABLE LAW.**  If the provisions of this Article 16 are inconsistent with applicable law, the applicable law will apply.

### ARTICLE 17
### FRANCHISEE'S TERMINATION RIGHTS

**17.1**    **CONDITIONS OF BREACH.**  The Franchisee will have the right and privilege to terminate this Agreement, as provided herein, if: (A) TMI violates any material provision, term or condition of this Agreement; or (B) TMI fails to timely pay any material uncontested obligations due and owing to the Franchisee.

**17.2**    **NOTICE OF BREACH.**  The Franchisee will not have the right to terminate this Agreement or to commence any action or lawsuit against TMI for breach of this Agreement, injunctive relief, violation of any state, federal or local law (including alleged violations of franchise laws), violation of common law (including allegations of fraud and misrepresentation), rescission, general or punitive damages, or termination, unless and until:

       (A)    written notice setting forth the alleged breach or violation, in detail, has been given to TMI by the Franchisee; and

       (B)    TMI fails to correct the alleged breach or violation within 60 days after the date of the written notice.

If TMI fails to correct the alleged breach or violation, as provided for herein, within 60 days after written notice of the alleged breach, then this Agreement may be terminated by the Franchisee as provided for in this Agreement.  For the purposes of this Agreement, an alleged breach or violation of this Agreement by TMI will be "corrected" if both TMI and the Franchisee agree in writing that the alleged breach or violation has been corrected.

**17.3**    **LITIGATION.**  If TMI files a lawsuit within 60 days after the date TMI is given written notice of any alleged breach of this Agreement by the Franchisee, then the Franchisee will not have the right to terminate this Agreement until the facts of the alleged breach have been submitted to a court of competent jurisdiction, the court determines that TMI has breached this Agreement and TMI fails to correct the breach within the applicable time period.  If the court determines that TMI has violated or breached this Agreement as alleged by the Franchisee in the written notice given to TMI, then TMI will

have 60 days from the date the court issues a written determination on the matter to correct the specified breach or violation of this Agreement. If TMI does timely correct the specified breach or violation of this Agreement, then this Agreement will remain in full force and effect. If TMI does not correct the specified breach or violation of this Agreement, then the Franchisee will have the right to terminate this Agreement by giving TMI written notice that this Agreement is terminated, and in that event the effective date of termination of this Agreement will be the day the written notice of termination is given, as specified in Article 26. The time limitation set forth in this Article 17.3 within which TMI may commence litigation of a dispute or controversy relating to the right of the Franchisee to terminate this Agreement for an alleged breach will be mandatory. If TMI fails to comply with the time limitation set forth in this Article 17.3, the Franchisee may terminate this Agreement as provided for herein.

**17.4    WAIVER.** The Franchisee agrees to give TMI immediate written notice of any alleged breach or violation of this Agreement after the Franchisee has knowledge of, believes, determines or is of the opinion that there has been an alleged breach or violation of this Agreement by TMI. If the Franchisee fails to give written notice to TMI of any alleged breach or violation of this Agreement within one year from the date that the Franchisee has knowledge of, believes, determines or is of the opinion that there has been an alleged breach or violation by TMI, then the alleged breach or violation by TMI will be condoned, approved and waived by the Franchisee, the alleged breach or violation by TMI will not be a breach or violation of this Agreement by TMI, and the Franchisee will be barred from commencing any legal action against TMI for that alleged breach or violation.

**17.5    INJUNCTIVE RELIEF AVAILABLE TO TMI.** Notwithstanding any of the foregoing provisions, if the Franchisee gives TMI any notice of an alleged breach or violation of this Agreement or of any laws that give rise to damages and/or the termination of this Agreement by the Franchisee, then TMI will have the absolute right to immediately commence legal action against the Franchisee to enjoin and prevent the termination of this Agreement by the Franchisee until the matter has been resolved in court, all without giving the Franchisee any notice and without regard to any waiting period that may be contained in this Agreement. If TMI commences such legal action against the Franchisee, then the Franchisee will not have the right to terminate this Agreement, as provided for herein, unless and until a court of competent jurisdiction has ruled on the merits that TMI has breached this Agreement in the manner alleged by the Franchisee, and then only if TMI fails to correct the breach or violation within 60 days after a final judgment has been entered against TMI and all time for appeals by TMI has expired. If TMI commences any legal action against the Franchisee as contemplated by this provision, which will include legal actions for injunctive relief against the Franchisee to enjoin termination of this Agreement, then TMI will not be required to post any bonds or security whatsoever in such legal action.

**ARTICLE 18**
**EFFECT OF**
**TERMINATION OR EXPIRATION**

**18.1    FRANCHISEE'S INTEREST; GOODWILL.** Upon termination, expiration or non-renewal of this Agreement, Franchisee's interest in this Agreement and all rights licensed hereunder automatically reverts to TMI. All goodwill associated with the licensed Marks shall at all times remain the exclusive property of TMI.

**18.2    PAYMENT OF AMOUNTS OWED TMI.** Franchisee agrees to pay TMI, within five days of the effective date of termination or expiration of this Agreement, or at any later date that amounts due to TMI are determined:

(A)     all Continuing License Fees, Advertising Fees, Technology Fees, Software and Support Fees, amounts owed for purchases from TMI, late payments, interest, and any all other fees and amounts Franchisee owes to TMI;

(B)     upon termination for any default, the actual and consequential damages, costs, and expenses (including attorneys' fees, experts' fees, and interest on such costs and expenses) incurred by TMI as a result of Franchisee's default.

The obligation to pay these sums will create a lien in favor of TMI and against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory Franchisee owns at the time of the default and/or against any moneys TMI holds or are otherwise in TMI's possession.

**18.3    TERMINATION OF USE OF MARKS; OTHER OBLIGATIONS.**  Upon termination, expiration or non-renewal of this Agreement Franchisee shall:

(A)     strictly comply with all the provisions of this Agreement including, but not limited to, the Covenants Not to Compete set forth in Article 19;

(B)     deliver to TMI, within five days of the effective date of termination or expiration of this Agreement, all Manuals, proprietary information, confidential material, marketing and advertising materials, the required software, videotapes, and any other written materials containing any Mark or otherwise relating to a The Maids® Business;

(C)     alter, at its own expense, the appearance of the Franchisee's business location to eliminate any similarity in appearance, signage or décor to the distinctive appearance of a The Maids® Business, unless TMI exercises its rights under Article 14 of this Agreement.  Franchisee agrees to allow TMI, without liability to Franchisee or third parties, to remove these items from Franchisee's business location;

(D)     alter, at its own expense, the appearance of the automobiles used in the operation of the Franchised Business to eliminate any similarity in appearance, signage or décor to the distinctive appearance of automobiles used in the operation of a The Maids® Business, unless TMI exercises its rights under Article 14 of this Agreement;

(E)     inform its suppliers in writing of the termination of the Franchisee's right to operate a franchised The Maids® Business;

(F)     not hold itself out, either directly or indirectly, to the public or any other business as a present or former The Maids® franchise;

(G)     not represent directly or indirectly that any other business Franchisee may then own or operate, is or was operated as, or was in any way connected to TMI;

(H)     cease using The Maids® uniforms, office signs and decor, and vehicle colors and decals;

(I)        cease using any of TMI's distinctive, proprietary or confidential operational, administrative or advertising techniques, systems or know-how, or trade secrets disclosed to Franchisee by TMI;

(J)        cease use of all of TMI's Marks, any materials containing the Marks, and any other confusingly similar name or marks. The Franchisee agrees and acknowledges that its continued use of the Marks after the expiration or termination of this Agreement will be without TMI's consent and will constitute an "exceptional case" under federal trademark law (15 U.S.C. §1117) entitling TMI to recover treble damages, costs and attorneys' fees;

(K)        assist TMI and/or TMI's designee in the transition of customers' cleaning service(s) to TMI or TMI's designee, if applicable.

(L)        refund any and all outstanding gift certificates that current, former or prospective customers are in possession of;

(M)        return to customers all related keys in Franchisee's possession or to TMI or TMI's designee, if applicable;

(N)        refrain from engaging in any contacts with customers or former customers of the Franchised Business, other than with respect to collection of accounts receivable, the transition of customers to TMI's designee, and/or return of customer keys to the related customer;

(O)        notify the telephone company and telephone directory publisher of the termination or expiration of Franchisee's right to use any telephone, facsimile or other numbers and any telephone directory listings associated with the any Mark, and authorize the transfer of these numbers and directory listings to TMI or, at TMI's discretion, instruct the telephone company to forward all calls made to Franchisee's telephone numbers to numbers TMI specifies in accordance with the Telephone Listing Agreement; and

(P)        deliver to TMI, within 30 days, evidence that is satisfactory to TMI of Franchisee's compliance with each of the foregoing obligations.

**18.4    TRANSFER OF TELEPHONE DIRECTORY LISTINGS.** Upon termination or expiration of this Agreement, TMI will have the absolute right to notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use all telephone numbers and all classified and other directory listings under the "The Maids®" name and to authorize the telephone company and all listing agencies to transfer to TMI or its assignee all telephone numbers and directory listings for the Franchised Business. The Franchisee acknowledges that TMI has the absolute right and interest in and to all telephone numbers and directory listings associated with the Marks, and the Franchisee hereby authorizes TMI to direct the telephone company and all listing agencies to transfer the Franchisee's telephone numbers and directory listings to TMI or TMI's assignee if this Agreement expires or is terminated for any reason whatsoever. The telephone company and all listing agencies will have the right to accept this Agreement as evidence of the exclusive rights of TMI to such telephone numbers and directory listings and this Agreement will constitute the authority from the Franchisee for the telephone company and listing agency to transfer all such telephone numbers and directory listings to TMI. Upon termination or expiration of this Agreement, the Franchisee agrees to execute such other documents as is required by the telephone company and listing agency as may be necessary or desirable

in connection with the transfer of all telephone numbers and directory listings for the Franchisee's The Maids® Business. The Franchisee will not make any claims or commence any action against the telephone company and the listing agencies for complying with this provision.

**18.5    TRANSFER OF DOMAIN NAME REGISTRATIONS AND E-MAIL ADDRESSES.** Upon termination or expiration of this Agreement, TMI will have the absolute right to notify the domain name registry and internet service provider of the termination or expiration of Franchisee's right to use all domain name registrations and e-mail addresses associated with the Franchised Business and to authorize the domain name registry and internet service provider to transfer to TMI or its assignee all such domain name registrations and e-mail addresses. The Franchisee acknowledges that TMI has the absolute right and interest in and to all websites, domain name registrations and e-mail addresses associated with the Marks, and the Franchisee hereby authorizes TMI to direct the domain name registry and internet service provider to transfer the Franchisee's domain name registrations and e-mail addresses to TMI or its assignees if this Agreement expires or is terminated for any reason whatsoever. The domain name registry and internet service provider will have the right to accept this Agreement as evidence of the exclusive right of TMI to such websites, domain name registrations and e-mail addresses and this Agreement will constitute the authority from the Franchisee for the domain name registry and internet service provider to transfer such domain name registrations and e-mail addresses to TMI. Upon termination or expiration of this Agreement, the Franchisee agrees to execute such other documents as is required by the domain name registry and internet service provider as may be necessary or desirable in connection with the transfer of all domain name registrations and e-mail addresses for the Franchised Business. The Franchisee will not make any claims or commence any action against the domain name registry or the internet service provider for complying with this provision. The Franchisee further agrees not to utilize any "meta tags" and/or other hidden programming which would adversely affect such websites in the event registration of the domain name registrations and e-mail addresses are assigned to TMI.

**18.6    CONTINUING OBLIGATIONS.** All of TMI's and Franchisee's obligations which expressly or by their nature survive the expiration of this Agreement, will continue in full force and effect following and notwithstanding this Agreement's expiration or termination until the obligations are fully satisfied or by their nature expire.

### ARTICLE 19
### FRANCHISEE'S COVENANTS NOT TO COMPETE

**19.1    CONSIDERATION.** The Franchisee, the holders of all Ownership Interests in the Franchisee and the Personal Guarantors acknowledge that, pursuant to this Agreement, the Franchisee, its owners and its employees will receive specialized training, current and future marketing and advertising plans, business plans and strategies, "know-how," business information, concepts, confidential information and trade secrets from TMI pertaining to the System and the operation of The Maids® Business. In consideration for the use and license of such valuable and confidential information, the Franchisee, the holders of all Ownership Interests in the Franchisee and the Personal Guarantors will comply in all respects with the provisions of this Article 19. For purposes of this Agreement, "Personal Guarantors" means any persons executing the Personal Guaranty and Agreement to be Bound Personally by the Terms and Conditions of the Franchise Agreement, attached to this Agreement, which would include all holders of Ownership Interests of any entity which is the Franchisee, any spouse of any individual that is the Franchisee, and any other individual guaranteeing the obligations of the Franchisee under this Agreement.

**19.2    IN-TERM COVENANT NOT TO COMPETE.** TMI has advised the Franchisee that this provision is a material provision of this Agreement, and that TMI will not sell a The Maids®

franchise to any person or entity that does or intends to own, operate or be involved in a business that competes directly or indirectly with a The Maids® Business.  Consequently, the Franchisee, the holders of all Ownership Interests in the Franchisee and the Personal Guarantors will not, during the term of this Agreement, on their own account or as an employee, agent, consultant, partner, officer, director, member or shareholder of any other person, firm, entity, partnership or corporation, own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in, or assist any person or entity engaged in any business that is in any way competitive with (including, but not limited to, over the Internet) or similar to The Maids® Business, except with the prior written consent of TMI.  For purposes of this Article 19 and the other Articles of this Agreement, any business that is involved or engaged in any fashion in the home services, cleaning or maintenance of the interior or exterior of any residential or commercial structure or facility is competitive to a The Maids® Business.

 **19.3** **POST-TERM COVENANT NOT TO COMPETE.**  The Franchisee, the holders of all Ownership Interests in the Franchisee and the Personal Guarantors will not, for a period of 18 months after the termination or expiration of this Agreement, on their own account or as an employee, agent, consultant, partner, officer, director, member or shareholder of any other person, firm, entity, partnership or corporation, without first obtaining the prior written consent of TMI,

  (A) own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in any or other related business that is in any way competitive with (including, but not limited to, over the Internet) or similar to The Maids® Business or a facet thereof, which is located (i) within the Designated Market Area, (ii) within the territories of any other The Maids® Businesses operated by TMI or any of its franchisees, (iii) within any development area granted to any other person or entity by TMI pursuant to a development agreement, sub-franchise agreement or other agreement, (iv) within 20 miles of any of the areas described in (i), (ii) or (iii) above, or (v) over the Internet; or

  (B) divert or attempt to divert any existing or potential business or customers of TMI or any The Maids® Franchisee; or

  (C) solicit or perform maintenance or cleaning services for any customer for whom or which such services was performed by the Franchisee under The Maids® service marks, trademarks and System during the term of this Agreement.

The Franchisee, the holders of all Ownership Interests in the Franchisee and the Personal Guarantors expressly agree that the time, the Internet and the geographical limitations set forth in this provision are reasonable and necessary to protect TMI and TMI's franchisees if this Agreement expires or is terminated by either party for any reason, and that this covenant not to compete is necessary to permit TMI the opportunity to resell and/or develop a new The Maids® Business at or in the area near the Designated Market Area.  The Franchisee, the holders of all Ownership Interests in the Franchisee and the Personal Guarantors expressly acknowledge that they would not be in a position to operate a competing business following the termination, expiration or non-renewal of this Agreement without taking advantage of TMI's specialized training, marketing and advertising plans, business plans and strategies, "know-how," business information, concepts, confidential information and trade secrets.

 **19.4** **INJUNCTIVE RELIEF.**  The Franchisee, holders of all Ownership Interests in the Franchisee and the Personal Guarantors agree that the provisions of this Article 19 are necessary to protect the legitimate business interests of TMI and TMI's franchisees including, without limitation, prevention of the unauthorized dissemination of confidential information to competitors of TMI and

TMI's franchisees, protection of TMI's trade secrets and the integrity of TMI's franchise system, and prevention of the duplication of the System by unauthorized third parties. The Franchisee, holders of all Ownership Interests in the Franchisee and the Personal Guarantors also agree that damages alone cannot adequately compensate TMI if there is a violation of this Article 19 by the Franchisee, holders of all Ownership Interests in the Franchisee or the Personal Guarantors, and that injunctive relief against the Franchisee, holders of all Ownership Interests in the Franchisee and the Personal Guarantors is essential for the protection of TMI and TMI's franchisees. The Franchisee, holders of all Ownership Interests in the Franchisee and the Personal Guarantors agree therefore, that if TMI alleges that the Franchisee, holders of all Ownership Interests in the Franchisee or the Personal Guarantors have breached or violated this Article 19, then TMI will have the right to petition a court of competent jurisdiction for injunctive relief against the Franchisee, holders of all Ownership Interests in the Franchisee and the Personal Guarantors, in addition to all other remedies that may be available to TMI. TMI will not be required to post a bond or other security for any injunctive proceeding. In cases where TMI is granted ex parte injunctive relief against the Franchisee, holders of all Ownership Interests in the Franchisee or the Personal Guarantors, then the Franchisee, holders of all Ownership Interests in the Franchisee or the Personal Guarantors will have the right to petition the court for a hearing on the merits at the earliest time convenient to the court.

      **19.5    SEVERABILITY.** It is the desire and intent of the parties to this Agreement, including holders of all Ownership Interests in the Franchisee and the Personal Guarantors, that the provisions of this Article 19 be enforced to the fullest extent permissible under the laws and public policy applied in each jurisdiction in which enforcement is sought. Accordingly, if any part of this Article 19 is adjudicated to be invalid or unenforceable, then this Article 19 will be deemed amended to modify or delete that portion thus adjudicated to be invalid or unenforceable, such modification or deletion to apply only with respect to the operation of this Article 19 in the particular jurisdiction in which the adjudication is made. Further, to the extent any provision of this Article 19 is deemed unenforceable by virtue of its scope or limitation, the parties to this Agreement, including holders of all Ownership Interests in Franchisee and the Personal Guarantors, agree that the scope and limitation provisions will, nevertheless, be enforceable to the fullest extent permissible under the laws and public policies applied in such jurisdiction where enforcement is sought.

      **19.6    EXTENSION DURING BREACH OR NEGOTIATIONS**. The Franchisee, holders of all Ownership Interests in the Franchisee and the Personal Guarantors acknowledge and agree that the 18-month period expressed in Article 19.3 above shall be extended to include the time during which the Franchisee, holders of all Ownership Interests in the Franchisee or the Personal Guarantors are (a) in breach of any of the provisions of Article 19.3 of this Agreement or (b) are involved in ongoing negotiations for the reacquisition of the Franchise for the Designated Market Area after the expiration of this Agreement.

**ARTICLE 20**
**INDEPENDENT CONTRACTORS**

      **20.1    RELATIONSHIP OF PARTIES.** TMI and the Franchisee are each independent contractors and, as a consequence, there is no employer-employee or principal-agent relationship between TMI and the Franchisee. The Franchisee will not have the right to and will not make any agreements, representations or warranties in the name of or on behalf of TMI or represent that their relationship is other than that of franchisor and franchisee. Neither TMI nor the Franchisee will be obligated by or have any liability to the other under any agreements or representations made by the other to any third parties. The Franchisee will take all reasonable steps necessary to inform the public, customers, suppliers, lenders and other business establishments that the Franchised Business is independently operated by the Franchisee pursuant to a Franchise from TMI.

## ARTICLE 21
## INDEMNIFICATION

    **21.1**    <u>**INDEMNIFICATION.**</u>  Neither TMI or P&G will not be obligated to any person or entity for any damages arising out of, from, in connection with, or as a result of the Franchisee's negligence, the Franchisee's wrongdoing, or the operation of the Franchised Business.  Therefore, the Franchisee will indemnify and hold TMI, P&G and their respective affiliates harmless against, and will reimburse TMI, P&G and their respective affiliates for, all damages for which TMI, P&G and their respective affiliates is held liable and for all costs reasonably incurred by TMI in the defense of any claim or action brought against TMI arising from, in connection with, arising out of, or as a result of the Franchisee's negligence, the Franchisee's wrongdoing, Franchisee's breach of this Agreement, or the operation of the Franchised Business including, without limitation, attorneys' fees, investigation expenses, court costs, deposition expenses, interest, and travel and living expenses.  The Franchisee will indemnify TMI, P&G and their respective affiliates, without limitation, for all claims arising from: (A) any personal injury, property damage, commercial loss or environmental contamination resulting from any act or omission of the Franchisee or its employees, agents or representatives; (B) any failure on the part of the Franchisee to comply with any requirement of any governmental authority; (C) any failure of the Franchisee to pay any of its obligations; or (D) any failure of the Franchisee to comply with any requirement or condition of this Agreement or any other agreement with TMI or any affiliate of TMI.  TMI and P&G will have the right to defend any claim made against it arising as a result of, in connection with or from the Franchisee's negligence or the operation of the Franchised Business.

    **21.2**    <u>**ATTORNEYS' FEES AND OTHER COSTS.**</u>  The Franchisee will pay all attorneys' fees, costs and expenses incurred by TMI in enforcing any term, condition or provision of this Agreement or in seeking to enjoin any violation of this Agreement by the Franchisee.  In any action brought pursuant to this Agreement where TMI prevails against the Franchisee, the Franchisee will indemnify TMI for all costs that it incurs in any lawsuit or proceeding arising under this Agreement including, without limitation; attorneys' fees, expert witness fees, costs of investigation, court costs, litigation expenses, interest, travel and living expenses, and all other costs incurred by TMI.

    **21.3**    <u>**CONTINUATION OF OBLIGATIONS.**</u>  The indemnification and other obligations contained herein will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## ARTICLE 22
## ACKNOWLEDGMENTS

    **22.1**    <u>**BUSINESS RISKS; NO FINANCIAL PROJECTIONS.**</u>  The Franchisee acknowledges that it has conducted an independent investigation of The Maids® Business and recognizes that the business venture contemplated by this Agreement involves business and economic risks and that the financial and business success of the Franchised Business will be primarily dependent upon the personal efforts of the Franchisee, its management and its employees.  TMI expressly disclaims the making of, and the Franchisee acknowledges that it has not received, any estimates, projections, warranties or guaranties, expressed or implied, regarding potential Gross Revenues, income, profits or earnings, expenses or the financial or business success of the Franchised Business, except as set forth in TMI's Franchise Disclosure Document, a copy of which has been provided to the Franchisee.

    **22.2**    <u>**NO INCOME OR REFUND WARRANTIES.**</u>  TMI does not warrant or guarantee to the Franchisee: (A) that the Franchisee will derive income or profit from the Franchised Business; or (B) that TMI will refund all or part of the Initial Franchise Fee or any other fees paid hereunder, or the price paid for the Franchised Business, or repurchase any of the vehicles, products, supplies or equipment

supplied or sold by TMI or an approved supplier if the Franchisee is unsatisfied with its Franchised Business.

**22.3     RETAINING OF LEGAL COUNSEL.**  The Franchisee acknowledges that TMI has strongly recommended that the Franchisee should retain an attorney to review TMI's Franchise Disclosure Document, including TMI's financial statements and this Agreement, review all leases, contracts and other documents relating to The Maids® Business, to advise the Franchisee on tax issues, financing matters, applicable state and federal laws, environmental laws, licensing laws and any other laws relating to household maintenance and cleaning, employee issues, insurance, structure of the Franchised Business, and other business matters, and to advise the Franchisee as to the terms and conditions of this Agreement and the potential economic benefits and risks of loss relating to this Agreement and the Franchised Business.

**22.4     OTHER FRANCHISEES.**  The Franchisee acknowledges that other franchisees of TMI have or will be granted franchises at different times, different locations, under different economics and in different situations, and further acknowledges that the economics and terms and conditions of such franchises may vary substantially in form and in substance from those contained in this Agreement.

**22.5     RECEIPT OF AGREEMENT AND FRANCHISE DISCLOSURE DOCUMENT.**
The Franchisee acknowledges that except for negotiated changes the Franchisee initiated, it received a copy of this Agreement with all material blanks fully completed at least seven calendar days prior to the date that this Agreement was executed by the Franchisee.  The Franchisee further acknowledges that it has received a copy of TMI's Franchise Disclosure Document at least fourteen calendar days prior to the date on which this Agreement was executed.

**ARTICLE 23**
**DISCLAIMER; FRANCHISEE'S LEGAL COUNSEL**

**23.1     DISCLAIMER BY TMI.**  TMI expressly disclaims the making of any express or implied representations or warranties regarding the sales, earnings, income, profits, Gross Revenues, business or financial success, or value of the Franchised Business that were not contained in the Franchise Disclosure Document received by the Franchisee.

**23.2     ACKNOWLEDGMENTS BY FRANCHISEE.**  The Franchisee acknowledges that it has not received any express or implied representations or warranties regarding the sales, earnings, income, profits, Gross Revenues, business or financial success, value of the Franchised Business or any other matters pertaining to The Maids® Business from TMI or any of TMI's officers, employees or agents that were not contained in the Franchise Disclosure Document received by the Franchisee (hereinafter referred to in this provision as "Representations").  The Franchisee further acknowledges that if it had received any such Representations, it would not have executed this Agreement, and that it would have: (A) promptly notified the President of TMI in writing of the person or persons making such Representations; and (B) provided to TMI a specific written statement detailing the Representations made.

**23.3     LEGAL REPRESENTATION.**  The Franchisee acknowledges that this Agreement constitutes a legal document which grants certain rights to and imposes certain obligations upon the Franchisee.  The Franchisee has been advised by TMI to retain an attorney or advisor prior to the execution of this Agreement to review TMI's Franchise Disclosure Document, to review this Agreement in detail, to review all legal documents, to review the economics, operations and other business aspects of the Franchised Business, to determine compliance with franchising and other applicable laws, to advise the Franchisee regarding the economic risks, liabilities, obligations and rights under this Agreement and

41

to advise the Franchisee on tax issues, financing matters, applicable state and federal laws, health and safety laws, environmental laws, employee issues, insurance, structure of The Franchised Business, and other business matters.  The name of the Franchisee's attorney or other advisor is:

Name:_____

Name of Firm:_____

Address:_____

City, State, Zip Code:_____

Telephone Number:_____

Fax Number:_____

## ARTICLE 24
## ENFORCEMENT

**24.1**    **INJUNCTIVE RELIEF.**  TMI will have the right to petition a court of competent jurisdiction for the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement relating to:

    (A)    TMI's Marks, the required software and the System;

    (B)    the obligations of the Franchisee upon termination or expiration of this Agreement;

    (C)    the assignment, transfer or sale of this Agreement, the Franchised Business or the Ownership Interests of the Franchisee;

    (D)    confidentiality and covenants not to compete; and

    (E)    any act or omission by the Franchisee or the Franchisee's employees that, (1) constitutes a violation of any applicable law, ordinance or regulation, (2) is dishonest or misleading to the clients or customers of the Franchised Business or other The Maids® Businesses, (3) constitutes a danger to the employees, public, clients or customers of the Franchised Business, or (4) may impair the goodwill associated with TMI's Marks, the required software and the System.

TMI will be entitled to injunctive relief against the Franchisee without posting a bond or other security. The Franchisee will indemnify TMI for all costs that it incurs in any lawsuit or proceedings under this provision including, without limitation; attorneys' fees, expert witness fees, costs of investigation, court costs, litigation expenses, accounting fees, travel and living expenses, and all other costs incurred by TMI.

**24.2**    **SEVERABILITY.**  All provisions of this Agreement are severable and this Agreement will be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein and partially valid and enforceable provisions will be enforced to the extent valid and enforceable.  If any applicable law or rule of any jurisdiction requires a greater prior notice of the termination of this Agreement than is required hereunder or the taking of some other action not required hereunder, or if under any applicable law or rule of any jurisdiction, any provision of this Agreement or

any specification, standard or operating procedure prescribed by TMI is invalid or unenforceable, the prior notice or other action required by such law or rule will be substituted for the notice requirements hereof, or such invalid or unenforceable provision, specification, standard or operating procedure will be modified to the extent required to be valid and enforceable. Such modifications to this Agreement will be effective only in such jurisdiction and will be enforced as originally made and entered into in all other jurisdictions.

      **24.3**    **WAIVER.** TMI and the Franchisee may, by written instrument signed by TMI and the Franchisee, waive any obligation of or restriction upon the other under this Agreement. Acceptance by TMI of any payment by the Franchisee and the failure, refusal or neglect of TMI to exercise any right under this Agreement or to insist upon full compliance by the Franchisee of its obligations hereunder including, without limitation, any mandatory specification, standard or operating procedure, will not constitute a waiver by TMI of any provision of this Agreement.

      **24.4**    **PAYMENTS TO TMI.** The Franchisee will not for any reason withhold payment of any Continuing License Fees or any other fees or payments due TMI pursuant to this Agreement or pursuant to any other contract, agreement or obligation to TMI. The Franchisee will not have the right to "offset" any liquidated or unliquidated amounts, damages or other funds allegedly due to the Franchisee by TMI against any Continuing License Fees or any other fees or payments due to TMI under this Agreement or under any other agreement or contract. TMI shall have the right to apply any payments received from the Franchisee first to the repayment of all costs of collection, including but not limited to attorney's fees, next to any late payment charges, next to accrued interest and then to the oldest obligation due under this Agreement or any other agreement between the Franchisee and TMI or an affiliate of TMI. In addition, TMI shall have the right to set-off, from any amounts that TMI may owe to the Franchisee, any amount that the Franchisee owes to TMI.

      **24.5**    **EFFECT OF WRONGFUL TERMINATION.** In the event that TMI or the Franchisee takes any action to terminate this Agreement and/or to convert the Franchised Business to another business without first complying with the terms and conditions (including the written notice and opportunity to cure provisions) of Article 16 or Article 17 of this Agreement, as applicable, then such action will not relieve either party of, or release either party from, any of its obligations under this Agreement, and the terms and conditions of this Agreement will remain in full force and effect until such time as this Agreement expires or is terminated in accordance with the provisions of this Agreement and applicable law.

      **24.6**    **CUMULATIVE RIGHTS**. The rights of TMI hereunder are cumulative and no exercise or enforcement by TMI of any right or remedy hereunder will preclude the exercise or enforcement by TMI of any other right or remedy hereunder or which TMI is entitled by law to enforce.

      **24.7**    **VENUE AND JURISDICTION.** Unless provided by this Agreement or applicable law to the contrary, all litigation, lawsuits, hearings, proceedings and other actions initiated by either party against the other party will be venued exclusively in Douglas County, Nebraska. The Franchisee acknowledges that the Franchisee and its officers, directors, members, partners and employees have had substantial business and personal contacts with TMI in Douglas County, Nebraska. Consequently, TMI, the Franchisee, and each of their officers, directors and shareholders, and the Personal Guarantors do hereby agree and submit to personal jurisdiction in the State of Nebraska for the purposes of any suit or proceeding brought to enforce or construe the terms of this Agreement or to resolve any dispute or controversy arising under, as a result of, or in connection with this Agreement, the Designated Market Area or the Franchised Business, and do hereby agree and stipulate that any such suits, proceedings, hearings or other actions will be exclusively venued and held in Douglas County, Nebraska. TMI also reserves the right to file any litigation, lawsuits, hearings, proceedings or other action against the

Franchisee in the federal or state courts where the Franchised Business is located. The Franchisee waives all rights to challenge personal jurisdiction and venue.

  **24.8** **BINDING AGREEMENT.** This Agreement is binding upon the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest.

  **24.9** **NO ORAL MODIFICATION.** No modification, change, addition, rescission, release, amendment or waiver of this Agreement and no approval, consent or authorization required by any provision of this Agreement may be made except by a written agreement signed by duly authorized officers or partners of the Franchisee and the President or the Chief Operating Officer. The Franchisee and TMI will not have the right to amend or modify this Agreement orally or verbally, and any attempt to do so will be void in all respects.

  **24.10** **ENTIRE AGREEMENT.** This Agreement supersedes and terminates all prior agreements, either oral or in writing, between the parties involving the franchise relationship and therefore, representations, inducements, promises or agreements alleged by either TMI or the Franchisee that are not contained in this Agreement will not be enforceable. The preambles are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings or agreements between TMI and the Franchisee relating to the subject matter of this Agreement. Nothing in this Agreement is intended to disclaim the representations TMI made in its Franchise Disclosure Document that TMI provided to the Franchisee.

  **24.11** **JOINT AND SEVERAL LIABILITY.** If the Franchisee consists of more than one individual, then the liability of all such individuals under this Agreement will be joint and several.

  **24.12** **HEADINGS; TERMS.** The headings of the Articles are for convenience only and do not in any way define, limit or construe the contents of such Article. The term "Franchisee" as used herein is applicable to one or more individuals, a corporation or a partnership, as the case may be, and the singular usage includes the plural, the masculine usage includes the neuter and the feminine, and the neuter usage includes the masculine and the feminine. References to "Franchisee," "assignee," "licensee" and "transferee" which are applicable to an individual or individuals will mean the principal owner or owners of the equity or operating control of the Franchisee or any such assignee or transferee if the Franchisee or such assignee or transferee is a corporation or partnership. If the Franchisee consists of more than one individual, then all individuals will be bound jointly and severally by the terms and conditions of this Agreement.

  **24.13** **OPERATION IN THE EVENT OF ABSENCE, DISABILITY OR DEATH.** To endeavor to avoid any interruption of the Franchised Business which would cause harm to the Franchised Business and thereby depreciate the value of the Franchised Business, the Franchisee expressly authorizes TMI, if the Franchisee and its Manager are absent or incapacitated by illness or death, or in the absence of a Manager who has successfully completed the TMI SMART Start Training program, and the Franchisee is not, therefore, in the sole judgment of TMI, able to operate the Franchised Business, to operate the Franchised Business for as long as TMI deems necessary and practical, without waiver of any other rights or remedies TMI may have under this Agreement. All monies received by TMI from the operation of the Franchised Business during such period of operation by TMI will be kept in a separate account and the expenses of such Business, including reasonable compensation and expenses for TMI's representatives, will be charged to such account. If TMI operates the Franchised Business for the Franchisee, the Franchisee agrees to indemnify and hold harmless TMI and any representative of TMI from and against all acts which TMI or such representative may perform in such operation of the Franchised Business.

**24.14    NO DISPUTES SUBJECT TO ARBITRATION.**  No disputes arising under, as a result of, or in connection with this Agreement, the Designated Market Area or the Franchised Business will be subject to arbitration or mediation.

**24.15    NO CLASS ACTIONS.**  No party except TMI, the Franchisee, and the Franchisee's officers, directors, partners, members, shareholders and Personal Guarantors will have the right to join in any proceeding arising under this Agreement.  No class actions or the joinder of any person or entity that is not a party to this Agreement shall be involved in or participate in any legal actions conducted pursuant to this Agreement.

**ARTICLE 25**
**GOVERNING LAW**

**25.1    GOVERNING LAW.**  Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §1051 et seq.), this Agreement and the relationship between TMI and the Franchisee will be governed by the laws of the state in which the Designated Market Area is located.  The provisions of this Agreement which conflict with or are inconsistent with applicable governing law will be superseded and/or modified by such applicable law only to the extent such provisions are inconsistent.  All other provisions of this Agreement will be enforceable as originally made and entered into upon the execution of this Agreement by the Franchisee and TMI.

**ARTICLE 26**
**NOTICES**

All notices to TMI will be in writing and will be made by personal service upon an officer or director of TMI or sent by prepaid registered or certified mail addressed to TMI at 9394 West Dodge Road, Suite 140, Omaha, NE 68114 or such other address as TMI may designate in writing, with a copy to Craig Miller, Gray Plant Mooty, 500 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402.  All notices to the Franchisee will be made by personal service upon the Franchisee (or, if applicable, upon an officer or Director of the Franchisee) or sent by prepaid registered or certified mail addressed to the Franchisee at the Franchisee's office, or such other address as the Franchisee may designate in writing.  Notice may also be made through delivery by a recognized delivery service that requires a written receipt signed by the addressee.  Notice by mail is effective upon depositing the same in the mail in the manner provided above, notice by personal service is effective upon obtaining service, and notice by overnight delivery service is effective upon delivery (as confirmed by written receipt) by such delivery service.

IN WITNESS WHEREOF, TMI, the Franchisee and the holders of all of the Ownership Interests in the Franchisee have respectively signed and sealed this Agreement effective as of the day and year first above written.

"TMI"
**THE MAIDS INTERNATIONAL, LLC**

By _____    7/24/2020
DocuSigned by:
0B1D21C95A95455...

Its _____CEO_____


"Franchisee"
DocuSigned by:
_Derk Wallace_____    7/24/2020
34A283113611434...

_____

_____

_____


The undersigned holders of Ownership Interests in the Franchisee hereby agree to be bound by the terms and conditions of this Agreement.

| HOLDERS | PERCENTAGE OF OWNERSHIP |
|---------|-------------------------|
| DocuSigned by: _Derk Wallace_ 34A283113611434... | 100 _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |

## PERSONAL GUARANTY AND AGREEMENT TO BE BOUND
## PERSONALLY BY THE TERMS AND CONDITIONS
## OF THE FRANCHISE AGREEMENT

In consideration of the execution of this Agreement by TMI, and for other good and valuable consideration, the undersigned, for themselves, their heirs, successors, and assigns, do jointly, individually and severally hereby become surety and guaranty for the payment of all amounts and the performance of the covenants, terms and conditions in this Agreement, to be paid, kept and performed by the Franchisee.

Further, the undersigned, individually and jointly, hereby agree to be personally bound by each and every condition and term contained in this Agreement and agree that this Personal Guaranty should be construed as though the undersigned and each of them executed an Agreement containing the identical terms and conditions of this Agreement.

If any default should at any time be made therein by the Franchisee, then the undersigned, their heirs, successors and assigns, do hereby, individually, jointly and severally, promise and agree to pay to TMI all monies due and payable to TMI under the terms and conditions of this Agreement.

In addition, if the Franchisee fails to comply with any other terms and conditions of this Agreement, then the undersigned, their heirs, successors and assigns, do hereby, individually, jointly and severally, promise and agree to comply with the terms and conditions of this Agreement for and on behalf of the Franchisee.

In addition, should the Franchisee at any time be in default on any obligation to pay monies to TMI or any subsidiary or affiliate of TMI, whether for merchandise, products, supplies, furniture, fixtures, equipment or other goods purchased by the Franchisee from TMI or any subsidiary or affiliate of TMI, or for any other indebtedness of the Franchisee to TMI or any subsidiary or affiliate of TMI, then the undersigned, their heirs, successors and assigns, do hereby, individually, jointly and severally, promise and agree to pay all such monies due and payable from the Franchisee to TMI or any subsidiary or affiliate of TMI upon default by the Franchisee.

It is further understood and agreed by the undersigned that the provisions, covenants and conditions of this Personal Guaranty will inure to the benefit of the successors and assigns of TMI.

## PERSONAL GUARANTORS

_Derk Wallace_                         7/24/2020
_____         _____
Individually                          Individually

24514 Elise Falls
_____         _____
Address                               Address

San Antonio, TX 78255
_____         _____
City            State    Zip Code     City            State    Zip Code

210-319-9653
_____         _____
Telephone                             Telephone


_____         _____
Individually                          Individually


_____         _____
Address                               Address


_____         _____
City            State    Zip Code     City            State    Zip Code


_____         _____
Telephone                             Telephone


_____         _____
Individually                          Individually


_____         _____
Address                               Address


_____         _____
City            State    Zip Code     City            State    Zip Code


_____         _____
Telephone                             Telephone

48

EXHIBIT A

**<u>DESIGNATED MARKET AREA</u>**

     The Franchisee's Designated Market Area shall be the following geographic area, as described on the attached written boundaries and map.

DocuSign Envelope ID: C4DB0F01-5A1A-4258-9A66-D0EC009105BF

DocuSign Envelope ID: C4D89E01-5A1A-4258-9A66-D0EC009105BF

Territory : Wallace C1







Page 2

# Summary for Wallace C1

## 2020 Demos by AGS

| Territory Name | Total Households | Number of HH 75k+ | Number of HH 100k+ | Number of HH 150k+ |
|---|---|---|---|---|
| Wallace C1 | 150,676 | 65,679 | 45,965 | 20,758 |

EXHIBIT E

## **SOFTWARE LICENSE AGREEMENT**

DocuSign Envelope ID: C4DB9F01-5A1A-4258-9A66-D0EC009105BF

# THE MAIDS INTERNATIONAL, LLC
## SOFTWARE LICENSE AGREEMENT

1.      **Parties**.  This Software License Agreement (this "Agreement") is entered into effective as of the _____ day of _____, 20___ (the "Effective Date"), by and between The Maids International, LLC, a Nebraska limited liability company, ("Licensor") and <u>Raising Dreams Group, LLC, a Texas limited liability company</u> ("Licensee").

2.      **Software**.  Licensor has entered into an Agreement with Waterstreet Technology Group, 171 Water Street, Suite 200, Vancouver, BC  V6B 1A7 ("WSTG") whereby Licensor has been granted a limited Master License for licensing purposes to distribute WSTG's Licensed Franchise Management Software (the "Software") to its franchisees.  The Software was designed specifically to support the operations and management of a The Maids® Business.  "Software" means all software products supplied to  Licensee by Licensor including all documentation, user manuals, and other material related to the Software, whether in machine-readable or printed form, and error corrections and enhancements supplied by Licensor pursuant to this Agreement.  If significant structural changes to the Software are made, additional upgrade costs may be incurred by Licensee.

3.      **Franchise Relationship**.  Licensee (as Franchisee) has signed a Franchise Agreement with Licensor (as Franchisor) on or before the date of this Agreement (hereinafter the "Franchise Agreement").  Pursuant to the Franchise Agreement, Licensee operates or will operate a franchised The Maids® Business to service a Designated Market Area defined in the Franchise Agreement.  Licensee desires to obtain a license to use the Software in connection with the operation of its franchised The Maids® Business.

4.      **Hardware and Software**.  Licensee has acquired, at its sole expense, prior to or concurrently with access to the Software by Licensor, the compatible computer hardware and peripheral equipment, operating system software, internet connection, and other computer hardware and software required by Licensor to support the operation of the Software.  Licensee will, at its sole expense, acquire any other hardware or third-party software required by Licensor during the term of this Agreement for the support of the Software or the operation of Licensee's The Maids® Business, and will pay all license or use fees payable with respect to any software required to support the operation of the Software.

5.      **Grant of License**.  Licensor grants to Licensee a nonexclusive and non-transferable license to use the Software in Licensee's business subject to the terms and conditions of this Agreement.  Licensee is strictly prohibited from using the Software (a) for any purpose other than supporting the operation of Licensee's The Maids® Business, or (b) after the expiration or termination of this Agreement.

6.      **Monthly Software Fees**.  In addition to the Software and Support Fee paid to Licensor pursuant to the terms of the Franchise Agreement, Licensee will pay a monthly fee which allows Licensee one site license per Licensee defined business entity (site), access to upgrades, fixes or any future versions of the Software at no additional cost and allows access to all training provided by Licensor.  Software Subscription Fees are $105 to $265 (based on prior calendar year's Gross Revenues) per month, plus an additional $30 per office per month.  Licensee will remit the Software and Support Fee monthly to Licensor on or after the 15th of the month for which the License is active.  Licensee is deemed active for purposes of the initiation of continuing software fees upon completion of SMART Start Training.  Remittance of the monthly Software and Support Fee to Licensor must be made (a) by pre-authorized electronic bank transfer from Licensee's account to Licensor's account, or (b) as otherwise directed by Licensor.  Licensee will remit all applicable sales, use, excise, and other taxes on the Software, except for

taxes based on Licensor's net income. Licensor reserves the right to increase the monthly Software Subscription Fee upon 30 days' notice.

**7.      Software Support Plan.** Basic Software support is provided by Licensor as part of the monthly software fee. Software customization, enhancements or other non-standard requests may result in billable services at WSTG's current rate.

**8.      Late Payment**. Any amounts that are not paid to Licensor when due shall bear interest from the date due until paid of the lesser of 18% per annum or the maximum legal rate of interest allowed by the state in which the Licensee's The Maids® Business is located.

**9.      Term**. Unless sooner terminated, the term of this Agreement and of the license granted herein will begin on the Effective Date and continue until the expiration or termination of the Franchise Agreement. Licensee enter into a successor Software License Agreement with Licensor by signing Licensor's then-current form of Software License Agreement, and by paying all fees and complying with all terms and conditions set forth in the then-current form of Software License Agreement. Licensee further acknowledges that future changes in technology may necessitate upgrades in hardware and third-party software required to operate the Software which may result in additional costs or fees payable by Licensee after the initial term of this Agreement.

**10.      Licensee Responsibilities - Security**. Licensee must use discretion in granting access to Software and agrees to adhere to best practices for secure use and access to customer and business information. Licensee and users agree that unique login and password assignments will be granted to each user of the software and will not be shared. Passwords should be changed at least every thirty days. Licensee agrees to use up-to-date local anti-virus software on each device accessing Software. Licensee agrees to notify Licensor in the event, or suspicion of, a security breach in which an unauthorized or authorized user may have or has accessed Software for malicious purpose.

**11.      Ownership**. Licensee is granted only a license to use the Software, and Licensor and/or WSTG retain all title to the Software. Licensor and/or WSTG reserve all rights in the patents, copyrights, trade secrets and other intellectual property in the Software.

**12.      Confidential Information**. Licensee agrees that the Software is confidential and contains proprietary information of Licensor and that its unauthorized disclosure could cause the Licensor irreparable harm. Licensee agrees not to disclose the Software or make the Software available to anyone other than Licensee's employees or contractors unless Licensee has Licensor's prior written consent. Licensee will exercise no less than reasonable care to protect the Software from unauthorized disclosure, and will take reasonable steps to ensure that Licensee's employees and contractors do not disclose it in violation of this Agreement. Licensee will be liable to Licensor for damages if Licensee is negligent in protecting the Software in accordance with this Agreement. LICENSEE WILL NOT DISASSEMBLE, DECOMPILE, OR REVERSE ENGINEER THE SOFTWARE UNDER ANY CIRCUMSTANCES.

**13.      Access to Software and Information**. Licensee agrees that Licensor will at all times have the right to access the Software, by high speed internet access, i.e. cable modem access, for purposes of obtaining financial, sales, customer, marketing and all other data and information contained, resident or otherwise available in Licensee's computer system, for purposes of verifying compliance by Licensee with the terms of this Agreement or the Franchise Agreement, and for such other purposes as may be determined by Licensor, in its sole discretion. Licensor will have the right to retain and use any information obtained by accessing Licensee's Software for any purposes deemed appropriate by Licensor, in its sole discretion. Licensor may also, personally or through its assignees, access Licensee systems for the purposes of technical troubleshooting, diagnosis and resolution.

14.  **Limited Warranty**.   LICENSOR EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, GUARANTEES OR REMEDIES, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

15.  **Limitation of Liability**.  UNDER NO CIRCUMSTANCES WILL LICENSOR BE LIABLE FOR LOSS OF DATA, REPROCUREMENT COSTS, LOST REVENUE OR PROFITS OR FOR ANY OTHER SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES EVEN IF THEY WERE FORESEEABLE OR LICENSEE HAS INFORMED LICENSOR OF SUCH POTENTIAL DAMAGES.

16.  **Proprietary Rights Indemnity**.  Licensor will, at its expense, defend Licensee against any claim that the Software infringes a United States patent or copyright.  Licensee must give the Licensor prompt written notice of any claim and cooperate fully with Licensor in its defense.  Licensor will have the sole authority to control the case and any related settlement negotiations, and will pay all costs, damages and attorney's fees that a Court finally awards as a result of such claim.  If, in Licensor's opinion, the Software or any component of the Software is likely to become the subject of such a claim, Licensor will have the right, at its option and expense, to attempt to either secure the right to continue using the Software, or else replace or modify the Software so that it becomes non-infringing without materially affecting the Licensee's ability to use it.  If neither of these alternatives is available on terms which Licensor deems to be reasonable, then Licensee will return the Software to Licensor at Licensor's request, and Licensor will have no further obligations to Licensee with regard to the Software.  Licensor will not be obligated to Licensee under this section for any claim which arises as a result of or relates to (a) Licensee's modification of the Software; (b) Licensor's compliance with Licensee's specifications or instructions in connection with providing support services; (c) the combination or interconnection of the Software with any other product, device or system Licensor did not supply or designate; or (d) any claims of infringement relating to any computer software other than the Software, including any claims relating to any operating system used to support the operation of the Software.

17.  **Assignment**.  Licensee will not sublicense, transfer, rent or lease the Software except in connection with an assignment of Licensee's The Maids® Business pursuant to and in accordance with the terms and conditions of the Franchise Agreement, or otherwise with Licensor's prior written consent. If Licensor gives Licensee authorization to transfer this Agreement and the license granted hereunder to use the Software, the assignee must agree to accept the terms and conditions of this Agreement or sign Licensor's then-current Software License Agreement, at Licensor's option.  Licensee access to Software will be terminated.  Licensor will have the right to assign this Agreement or the rights to receive monthly Software Subscription Fees to a parent or Affiliate Company, a successor in interest, or other transferee upon notice to the Licensee.

18.  **Default**.  Any of the following occurrences will constitute an "Event of Default" under this Agreement:

    (a)    Licensee's failure to pay when due any monthly Software Subscription Fees or other charge or fee payable to Licensor pursuant to this Agreement;

    (b)    Licensee's breach or default of any other provision of this Agreement if such breach or default is not corrected within 30 days, or such other period of time specified by applicable law, after the Licensor gives the Licensee written notice of breach;

(c)    The Franchise Agreement is terminated by either party or expires and is not renewed; or

(d)    Licensee is in default of any of its obligations under the Franchise Agreement and fails to correct such default in accordance with the notice and cure provisions of the Franchise Agreement.

19.    **Licensor's Remedies Upon Default**.  Upon the occurrence of any event of default, Licensor will have the right to exercise any or all of the following rights and remedies:

(a)    Terminate this Agreement;

(b)    Declare all amounts owed to Licensor pursuant to this Agreement to be immediately due and payable;

(c)    Require that Licensee cease use of the Software;

(d)    Cease performance of all of Licensor's obligations under this Agreement without liability to Licensee;

(e)    Use computer hardware and/or computer software to limit Licensee's use of the Software; and/or

(f)    Use computer hardware and/or computer software to render the Software unusable to Licensee.

20.    **Sole Agreement; Modification**.  This Agreement is the sole agreement between the parties relating to the subject matter hereof and supersedes all prior understandings, writings, proposals, representations or communications, oral or written, of either party.  This Agreement may be amended only by a writing executed by the party against whom enforcement is sought.

21.    **Governing Law**.  This Agreement will be interpreted in accordance with the substantive laws of the state in which Licensee's The Maids® Business is located.

22.    **Costs and Attorneys' Fees**.  Licensee will indemnify Licensor for all costs that Licensor incurs in any lawsuit or proceeding to enforce this Agreement including, without limitation; actual attorneys' fees, expert witness fees, costs of investigation, court costs, litigation expenses, travel and living expenses, and all other costs incurred by Licensor.

23.    **Severability**.  All provisions of this Agreement are severable and this Agreement will be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein and partially valid and enforceable provisions will be enforced to the extent valid and enforceable. If any applicable law or rule of any jurisdiction requires a greater prior notice of the termination of this Agreement than is required or the taking of some other action not required, or if under any applicable law or rule of any jurisdiction, any provision of this Agreement is invalid or unenforceable, the prior notice or other action required by such law or rule will be substituted for the notice requirements hereof, or such invalid or unenforceable provision will be modified to the extent required to be valid and enforceable. Such modifications to this Agreement will be effective only in such jurisdiction and will be enforced as originally made and entered into in all other jurisdictions.

24.     **Waiver; Consent**.  Licensor and Licensee may, by written instrument signed by Licensor and Licensee, waive any obligation of or restriction upon the other under this Agreement.  Acceptance by Licensor of any payment by Licensee and the failure, refusal or neglect of Licensor to exercise any right under this Agreement or to insist upon full compliance by Licensee of its obligations will not constitute a waiver by Licensor of any provision of this Agreement.  Whenever this Agreement requires Licensor's prior written consent, such consent may be withheld by Licensor for any reason whatever.

25.     **No Rights of Offset**.  Licensee will not, on grounds of the alleged nonperformance by Licensor of any of its obligations or for any other reason, withhold payment of any monthly Software Subscription Fees or payments due Licensor pursuant to this Agreement or pursuant to any other contract, agreement or obligation.  Licensee will not have the right to "offset" any liquidated or unliquidated amounts, damages or other funds allegedly due to Licensee by Licensor against any payments due to Licensor under this Agreement.

26.     **Licensor's Rights Cumulative**.  The rights of Licensor are cumulative and no exercise or enforcement by Licensor of any right or remedy will preclude the exercise or enforcement by Licensor of any other right or remedy or which Licensor is entitled by law to enforce.

27.     **Jurisdiction; Venue**.  All litigation, court hearings, or other proceedings initiated by either party against the other party will be initiated, venued and maintained in strict accordance with the corresponding applicable provisions of the Franchise Agreement.

28.     **Binding Agreement**.  This Agreement is binding upon the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest.

29.     **Headings**.  The headings used in this Agreement are for convenience only and do not in any way define, limit or construe the contents hereof.

30.     **Notices**.  All notices to Licensor or Licensee will be given in accordance with and subject to the corresponding applicable terms and conditions of the Franchise Agreement.

31.     **Counterparts**.  This Agreement may be executed simultaneously in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed this Agreement to be effective as of the day and year first above written.

**"LICENSEE"**                                    **"LICENSOR"**
                                                 **THE MAIDS INTERNATIONAL, LLC**

By _Derk Wallace_____ 7/24/2020      By _D. Kim_____ 7/24/2020
   34A283113611434...                        0B1D21C95A95455...
Its _President_____          Its _CEO_____

DocuSign Envelope ID: C4D80F01-5A1A-4258-9A66-D0EC009105BF

DocuSign Envelope ID: C4D89F01-5A1A-4258-9A66-D0EC009105BF

EXHIBIT F

## NATIONAL ALLIANCE PARTICIPATION AGREEMENT

DocuSign Envelope ID: C4D80F01-5A1A-4258-9A66-D0EC009105BF

# NATIONAL ALLIANCE PARTICIPATION AGREEMENT

The undersigned franchisee ("Franchisee") and The Maids International, LLC ("TMI") are parties to a The Maids® franchise agreement (the "Franchise Agreement").    Franchisee, by executing this Participation Agreement (the "Agreement"), elects to become a participating franchisee in the arrangements between TMI and all of TMI's national alliances ("Alliances") as described in the master services agreements entered into by and between TMI and Alliances (the "Master Services Agreement").    TMI has created a manual and other written documents that TMI will make available to Franchisee and will periodically update, that describes various standards, programs and rules for Franchisee to participate in arrangement between TMI and its Alliances.  Franchisee accepts, and agrees to be bound by, all of the terms of this Agreement and the Alliances Manual.  Except as provided for in Section 7 of this Agreement, in the event of an inconsistency between the terms of this Agreement and the terms of the Franchise Agreement, the terms of the Franchise Agreement control.

# TERMS

1.     Provision of Services.    Franchisee shall provide certain services to Alliances' customers in accordance with this Agreement and with the terms and conditions of Alliances Manual (the "Services").

2.     Service Fees.    Alliances shall pay TMI the fees due under the Master Services Agreements as described in the Alliances Manual (the "Fees").    TMI will forward weekly invoices as updated on TMI's intranet or otherwise in writing to Alliances for Services previously performed by Franchisee.  Alliances will provide payment of the Fees to TMI no later than thirty (30) days from the date of receipt of such invoice. Once the Fees are received by TMI from Alliances, TMI will remit such Fees to Franchisee within a reasonable amount of time, but no later than within ten (10) business days of its receipt of such fees from Alliances.  Fees pertaining to any additional services or service hours requested by Alliances' customers will be payable directly to Franchisee by customer. Franchisee shall locate and provide to TMI any documentation required to substantiate any Fees, including an itemized list of the Services provided to specific residences on specific dates, as requested.  In the event that Alliances reasonably disputes any Fees, it must submit written notice and any supporting documentation to TMI within thirty (30) days of its receipt of TMI's invoice.  TMI will immediately forward such notice to Franchisee for Franchisee's consideration. Franchisee shall provide TMI a written response within ten (10) days of the date of Alliances' notice of dispute.

3.     Taxation.  Franchisee is responsible for payment of any and all taxes related to its provision of the Services to Alliances, including without limitation, any and all state and local sales and use taxes, gross receipts, business and occupation taxes incurred or required to be paid for any reason in connection with the sale of Services to Alliances or any penalties or interest assessed on audit due to any action, inaction or omission of Alliances or its customers or their respective employees, agents, contractors or representatives with respect to the taxes to be paid hereunder.  The Fees are inclusive of any such taxes. The terms set forth in Section 2 of this Agreement shall govern any collection of taxes pursuant to this Section 3.

4.     Insurance.  Franchisee will submit to TMI concurrently with the execution of this Agreement, and annually thereafter, proof of all insurance required under the Franchise Agreement.  Franchisee agrees to keep TMI informed of all claim activities involving the Services provided to Alliances or its customers, including actions taken with regard to any claim by any insurance carrier. The purchase of insurance and the furnishing of certificates are required in order to perform any Services for Alliances or its customers.

5.     Compliance with TMI Franchise Agreement.    Except as provided for in Section 7 of this Agreement, Franchisee agrees to comply with all of its obligations under its Franchise Agreement with

TMI, including but not limited to, being on the latest version of software and related electronic payment process, being current with payment of royalties and meeting its obligations with an agreed upon payment plan.

6.    Exclusivity.  Franchisee agrees these programs are maintained exclusively with Alliances and that agreements with any company to perform the same services provided to the Alliances may be a violation of the exclusivity terms of the Master Services Agreements.  Any other relationships with such companies must be approved in writing by TMI prior to their commencement.

7.    Franchisee Availability Outside Its Territory.  Notwithstanding any provision of Franchisee's Franchise Agreement to the contrary, upon Franchisee's execution of this Agreement, TMI will designate the zip codes outside the Designated Market Area ("DMA") of Franchisee (and all other TMI franchisees' DMAs) in which Franchisee is able to offer Services under this Agreement, if Franchisee is willing to do so.  TMI retains the sole and exclusive right and authority to designate to which franchisee sales from Alliance programs will be sent when outside any DMAs and may reassign or sell those service zips at any time.  TMI also retains the sole and exclusive right and authority to amend the Alliances projects that Franchisee will perform in such areas during the term of this Agreement.   Franchisee acknowledges the designation to perform Services under this Agreement is a non-exclusive designation and that it will have no right to perform Alliances projects in any designated zip codes should TMI sell a DMA which includes the designated zip codes or reassigns the designated zip codes to another franchisee.

8.    Marketing Outside Its Territory.  Franchisee acknowledges that TMI does not recommend marketing outside of a Franchisee's DMA.

9.    Service Standards and Quality Labor Standards.  Franchisee agrees to abide by the "Service Standards" and the "Quality Labor Standards" required by the Alliances as described in the TMI's Alliances Manual.

10.    Indemnification.  Franchisee will indemnify, defend and hold TMI and the Alliances, and their respective affiliates, subsidiaries, officers, directors, agents and employees harmless for, from and against any and all liability, third party claims, causes of action, costs, loss and/or damages, including reasonable attorney's fees and costs (collectively, "Adverse Consequences"), arising out of or related to Franchisee's action or inaction with the performance of its obligations under this Agreement, including any Adverse Consequences arising out of or relating to the determination by any taxing jurisdiction that TMI or any Alliance owes any tax, penalty or interest with respect to Franchisee's provision of Services to Alliances or its customers.  Franchisee will give prompt written notice to TMI of any Adverse Consequence for which Franchisee will have an obligation to indemnify and hold harmless TMI or an Alliance.  This section will survive the termination, cancellation or expiration of this Agreement.

11.    Use of Marks/Logos.  Franchisee may not use Alliances' marks and logos without TMI's prior written consent.

12.    Participation.  TMI reserves the right, in its sole discretion, to determine a Franchisee's ability to participate in the program.  At TMI's discretion, Franchisee may not be allowed to participate for any reason, including but not limited to quality issues, customer damage, or non-compliance with the Agreement.

13.    Notification of non-compliance.  Franchisee shall immediately inform TMI in writing of any non-compliance with the Agreement.  If Franchisee breaches this Agreement, TMI may terminate this Agreement immediately upon written notice.

July 24

14.  <u>Effective Date and Termination</u>.  The Effective Date of this Agreement is _____, 2020 ("Effective Date").  The term of this Agreement commences on the Effective Date and continues for a period of one (1) year thereafter ("Initial Term").  This Agreement shall automatically renew on the Effective Date every year until the earlier of (i) termination of the Master Services Agreements, or (ii) TMI or Franchisee providing thirty (30) days prior written notice to the other party of its intent to terminate the Agreement.

15.  <u>Miscellaneous</u>.  All litigation, court hearings, or other proceedings initiated by either party against the other party will be initiated, venued and maintained in strict accordance with the corresponding applicable provisions of the Franchise Agreement. This Agreement is binding upon the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest.

**"FRANCHISEE"**

By _____    7/24/2020
   DocuSigned by:
   *Derk Wallace*
   34A283113611434...

Its _____
   President

DocuSign Envelope ID: C4DB0F01-5A1A-4258-9A66-D0EC009105BF

EXHIBIT G

**PROMISSORY NOTE AND SECURITY AGREEMENT**

DocuSign Envelope ID: C4D80F01-5A1A-4258-9A66-D0EC009105BF

DocuSign Envelope ID: C4D80F01-5A1A-4258-9A66-D0EC009105BF

EXHIBIT H

## AGREEMENTS TO BE SIGNED BY THE FRANCHISEE AND/OR ITS MANAGER

DocuSign Envelope ID: C4D80F01-5A1A-4258-9A66-D0EC009105BF

DocuSign Envelope ID: C4D59F01-5A1A-4258-9A66-D0EC009105BF

The following are copies of Agreements and forms THE MAIDS International, LLC requires Franchise Owners and/or Managers to sign:

| AGREEMENT/FORM | SIGNED BY |
|---|---|
| Franchise Questionnaire | Franchise Owner |
| Telephone Listing Agreement | Franchise Owner |
| Assignment of Domain Name and E-Mail Address | Franchise Owner |
| Authorization of Electronic Transfer of Funds | Franchise Owner |
| Manual Sign-Off Agreement | Franchise Owner |
| Model Release | Franchise Owner<br>Manager |
| TMI Confidentiality / Nondisclosure Agreement | Franchise Owner |

DocuSign Envelope ID: C4D80F01-5A1A-4258-9A66-D0EC009105BF

## FRANCHISE QUESTIONNAIRE

As you know, The Maids International, LLC (the "Franchisor") and you are preparing to enter into a Franchise Agreement for the operation of a The Maids® franchised business (the "Franchise").  The purpose of this Questionnaire is to determine whether any statements or promises were made to you that the Franchisor has not authorized and that may be untrue, inaccurate or misleading.  Please review each of the following questions carefully and provide honest responses to each question.

| QUESTION | YES | NO |
|---|---|---|
| 1. Have you received the Franchisor's Franchise Disclosure Document at least 14 days before signing the Franchise Agreement? | x | |
| 2. Did you sign a receipt for the Franchise Disclosure Document indicating the date you received it? | x | |
| 3. Did you personally review the Franchise Disclosure Document and do you understand all of the information contained in the Franchise Disclosure Document? | x | |
| 4. Have you received and personally reviewed the Franchise Agreement and each exhibit or schedule attached to it? | x | |
| 5. If Franchisor materially altered the provisions of the basic Franchise Agreement or any related agreements attached to the Franchise Disclosure Document (except as a result of negotiations you initiated) before you signed the Franchise Agreement did you receive a copy of the revised Franchise Agreement at least seven days prior to signing the Franchise Agreement? | x | |
| 6. Do you understand the terms of and your obligations under the Franchise Agreement? | x | |
| 7. Have you discussed the benefits and risks of operating the Franchise with an attorney, accountant or other professional advisor? | x | |
| 8. Do you understand the risks associated with operating the Franchise? | x | |
| 9. Do you understand that the success or failure of the Franchise will depend in large part upon your skills and abilities, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace? | x | |

| QUESTION | YES | NO |
|---|---|---|
| 10. Do you understand that this franchise business may be impacted by other risks, including those outside your or our control such as economic political or social disruption, including COVID-19? In addition, do you understand that the COVID-19 outbreak and any preventative or protective actions that federal, state, and local governments may take in response to this pandemic may result in a period of business disruption reduced customer demand, and reduced operations for The Maids® businesses? Do you also understand that the extene5t to which the coronavirus impacts the The Maids® system will depend on future developments which are highly uncertain and which we cannot predict? | x | |
| 11. Has any employee or other person speaking on behalf of the Franchisor made any statement or promise regarding the total amount of money you may earn in operating the Franchise that is contrary to, or different from, the information contained in the Franchise Disclosure Document? | | x |
| 12. Has any employee or other person speaking on behalf of the Franchisor made any statement or promise concerning the total amount of revenue the Franchise that is contrary to, or different from, the information contained in the Franchise Disclosure Document? | | x |
| 13. Has any employee or other person speaking on behalf of the Franchisor made any statement or promise concerning the costs involved in operating the Franchise that is contrary to, or different from, the information contained in the Franchise Disclosure Document? | | x |
| 14. Has any employee or other person speaking on behalf of the Franchisor made any statement or promise concerning the actual, average or projected profits or earnings or the likelihood of success, that you should or might expect to achieve from operating the Franchise that is contrary to, or different from, the information contained in the Franchise Disclosure Document? | | x |
| 15. Has any employee or other person speaking on behalf of the Franchisor made any statement or promise or agreement, other than those matters addressed in your Franchise Agreement, concerning advertising, marketing, media support, market penetration, training, support service or assistance relating to the Franchise that is contrary to, or different from, the information contained in the Franchise Disclosure Document? | | x |

If you answered "Yes" to any of questions ten (10) through fourteen (14), please provide a full explanation of your answer in the following blank lines. (Attach additional pages, if necessary, and refer to them below.) If you have answered "No" to each of the foregoing questions, please leave the following lines blank.

I understand that COVID-19 may impact the business success of my franchise.

You understand that your answers are important to us and that we will rely on them.  By signing this Questionnaire, you are representing that you have responded truthfully to the above questions.

*Derk Wallace*

_____        _____
FRANCHISE APPLICANT                                                FRANCHISE APPLICANT


7/24/2020

Date: _____                Date: _____

# THE MAIDS INTERNATIONAL, LLC

### TELEPHONE LISTING AGREEMENT

Between

The Maids International, LLC

**And**

Raising Dreams Group, LLC

July 24                          20
_____, 20____

In accordance with the terms of the Franchise Agreement between <u>Raising Dreams Group,</u> <u>LLC, a Texas limited liability company</u> ("Franchisee") and The Maids International, LLC ("TMI"), a Nebraska limited liability company, executed concurrently with this Assignment, under which TMI granted Franchisee the right to own and operate a franchised business located in _____Bexar_____ County,Texas (the "Franchised Business"), Franchisee, for value received, hereby assigns to TMI all of Franchisee's right, title, and interest in and to those certain telephone numbers and regular, classified, or other telephone directory listings (collectively, the "Telephone Numbers and Listings") associated with TMI trade and service marks and used from time to time in connection with the operation of the Franchised Business.  This assignment is for collateral purposes only and, except as specified herein, TMI will have no liability or obligation of any kind whatsoever arising from or in connection with this Assignment unless TMI notifies the telephone company and all listing agencies (collectively, the "Telephone Company") pursuant to the terms hereof to effectuate the assignment.

Upon termination or expiration of the Franchise Agreement (without renewal or extension), TMI will have the right and is hereby empowered to effectuate the assignment of the Telephone Numbers and Listings, and, in such event, Franchisee will have no further right, title, or interest in the Telephone Numbers and Listings and will remain liable to the Telephone Company for all past due fees owing to the Telephone Company on or before the effective date of the assignment hereunder.

Franchisee agrees and acknowledges that as between TMI and Franchisee, upon termination or expiration of the Franchise Agreement, TMI will have the sole right to and interest in the Telephone Numbers and Listings, and Franchisee appoints TMI as Franchisee's true and lawful attorney-in-fact to direct the Telephone Company to assign same to TMI, and execute such documents and take such actions as may be necessary to effectuate the assignment.  Upon such event, Franchisee will immediately notify the Telephone Company to assign the Telephone Numbers and Listings to TMI.  If Franchisee fails to promptly direct the Telephone Company to assign the Telephone

Numbers and Listings to TMI, TMI will direct the Telephone Company to effectuate the assignment, contemplated hereunder, to TMI.  The parties agree that the Telephone Company may accept written direction from TMI, or this Assignment, as conclusive proof of TMI's exclusive rights in and to the Telephone Numbers and Listings upon such termination or expiration.  The parties further agree that if the Telephone Company requires that the parties execute the Telephone Company's assignment forms or other documentation at the time of termination or expiration, TMI's execution of such forms or documentation will effectuate Franchisee's consent and agreement to the assignment.  The parties agree that at any time after the date hereof, they will perform such acts and execute and deliver such documents as may be necessary to assist in or accomplish the assignment described herein upon termination or expiration of the Franchise Agreement.

FRANCHISEE

By: _Dirk Wallace_____     Date: 7/24/2020_____
 34A283113611434...

Its:_President_____


By:_____     Date:_____

Its:_____



ASSIGNEE
THE MAIDS INTERNATIONAL, LLC,
a Nebraska limited liability company

By:_____     Date: 7/24/2020_____
 0B1D21C95A95455...

Its:_CEO_____

# THE MAIDS INTERNATIONAL, LLC

### ASSIGNMENT OF DOMAIN NAME
### AND E-MAIL ADDRESS

The undersigned, <u>Raising Dreams Group, LLC, a Texas limited liability company</u>, d/b/a The Maids®, hereby assigns to The Maids International, LLC ("TMI"), 9394 West Dodge Road, Suite 140, Omaha, NE 68114, all of my (our) right, title, and interest in and to the following domain names and e-mail addresses:

_____,    _____

_____,    _____

TMI will hold this assignment until the earlier of the time (a) TMI notifies the undersigned that the undersigned (or any affiliate of the undersigned) is in default under any Franchise Agreement or any other agreement with TMI (or any affiliate of TMI) or (b) such Franchise Agreement expires or is terminated.  The undersigned agrees to pay all amounts, whether due and payable or not, that any domain name registry or internet service provider may require in connection with such transfer or otherwise and agrees to indemnify and hold harmless _____ _____ ("Registry") and _____ _____ ("ISP") and TMI in connection with this and any other assignment and any other matters and/or disputes related in any way thereto.

The Registry and the ISP are requested to honor this Assignment upon notice by TMI that the undersigned (or any affiliate of the undersigned) is in default under such Franchise Agreement or any other agreement with TMI (or any affiliate of TMI) or such Franchise Agreement has expired or is or was terminated.

On transfer to TMI, TMI may continue the monthly (periodic) service with said Registry and ISP or cancel the same, but shall not be obligated or liable for any arrears or charges for domain name registration or internet service or otherwise prior to such transfer, the undersigned specifically agreeing to remain liable for any such charges.

Dated: __July 24_____, 20_20_

_____          _____
(Signature)                                              (Signature)

Derk Wallace

_____          _____
(Print or Type Name)                               (Print or Type Name)

# THE MAIDS INTERNATIONAL, LLC
### Authorization Electronic Transfer of Funds

Company
Name:  The Maids International, LLC

Company ID
Number: _____

I (we) hereby authorize The Maids International, LLC. ("TMI") to initiate debit entries and to initiate, if necessary, credit entries and adjustments for any debit entries and to initiate, if necessary, credit entries and adjustments for any debit entries in error to my (our) _____ Checking _____ Savings account (select one) indicated below.  I (we) further authorize the depository named below (the "DEPOSITORY") to debit and/or credit the same to such account.

DEPOSITORY   Security Service Federal Credit Union
Name:

Branch:        Rim

Address:       15000 IH 10 W

City:    San Antonio    State:    Texas    Zip:    78249

Transit/ABA No.:    314088637    Account No.:    6625118071

This authority is to remain in full force and effect until TMI has received written notification from me (or either of us) of its termination in such time and in such manner as to afford TMI reasonable opportunity to act on it.  I (or either of us) have the right to stop payment of debit entry by notification to DEPOSITORY at such time as to afford DEPOSITORY a reasonable opportunity to act on it prior to charging such account.  After such account has been charged, I have the right to have the amount of erroneous debit immediately credited to my account by DEPOSITORY, provided I (we) send written notice of such debit entry in error to DEPOSITORY within fifteen (15) days following issuance of the account statement or forty-five (45) days after posting, whichever occurs first.

Name(s):    Derk Wallace

ID Number: _____

Date:    7/24/2020

Signed:    *Derk Wallace*
           34A283113611434...

Signed: _____

DocuSign Envelope ID: C4DB0F01-5A1A-4258-9A66-D0EC009105BF

# THE MAIDS INTERNATIONAL, LLC

### Video and Manual Sign off Agreement

All The Maids® proprietary documents, manuals and video programs, electronic or hard copy are copyrighted and confidential material and shall not be copied, reproduced, or disclosed in any manner or form without expressed written permission from The Maids International, LLC
Items included, but not limited to:

- All documents and discussions found on MaidShare.net.
- All manuals found in the InfoBucket, including Administrative, Technical, TM Connect and Marketing manuals.
- Video programs found on TMI's Online Learning Platform.  Access to the proprietary website outside of The Maids® office is not recommended.  Additionally, passwords should not be provided to the employees.

All learning materials are the property of The Maids International, LLC and any available copies must be returned to The Maids International upon termination of the franchise agreement.  Please fill in the information requested below and return the original to the home office.  Retain a copy for your files.

| | |
|---|---|
| Training date | |
| Franchise number | |
| Name | Derk Wallace |
| Signature | *Derk Wallace* (DocuSigned by: 34A283113611434...) |
| Date | 7/24/2020 |
| Location | San Antonio |

DocuSign Envelope ID: C4DB0F01-5A1A-4258-9A66-D0EC009105BF

DocuSign Envelope ID: C4D89E04-5A1A-42E8-9A66-D0EC909105BF

# THE MAIDS INTERNATIONAL, LLC

MODEL RELEASE

Date _____    7/24/2020

NAME OF MODEL   Derk Wallace
_____

ADDRESS   24514 Elise Falls, San Antonio, TX 78255
_____

TELEPHONE NUMBER   210-319-9653
_____

I hereby give The Maids International, its successors and assigns those acting under its permission and upon its authority, or those for whom it is acting, the absolute right and permission to copyright and/or publish photographic portraits or motion pictures of me or in which I may be included in whole or in part, or composite or distorted in character, or in form, in conjunction with my own or a fictitious name, or reproductions thereof in color or otherwise, made through any media at their studios or elsewhere for art, advertising, trade, or any other lawful purpose whatsoever.

I hereby waive any right that I may have to inspect and/or approve the finished product or the advertising copy that may be used in connection therewith or the use to which it may be applied.

I hereby release, discharge, and agree to save harmless The Maids International, its successors and assigns and all persons acting under the permission or authority or those for whom it is acting, from any liability by virtue of blurring, distortion, alteration, optical illusion, or use in composite form whether intentional or otherwise, that may occur or be produced in the finished product, unless it can be shown that they and the publication thereof were maliciously caused, produced and published solely for the purpose of subjecting me to conspicuous ridicule, scandal, reproach, scorn, and indignity.

I hereby waive release, discharge, and agree to save harmless The Maids International, its successors and assign and all other persons acting under their permission or authority or these for whom it is acting from any claim for residuals or other multiple compensation for repeated showings of photographic portraits or motion pictures of me.

I hereby warrant that I am of full age and have every right to contract in my own name in the above regard. I state further that I have read the above authorization and release, prior to its execution, and that I am fully familiar with its contents.

DocuSigned by:

MODEL SIGNATURE   *Derk Wallace*
34A283113611434...

I, the undersigned, being the parent or guardian of the above Model, do hereby for a valuable consideration consent and release and signature thereto on behalf of my child or ward.

PARENT OR GUARDIAN _____

# The Maids

## CONFIDENTIALITY/NONDISCLOSURE AGREEMENT

I acknowledge and agree that The Maids International, LLC ("Company"), is engaged in a highly competitive industry of professional residential cleaning service.  I further acknowledge and agree that Company has invested substantial time, effort and money in the development of its trade secrets, business methods and procedures, employees, customers and other confidential and proprietary information defined below as "Confidential Information" which has enabled Company to compete successfully in its business, and the disclosure of such information would be greatly damaging to Company and the continued success of its business.

Therefore, in order to protect Company from the misappropriation of its Confidential Information and to allow me to receive and use the Confidential Information, I agree as follows:

Confidential Information.  For purposes of this Agreement, "Confidential Information" is defined as trade secrets and all internal business information which is proprietary in nature, confidential to Company, and not generally available to the public or to Company's competitors.  Such Confidential Information includes, without limitation, information about Company's products and services, customers and prospective customers, the buying patterns and needs of customers and prospective customers, vendors and suppliers, pricing, costing systems, billing and collection procedures, proprietary software and the source code thereof, financial and accounting data, data processing and communications, technical data, marketing strategies, business plans, research and development of new or improved products and services, and general know-how regarding the business of Company and its products and services (collectively "Confidential Information").

Nondisclosure.  Both during and after my employment with Company, I will not directly or indirectly disclose to any person or entity or use for any purpose or permit the exploitation, copying or summarizing of any Confidential Information of Company, except as specifically required in the proper performance of my duties for Company.

Return of Property.  I acknowledge and agree that the Confidential Information is and at all times shall remain the sole and exclusive property of Company.  Upon the termination of my employment with Company or upon request by Company at any time, I will promptly return to Company in good condition all documents, data and records of any kind, whether in hard copy or electronic form, which contain any Confidential Information or which were prepared based on Confidential Information, including any and all copies thereof, as well as all materials furnished to or acquired by me during the course of my employment with Company.

Enforcement.  I acknowledge and agree that, by reason of the sensitive nature of the Confidential Information of Company referred to in this Agreement, a breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Company for which there may not be an adequate remedy at law.  As such, I acknowledge and agree that, in addition to the recovery of any damages and other legal relief to which Company may be entitled in the event of my violation of this Agreement, Company shall also be entitled to equitable relief, including such injunctive relief as may be necessary to protect the interests of Company in such Confidential Information and as may be necessary to specifically enforce this Agreement.

Dated: 7/24/2020  _____

Franchisee  _____
DocuSigned by:
*Dirk Wallace*
34A283113611434...

Franchisee  _____

# PROMISSORY NOTE

July 24

$58,895.05                                        _____, 2020

Omaha, Nebraska



 **FOR VALUE RECEIVED**, the undersigned, <u>Raising Dreams Group, LLC, a Texas limited liability company</u> ("Maker"), promises to pay to the order of The Maids International, LLC, a Nebraska limited liability company (herein with its successors and/or assigns, "Payee") at 9394 West Dodge Road, Suite 140, Omaha, NE 68114, or at such other place as the Payee or other holder hereof may direct in writing, the aggregate principal sum of <u>Fifty Eight Thousand Eight Hundred Ninety-Five Dollars and 05/100 ($58,895.05),</u> payable as follows:

 1. **Principal**. This Note shall be due and payable by electronic funds transfer in one lump sum payment of <u>Fifty Eight Thousand Eight Hundred Ninety-Five Dollars and 05/100 ($58,895.05),</u> which shall occur at the earliest of within 15 days of Maker receiving funds from the SBA or November 1, 2020. All payments are to be made in lawful money of the United States of America in immediately available funds.

 2. **Events of Default**. An "Event of Default" shall be deemed to have occurred in the event that: (a) any installment of principal due hereunder is not paid after becoming due and payable; or (b) any default by Maker occurs in the performance of the covenants, obligations or other provisions under the Franchise Agreements between Maker and Payee (the "Franchise Agreement(s)"), or any other agreement between Maker (or its affiliates) and Payee; or (c) any representation or warranty of the Maker set forth in the Franchise Agreement(s), or any other agreement between Maker and Payee proves to have been incorrect in any material respect; or (d) Maker becomes subject to any bankruptcy, insolvency or debtor relief proceedings; or (e) Maker fails to comply with or perform any provision of this Note not constituting a default under the previous items of this paragraph and such failure continues for fifteen (15) days after notice thereof to Maker; or (f) a default occurs causing the acceleration of any material obligation of Maker to any other creditors; or (g) any guarantors of the Franchise Agreement(s) revokes or renounces his or her guaranty; or (h) the Franchise Agreement(s) is terminated by Maker or by Payee or is declared terminated in any judicial proceeding.

 3. **Default and Remedies**. Upon the occurrence of an Event of Default as defined herein or at any time thereafter, the entire principal of this Note shall become immediately due and payable, without further notice to Maker, at the option of Payee or other holder hereof. Payee or other holder hereof may also exercise any rights and remedies available to it as a secured party under the Security Agreement (if applicable), the Nebraska Uniform Commercial Code or other applicable law. To the extent permitted by applicable law, all benefits, rights and remedies hereunder shall be deemed cumulative and not exclusive of any other benefit, right or remedy herein. The failure of Payee or other holder hereof to exercise any right or remedy hereunder shall not be deemed to be a release or waiver of any obligation or liability of the Maker.

 4. **Obligations Absolute**. All obligations of Maker hereunder are absolute and unconditional, irrespective of any offset or counterclaim of Maker against Payee or other holder hereof. Maker hereby waives the right to claim or enforce any right of offset, counterclaim, recoupment or breach in any action brought to enforce the obligations of Maker under this Note.

 5. **Waivers**. Maker and any co-makers, sureties, endorsers and guarantors of this Note hereby jointly and severally waive presentment for payment, notices of non-performance or nonpayment,

protest, notice of protest, notice of dishonor, diligence in bringing suit hereon against any party hereto and notice of acceleration, and further consent to any extension of time for payment hereunder (whether one or more), any renewal hereof (whether one or more), any substitution or release of Collateral (if applicable), and any addition or release of any party liable for payment of this Note. Any such extension, renewal, substitution or release may be made without notice to any such party and without discharging such party's liability hereunder. Payee reserves the right, in its sole and exclusive discretion, to waive the requirement in Section 2 above that all payments hereunder be due by electronic funds transfer.

6.     **Collection Costs; Attorney's Fees**. Maker agrees to pay all expenses and costs of collection, including all reasonable attorney's fees and expenses, court costs, costs of sale and costs of maintenance and repair and similar costs incurred by Payee in connection with the enforcement of this Note, the collection of any amounts payable hereunder, whether by acceleration or otherwise, and/or the sale or other disposition of any Collateral.

7.     **Prepayment**. Maker may prepay this Note, in whole or in part, at any time without premium or penalty. Any partial payments shall be applied to the principal.

8.     **Severability**. If any term or provision of this Note or application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Note, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and shall be valid and enforced to the fullest extent permitted by law.

9.     **Notice**. All notices pursuant to this Agreement shall be in writing and delivered by certified or registered mail, by reputable commercial delivery service, or by telecopy (with a confirmation copy mailed, postage prepaid). Until changed by written notice to the other party, notices to each party must be addressed as follows:

| | |
|---|---|
| Notices to Payee: | THE MAIDS International, LLC |
| | 9394 West Dodge Road, Suite 140 |
| | Omaha, NE 68114 |
| | |
| With a copy to: | GRAY PLANT MOOTY |
| | 80 South 8th Street |
| | IDS Tower 500 |
| | Minneapolis, MN 55402 |
| | Attn: John Fitzgerald |
| Notices to Maker: | Raising Dreams Group LLC |
| | _____ |
| | 24514 Elise Falls |
| | _____ |
| | San Antonio, TX 78255 |
| | _____ |
| | Attn: Derk Wallace |
| | _____ |

10.     **Jurisdiction and Venue**. It is hereby agreed that any and all claims, disputes or controversies whatsoever arising from or in connection with this Note, shall be commenced, filed and litigated, if at all, in the judicial district in which Omaha, Nebraska, is located, unless the conduct of such litigation is not within the subject matter jurisdiction of the court of such district. The parties waive all

questions of personal jurisdiction, convenience of forum and venue for purposes of carrying out this provision.

**11.**   **Jury Trial Waiver**.

**MAKER AND PAYEE IRREVOCABLY WAIVE TRIAL BY JURY, REGARDLESS OF THE FORUM, IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ARISING FROM, WHETHER DIRECTLY OR INDIRECTLY, THIS NOTE.**

**12.**   **Governing Law**. In order to effect uniform interpretation of this Note, this Note and all disputes or controversies arising or related hereto shall be interpreted and construed under the laws of the State of Nebraska.  In the event of any conflict of law question, the law of Nebraska shall prevail, without regard to the application of Nebraska conflict of law rules.

**13.**   **Amount Owing**. The records of Payee or other holder of this Note shall be prima facie evidence of the amount owing on this Note.

**14.**   **Release.**  In consideration of the credit given to the Maker as evidenced by this Note, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned, for himself and his agents, employees, representatives, associates, heirs, successors and assigns (collectively the "Franchisee Entities"), does hereby fully and finally release and forever discharge the Payee ("TMI"), and its officers, shareholders, directors, agents, employees, representatives, associates, successors and assigns (collectively, the "TMI Entities") of and from any and all actions and causes of action, suits, claims, demands, damages, judgments, accounts, agreements, covenants, debts, levies and executions, including without limitation attorneys' fees, whatsoever, whether known or unknown, liquidated or unliquidated, fixed, contingent, direct or indirect, whether at law or in equity, which the Franchisee Entities, or any one or more of them, have had, now have or may in the future have against the TMI Entities, or any one or more of them, arising out of, in connection with or relating in any way to that certain franchise agreement between the undersigned and TMI, dated _____, 20___ (the "Franchise Agreement") or any other agreement between the undersigned and TMI, including but not limited to, any actions for fraud or misrepresentation, violation of any franchise laws, violation of any state or federal antitrust or securities laws, or violation of any common law, from the beginning time to the date of this Note; provided, however, specifically excluded from the release provisions of this Note shall be all obligations of TMI under the Franchise Agreement first accruing on and after the date hereof.

IN WITNESS WHEREOF, Maker has made, executed and delivered this Note effective as of the date first above written.

**MAKER**

Raising Dreams Group, LLC, a Texas limited liability company

By: _Derk Wallace_   7/24/2020
34A283113611434

Name: _Derk Wallace_____

Title: _President_____

DocuSign Envelope ID: C4D50F01-5A1A-42F8-9A66-D0FC909105BF





EXHIBIT
C

August 15, 2025

<u>Sent Via Electronic Mail and UPS</u>
Raising Dreams Group LLC
Attn: Derk Wallace
24514 Elise Falls
San Antonio, TX 78255
raisingdreamsgroup@gmail.com

RE:    **<u>NOTICE OF TERMINATION OF FRANCHISE AGREEMENT</u>**

Dear Mr. Wallace:

As you know, The Maids International, LLC is the franchisor (the "Franchisor") of The Maids® franchised businesses that provide household maintenance and cleaning services. This Notice of Termination is issued in connection with the franchise agreement Raising Dreams Group LLC (the "Franchisee") entered into with Franchisor on or about July 24, 2020 (the "Franchise Agreement"), pursuant to which Franchisee was granted the right and undertook the obligation to operate a The Maids® franchised business in or around Bexar County, Texas (the "Franchised Business"). Capitalized terms not otherwise defined herein shall have the meaning set forth in the Franchise Agreement.

<u>Notice of Termination</u>

**<u>You are hereby notified that the Franchise Agreement is terminated effective immediately upon your receipt of this Notice, due to your material defaults under the Franchise Agreement</u>**. You are instructed to comply with all post-term obligations as set forth in Sections 18 and 19.3 of the Franchise Agreement and as summarized in this Notice. This includes your obligation to pay all amounts owed to Franchisor within five (5) days of this Notice.

As a reminder, you are personally bound by and liable for the payment and performance obligations under the Franchise Agreement pursuant to the personal guaranty you executed with Franchisor.

<u>Background</u>

It has come to our attention that you have voluntarily ceased operations and abandoned the Franchised Business.

It has also come to our attention that, prior to the abandonment, you (i) failed to submit when due Gross Revenue reports of your Franchised Business; and (ii) consistently failed to pay when due Continuing License Fees, Advertising Fund Fees, and Technology Innovation Fund Fees owed to Franchisor under the Franchise Agreement, with an estimated sum past due of $3,600 (the "**Total Amount Due**").

As set forth in Section 3.1 of the Franchise Agreement, Franchisee agreed to operate the Franchised Business for a period of ten (10) years.

Pursuant to Section 13.5 of the Franchise Agreement, Franchisee is required to maintain an accurate record of the daily Gross Revenues generated by, at, as a result of, or from the Franchised Business and submit to Franchisor a weekly report of such Gross Revenues on or before Monday of each week for the preceding week.

Pursuant to Sections 6.1 and 6.2 of the Franchise Agreement, Franchisee is required to pay to Franchisor weekly Continuing License Fees equal to a percentage of Franchisee's total combined weekly Gross Revenues. Pursuant to Section 6.3 of the Franchise Agreement, Franchisee is required to pay to Franchisor a weekly Advertising Fund Fee equal to 2% of the Franchisee's weekly Gross Revenues. Additionally, pursuant to Section 6.5 of the Franchise Agreement, Franchisee is required to pay to Franchisor a weekly Technology Innovation Fund Fee in the amount of 0.25% to 1% of Franchisee's weekly Gross Revenues.

Material Defaults of Franchise Agreement

Franchisee's abandonment of the Franchised Business is a material default of Section 3.1 of the Franchise Agreement. Franchisor has the right to terminate the Franchise Agreement for such breach immediately upon notice pursuant to Section 16.5(D).

Additionally, as set forth in Section 16.1(B), Franchisee's failure to timely pay Continuing License Fees and any other monetary obligations and fees due to Franchisor or its affiliates is a material default of Sections 6.1, 6.2, 6.3, and 6.5 of the Franchise Agreement.

Obligations Upon Termination of Franchise Agreement

Franchisee must comply with all post-term obligations under the Franchise Agreement, including without limitation, those set forth in Section 18:

1.      Pay all amounts owed to Franchisor within 5 days of the effective date of termination of the Franchise Agreement, including all past due Continuing License Fees, Advertising Fund Fees, Technology Innovation Fund Fees, Software and Support Fees, amounts owed for purchases from Franchisor, late payments, interest, and the actual and consequential damages, costs, and expenses (including attorneys' fees) incurred by Franchisor as a result of Franchisee's default;

2.      Cease use of the Marks, including altering the appearance of Franchisee's Franchised Business location and automobiles used in the operation of the Franchised Business, and ceasing to hold yourself out, directly or indirectly, as a franchisee of Franchisor;



3.      Cease use of and deliver to Franchisor all Manuals, proprietary information, confidential material, marketing and advertising materials, the required software, videotapes, and any other written materials containing any of Franchisor's trademarks or otherwise relating to a The Maids® Business;

4.      Inform suppliers, in writing, of the termination of Franchise's rights to operate a The Maids® Franchised Business;

5.      Assist Franchisor in the transition of customers' cleaning services to Franchisor or Franchisor's designee, as applicable;

6.      Refund any and all outstanding gift certificates that current, former or prospective customers are in possession of;

7.      Return to customers, Franchisor, or Franchisor's designee (as applicable) all related keys in Franchisee's possession;

8.      Refrain from engaging in any contact with customers or former customers of the Franchised Business, other than with respect to collection of accounts receivable, the transition of customers to Franchisor, and/or return of customer keys to the related customer;

9.      Notify telephone company and telephone directory publishers of the termination of Franchisee's right to use any telephone, facsimile or other numbers and any telephone directory listings associated with the Marks and/or Franchised Business, and authorize the transfer of such numbers and listings to Franchisor; and

10.     Transfer domain name registrations and e-mail addresses to Franchisor or its designee.

        Additionally, as set forth in Section 19.3 of the Franchise Agreement, Franchisee, the holders of all Ownership Interests in the Franchisee entity, and the Personal Guarantor shall not, for a period of 18 months following termination, either directly or indirectly:

- Own, operate, or have any interest in a business that is in any way competitive with or similar to The Maids® Business, which is located within: (i) Franchisee's Designated Market Area; (ii) 20 miles of Franchisee's Designated Market Area; (iii) 20 miles of the territories of any other The Maids® Businesses operated by Franchisor or any of its franchisees; (iv) within any development area granted to any other person or entity by Franchisor; and/or (v) over the Internet;

- Divert or attempt to divert any existing or potential business or customers of Franchisor or any The Maids® Franchisee; or





- Solicit or perform maintenance or cleaning services for any customer for whom or which such services were performed by the Franchisee under The Maids® service marks, trademarks and System during the term of the Franchise Agreement.

This Notice is not intended to be, and should not be construed as, a waiver of Franchisor's rights under the Franchise Agreement or applicable law for this or any other violation, which rights are expressly reserved.

No representative of Franchisor is authorized to withdraw this Notice other than through a written agreement signed by an authorized representative. Due to the serious nature of this matter, I suggest you give it your immediate attention.

Very truly yours,

Calum Middleton
Chief Financial Officer

